UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MARIA T. VULLO, in her official capacity as
Superintendent of the New York State Department
of Financial Services,

                   Plaintiff,

          -- against --

OFFICE OF THE COMPTROLLER OF
THE CURRENCY,

and

JOSEPH M. OTTING, in his official capacity
as U.S. Comptroller of the Currency,

                Defendants.
-------------------------------------------------------------x

Civil Action No. 18-cv-8377

## COMPLAINT FOR DECLARATORY
## <u>AND INJUNCTIVE RELIEF</u>

<u>PRELIMINARY STATEMENT</u>

1.      By this action, plaintiff MARIA T. VULLO ("Plaintiff"), in her official capacity

as Superintendent of the New York State Department of Financial Services ("DFS"), challenges

the decision of the Office of the Comptroller of the Currency ("OCC") made on July 31, 2018, to

immediately begin accepting applications from, and grant special-purpose national bank charters

to, a boundless class of undefined and so-called "financial technology" ("fintech") companies,

including companies that do not accept deposits ("Fintech Charter Decision").   These newly

forged institutions will seek to provide financial services in connection with an unidentified and

sweeping array of commercial ventures never before authorized or regulated by the OCC.

2.      The Fintech Charter Decision is lawless, ill-conceived, and destabilizing of

financial markets that are properly and most effectively regulated by New York State.   It also

puts New York financial consumers – and often the most vulnerable ones – at great risk of exploitation by federally-chartered entities improperly insulated from New York law.  The OCC's reckless folly should be stopped.

3.      Specifically, because the OCC seeks to imbue its special purpose charter with vast preemptive powers over state law, the Fintech Charter Decision creates serious threats to the well-being of New York consumers and businesses alike.  The risks include:

- weakening regulatory controls on usury, payday loans, and other predatory lending practices;

- consolidating multiple non-depository business lines under a single federal charter thus creating even more institutions that are "too big to fail;"

- creating an unlevel and unfair playing field to the detriment of New York's strong community banking system that complies with New York law and serves New York's communities throughout the State; and

- creating competitive advantages for large, well-capitalized "fintech" firms, which can overwhelm smaller market players and thereby stunt rather than foster innovation in financial products and services.

4.      These and other weighty policy flaws make the Fintech Charter Decision unsustainable as a practical matter.  But the OCC's action is legally indefensible because it grossly exceeds the agency's statutory authority.  The argument is self-evident.  The OCC has determined that national "banks" holding fintech charters will not, and cannot, accept deposits. That proviso violates a fundamental premise of federal banking law.  Since 1863, when Congress first enacted the National Bank Act ("NBA") (originally denominated the National Currency Act), the operations of federally chartered banks have been confined solely to the "business of

banking." Yet even the most cursory reading of the NBA's language, history, and purpose reveals that Congress clearly intended the "business of banking" necessarily to include deposit taking. Accordingly, the Fintech Charter Decision does not concern the "business of banking" and is therefore beyond the OCC's jurisdiction to implement.

5.      Moreover, the lack of congressional authorization for the Fintech Charter Decision indisputably deprives preemptive effect to the OCC's actions. There is no quarrel that *only* the clearly expressed "purpose of Congress" decides whether federal law displaces state law. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). "In all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks and citations omitted). Here, the congressional silence as to whether the NBA preempts the states' time-honored regulation of non-depository financial service companies is deafening.

6.      Still, the OCC has tried to justify the Fintech Charter Decision as an important means of supporting "responsible innovation in the federal banking system." (*See infra* ¶ 40, Exhibit L at 2). Similarly, in issuing the Fintech Charter Decision, the current Comptroller of the Currency, Joseph M. Otting, has extolled the purported benefits of the Fintech Charter Decision as providing "more choices to consumers and businesses, and creat[ing] greater opportunity for companies that want to provide banking services in America." (*See infra* ¶ 39, Exhibit Kat 1). But even if these claims had merit, which they do not, they could not validate the OCC's action. "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that

Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal quotation marks omitted).

7.       Nor is this the first time that the OCC has exceeded its statutory authority by impermissibly redefining the "business of banking."  Indeed, federal courts have already twice struck down the agency's administrative efforts to authorize national banks that do not accept deposits.  *See Independent Bankers Ass'n of America v. Conover*, 84-1403-CIV-J-12, 1985 U.S. Dist. LEXIS 22529 at *32, Fed. Banking L. Rep. (CCH) P86, 178 (M.D. Fla. Feb. 15, 1985); *Nat'l State Bank v. Smith,* No. 76-1479 (D. N.J. Sept. 16, 1977), *rev'd on other grounds*, 591 F.2d 223 (3d Cir. 1979).

8.       In the same way, federal courts have repeatedly checked the OCC's unlawful efforts to authorize national banks to sell insurance products in derogation of the NBA's limitations on the "business of banking."  *See, e.g., Independent Insurance Agents of America, Inc. v. Hawke*, 211 F.3d 638 (D.C. Cir. 2000) (crop insurance); *American Land Title Ass'n v. Clarke*, 968 F.2d 150 (2d Cir. 1992) (title insurance); *Saxon v. Georgia Ass'n of Independent Insurance Agents*, 399 F.2d 1010 (5th Cir. 1968) (automobile, home, casualty, and liability insurance).  The OCC has even tried unsuccessfully to authorize a national bank to operate a travel agency under the NBA, only to be judicially halted.  *See Arnold Tours, Inc. v. Camp*, 472 F.2d 427 (1st Cir. 1972).

9.       The need for the Fintech Charter Decision to meet the identical fate is even more compelling because of the unavoidable and drastic consequences that it will have for New York State, its residents, and its businesses.

10.      New York is a global financial center and, as a result, DFS is effectively a global financial regulator.  In addition to the 229 state and international banks licensed by New York,

with assets of approximately $2.5 **trillion**, DFS also supervises approximately 600 non-bank financial services firms, with assets of approximately $1 trillion.   These non-depository institutions include licensed lenders, real estate lenders, mortgage servicers, sales and premium finance companies, pre-paid card issuers, money transmitters, virtual currency businesses, check cashers, and budget planners.  DFS also regulates approximately 1400 insurance companies operating within New York.  In all DFS supervises approximately $7 trillion in total assets of entities across banking, insurance, and other financial services.

11.     Such companies provide the financial infrastructure for much of the daily life of New York residents and businesses, and New York law has expertly regulated the integrity of those markets.  But under the Fintech Charter Decision, many of those same companies could become federally-chartered "banks," purportedly immune through federal preemption rules from New York's heighted financial safety and soundness controls (such as strict capital standards, liquidity requirements, surety bond obligations, and industry-wide insurance fund commitments) as well as the state's strong consumer protection laws (such as tough anti-usury laws, interest-rate caps, and prohibitions on pay-day lending schemes).

12.     Recent history graphically illustrates how excessive federal preemption of state law governing mortgage lenders and servicers was a root cause of the global financial collapse. The Fintech Charter Decision presents many similar perils.  It gives unscrupulous financial firms another way to skirt local oversight by the states in which they do business and impact consumers.  There has been a dramatic rise in small dollar loans to consumers at high interest rates, which loans are then securituzed and sold. Permitting lenders engaged in such conduct to evade state regulation and laws creates great risk similar to what was seen in the 2008 financial crisis.

13.     Thus, even if it were legal – which it clearly is not – the OCC's plan to charter special purpose, non-depository institutions is simply not worth the risk.   In short, financial centers like New York, which have developed comprehensive and well-functioning regulatory bodies, should not needlessly bear the harmful brunt of an overreaching federal agency.

### JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 701 *et seq.* (Administrative Procedure Act), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

### PARTIES

16.     Plaintiff is the Superintendent of DFS.  DFS is the New York governmental agency statutorily charged with the "enforcement of the [state's] insurance, banking and financial services laws."  N.Y. Fin. Serv. L § 102.  In forming DFS in 2011, the legislature declared that one of the purposes for consolidating the departments of insurance and banking was "to provide for the effective and efficient enforcement of the banking and insurance laws."  N.Y. Fin. Serv. L § 102(c).   DFS is headquartered at One State Street Plaza, New York, NY 10004.

17.  As the Superintendent of DFS, Plaintiff is responsible for supervising "the business of, and the persons providing, financial products and services, including any persons subject to the provisions of the insurance law and the banking law." N.Y.  Fin. Serv. L. § 201(a).  In carrying out this supervisory function, the legislature directed the Superintendent to "take such actions as the superintendent believes necessary to: … (2) ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services; … (4) protect

users of financial products and services from financially impaired or insolvent providers of such services." N.Y. Fin. Serv. L. § 201(b).

18.   Plaintiff possesses "the rights, powers, and duties in connection with financial services and protection in this state, expressed or reasonably implied by [the financial services law] or any other applicable law of this state." N.Y. Fin. Serv. L. § 202(a). Plaintiff has broad authority under the Financial Services Law, the Banking Law, and the Insurance Law to enforce the laws of the state including the power to take "such actions as the superintendent deems necessary to educate and protect users of financial products and services." N.Y. Fin. Serv. L. § 301(c)(1).

19.   Defendant Office of the Comptroller of the Currency is a bureau of the United States Department of the Treasury and functions as the primary supervisor of federally chartered national banks. Its offices are located at 400 7th Street S.W., Washington, DC 20219.

20.   Defendant JOSEPH M. OTTING is the current United States Comptroller of the Currency. Mr. Otting was nominated by President Trump for this office on June 5, 2017, and was confirmed by the United States Senate on November 27, 2017. Prior to the appointment of Mr. Otting, Kenneth Noreika, was the Acting Comptroller of the Currency. Thomas J. Curry, who served in the position from April 9, 2012 until May 5, 2017, was the last individual before Mr. Otting to be confirmed by the United States Senate to serve as the Comptroller of the Currency. The OCC is a bureau within the United States Treasury Department that "is charged with assuring the safety and soundness of, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers by, the institutions and other persons subject to its jurisdiction." 12 U.S.C. § 101(a). As Comptroller, Defendant JOSEPH M. OTTING is the "chief officer" of the OCC. 12 U.S.C. § 101(b)(1).

## STATUTORY AND REGULATORY FRAMEWORK

21.     In relevant part, Chapter 12, section 24 of the United States Code enables the OCC to charter national banking associations by granting them "all such incidental powers as shall be necessary to carry on the *business of banking*; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . ."  12 U.S.C. § 24 (Seventh) (emphasis added).

22.     The "Business of Banking" Clause in § 24 (Seventh) ("BOB Clause") has been an anchor provision of the NBA since that statute was first enacted in 1863.   It is long-settled that the historical phrase "business of banking" and its essential meaning define the scope of financial activities in which a national bank charted by the OCC may or must engage.  From the earliest days of the NBA, banks were understood to be "of three kinds, to wit: 1, of deposit; 2, of discount; 3, of circulation."  *Bank of Savings v. Field*, 70 U.S. 495, 512 (1865).  The Supreme Court emphasized that it "is an important part of the business of banking to receive deposits." *Bank of the Republic v. Millard*, 77 U.S. 152, 155 (1869).  Indeed, the Court noted that, "[s]trictly speaking the term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution," underscoring that "[o]riginally the business of banking consisted only in receiving deposits."  *Oulton v. Savings Institution*, 84 U.S. 109, 118 (1877).

23.     The NBA's language, history, structure, judicial construction, and relationship to other key federal banking statutes make plain that – at a minimum – the BOB Clause requires that OCC-chartered banks receive deposits.  In short, "the National Bank Act authorizes national banks to receive deposits without qualification or limitation."  *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 376 (1954).

24.     The OCC has promulgated regulations for the organization of national banks. *See* 12 C.F.R. § 5.20.  In 2003, the OCC amended its regulations to create, *for the first time in nearly 140 years*, a new category of nationally chartered institutions described as "special purpose" banks.  *See* 68 Fed. Reg. 70122-01 (Dec. 17, 2003).  To date, the OCC has never applied this rule to non-depository institutions now subject to the OCC Fintech Decision.  According to the amended rule, an OCC-chartered firm could "be a special purpose bank that limits its activities to fiduciary activities *or to any other activities within the business of banking*."  12 C.F.R. § 5.20(e)(1)(i) (emphasis added).  The amended regulation further provides that a "special purpose bank that conducts activities other than fiduciary activities must conduct *at least one* of the following core banking functions:  Receiving deposits, paying checks, *or* lending money."  *Id.* (emphasis added).

25.     Under the OCC's Fintech Charter Decision, the OCC now seeks to utilize 12 C.F.R. § 5.20(e) – in stark violation of the BOB Clause and the clear intent of Congress – *to empower itself* to charter non-depository institutions.  If validated by the courts, this agency sleight-of-hand, practiced on the barest of administrative records, *see* 68 FR 70122-01 (Dec. 17, 2003), plus a "whitepaper" and a manual (discussed below), would upend almost one and a half centuries of established federal banking law and displace a nation of 50 state financial regulators that annually supervise hundreds of billions of dollars in non-bank transactions.  There is absolutely no evidence that Congress ever intended, much less expressly authorized, any such seismic shift in the allocation of established regulatory responsibility.  For over 150 years, there has been dual authority, split between the federal and state governments, but the business of non-depository, non-bank institutions has been entirely regulated by the states.

26.     In fact, before the Fintech Charter Decision, the OCC had never sought to charter a "special purpose bank" under the authority of 12 C.F.R. § 5.20(e).  The OCC's fourteen-year reluctance has been warranted.  "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts] typically greet its announcement with a measure of skepticism."  *Utility Air Regulatory Group v. E.P.A.,* 134 S. Ct. 2427, 2444 (2014) (internal quotation marks and citations omitted).

27.     That "measure of skepticism" should grow exponentially when any such new-found power also claims to preempt states from regulating financial actors over which they have previously exercised 150 years of nearly exclusive jurisdiction.

<u>THE OCC's CONSIDERATION OF FINTECH CHARTERS</u>

28.     Although the Fintech Charter Decision was issued on July 31, 2018, its origins date back to March 2016, when the OCC published a white paper entitled, *Supporting Responsible Innovation in the Federal Banking System:  An OCC Perspective.* (available at https://www.occ.gov/publications/ publications-by-type/other-publications-reports/pub-responsible-innovation-banking -system-occ-perspective.pdf) (annexed hereto as Exhibit A). The publication identifies the impact of fast-paced developments in financial services technology as a much needed subject of regulatory inquiry.

29.     Six months later, the OCC first publicly stated that it was "considering whether a special-purpose charter could be an entity for the delivery of banking services in new ways." Proposed Rulemaking, *Receiverships for Uninsured National Banks*, 81 Fed. Reg. 62,835, 62,837 (Sept. 13, 2016).

30.     Soon thereafter, in December 2016, the OCC published another white paper, this one entitled, *Exploring Special Purpose National Bank Charters for Fintech Companies*

("Fintech White Paper") (available at https://www.occ.gov/topics/bank-operations/innovation/comments/special-purpose-national-bank-charters-for-fintech.pdf) (annexed hereto as Exhibit B).  The Fintech White Paper asks "whether it would be appropriate for the OCC to consider granting a special purpose national bank charter to a fintech company" and concludes that "it may be in the public interest to do so."  Fintech White Paper at 2.  The agency expressly roots its sole authority for chartering a fintech company in 12 C.F.R. § 5.20(e), *see id.* at 3 & n. 4, and insists that such institutions would be immune to state law and visitorial authority "in the same way and to the same extent" as "a full-service national bank," Fintech White Paper at 5.

31.     The OCC received numerous comments to the Fintech White Paper strongly opposing the agency's fintech charter proposal.  Just a few of the officials and institutions that objected to the Fintech White Paper include:

- The New York State Department of Financial Services (a true and correct copy of the letter from the Hon. Maria T. Vullo to the Hon. Thomas J. Curry, dated January 17, 2017, is annexed hereto as Exhibit C);

- The Conference of State Banking Supervisors (a true and correct copy of the letter from John W. Ryan, Esq. to the Hon. Thomas J. Curry, dated January 13, 2017, is annexed hereto as Exhibit D);

- The Independent Community Bankers of America (a true and correct copy of the letter from Christopher Cole, Esq. and James Kendrick to the Hon. Thomas J. Curry, dated January 17, 2017, is annexed hereto as Exhibit E);

- U.S. Senators Sherrod Brown (Ranking Member, Senate Committee on Banking, Housing, and Urban Affairs) and Jeffrey A. Merkley (a true and correct copy of

the letter from the Hon. Sherrod Brown and the Hon. Jeffrey A. Merkley to the

Hon. Thomas J. Curry, dated January 9, 2017, is annexed hereto as Exhibit F);

and

- The Illinois Department of Financial and Professional Regulation (a true and
  correct copy of the letter from the Hon. Bryan A. Schneider to the Hon. Thomas J.
  Curry, dated January 17, 2017, is annexed hereto as Exhibit G).

32.     These objections collectively set forth, in great detail, numerous regulatory gaps,

threats to consumer protection, and risks to the safety and soundness of the financial services

industry created by the OCC's fintech charter proposal.  Moreover, each one of these objections

specifically challenged the OCC's statutory authority to grant a fintech charter.   As summarized

by Senators Brown and Merkley:

> Because many of these [fintech] firms do not intend to accept deposits, it is far
> from clear whether the OCC has the authority to grant national bank charters to
> them.  Congress has given the OCC a very narrowly-defined authority to charter
> only three special-purpose national banks (bankers' banks, credit card banks, and
> trust banks) that do not accept deposits. . . . An alternatively chartered firm that
> does not take deposits by offering transactions or savings accounts, and therefore
> does not encourage the fundamental banking act of building wealth by
> encouraging savings, should not be able to refer to itself as a "bank."

Exhibit F at 2-3.

33.     The Independent Community Bankers of America ("ICBA") – a nationwide

association of nearly 6000 state and *federally* chartered banks of all sizes – echoed these

concerns:

> ICBA does not believe that the OCC has the necessary authority for establishing a
> special purpose national bank charter that engages exclusively in non-depository
> core banking functions. . . . [T]here is no explicit authority under the National
> Bank Act to charter a fintech company as a special purpose bank. . . . Congress
> needs to consider all the policy implications of a fintech charter, including the
> scope of such a charter and how the business of banking should be defined under
> federal law.

Exhibit E at 2. In response to the OCC's July 2018 announcement that it is proceeding with the

Fintech Charter Decision, ICBA stated:

> ICBA remains concerned that instituting a special-purpose national bank charter
> for fintech firms would create an unlevel regulatory playing field.  The Office of
> the Comptroller of the Currency should procure explicit statutory authority from
> Congress before it issues fintech charters.

Independent Community Bankers of America, Press Release *ICBA Statement on Treasury, OCC*

*Regulatory Announcements* (Aug. 1, 2018) *available at* https://www.icba.org/news/press-

releases/2018/08/01/icba-statement-on-treasury-occ-regulatory-announcements.

34.     In March 2017, while the OCC was still under the direction of Comptroller

Thomas J. Curry, the OCC responded to the comments that it received on the Fintech White

Paper.  *See OCC Summary of Comments and Explanatory Statement:  Special Purpose National*

*Bank Charters for Fintech Companies* ("Summary of Comments") (available at

www.occ.treas.gov/topics/bank-operations/innovation/summary-explanatory-statement-fintech-

charters.pdf) (annexed hereto as Exhibit H).

35.     The Summary of Comments did not address many of the objections raised to the

OCC fintech charter.  The Summary states the agency's position that:  (1) it would be in the

public interest for the OCC to grant fintech charters; (2) that entities granted such charters would

not take deposits; and (3) 12 C.F.R. § 5.20(e), on its own, gave the OCC the necessary chartering

authority.  *See* Summary of Comments at 2, 3, 14-15.

36.     On March 15, 2017, the agency issued a draft supplement to the Comptroller's

Licensing Manual, entitled *Evaluating Charter Applications from Financial Technology*

*Companies* ("Draft Manual Supplement") (available at

http://www.occ.treas.gov/publications/publictions-by-type/;icensing-manuals/file-pub-lm-fintech-licensing-manual-supplement.pdf.) (annexed hereto as Exhibit I.)

37.   On April 14, 2017, DFS sent an additional letter to the prior OCC Comptroller further opposing the publication of the Draft Manual Supplement and the OCC's issuance of a special purpose national bank charter to non-depository institutions (a true and correct copy of the letter from the Hon. Maria T. Vullo to the Hon. Thomas J. Curry, dated April 14, 2017, is annexed hereto as Exhibit J).

38.   Between March 15, 2017 and July 31, 2018, the OCC was allegedly evaluating whether non-depository fintech companies – *i.e*., those companies engaged in only paying checks and/or lending money but not taking deposits – should be chartered by the OCC as special purpose national banks.  According to the OCC, a final decision was not made until July 31, 2018.

39.   On July 31, 2018, the OCC announced the Fintech Charter Decision in a Press Release titled "OCC Begins Accepting National Bank Charter Applications from Financial Technology Companies" (a true and correct copy of the OCC's July 31, 2018 Press Release is annexed hereto as Exhibit K).   According to the July 31 Press Release, the OCC "today announced it will begin accepting applications for national bank charters from nondepository financial technology (fintech) companies engaged in the business of banking."  Id.  Lest there was any prior doubt, there now is no doubt that the OCC's July 31, 2018 announcement constitute's the agency's final decision to proceed with the unlawful Fintech Charter.

40.   In addition to the Press Release, the OCC also published on July 31, 2018, a "Policy Statement on Financial Technology Companies' Eligibility to Apply for National Bank Charters" ("OCC Fintech Policy Statement") and the "Comptroller's Licensing Manual Supplement:

Considering Charter Applications from Financial Technology Companies" ("Final Manual

Supplement") that implemented the Fintech Charter Decision.  (A true and correct copy of the

OCC Fintech Policy Statement is annexed hereto as Exhibit L and a true and correct copy of the

Final Manual Supplement is annexed hereto as Exhibit M.)

    41.  The OCC Fintech Policy Statement states that the OCC will immediately accept

applications from a broad range of Fintech businesses including those that do not accept

deposits: "It is the policy of the Office of the Comptroller of the Currency (OCC) to consider

applications for national bank charters from companies conducting the business of banking,

provided they meet the requirements and standards for obtaining a charter.  This policy includes

considering applications for special purpose national bank charters from financial technology

(fintech) companies that are engaged in the business of banking <u>but do not take deposits</u>."  Ex. L

at 1 (emphasis added).

    42. The focal point of the Fintech Charter Decision is on the federal licensure -- and

concomitant but unprecedented state law preemption -- for <u>non-depository</u> fintech companies

that seek licensure as a "special purpose national bank."   Indeed, the entire Final Manual

Supplement is devoted to providing the OCC's rules for "consideration of applications from

fintech companies to charter a special purpose national bank that would engage in one or more of

the core banking activities of paying checks or lending money, but would not take deposits and

would not be insured by the Federal Deposit Insurance Corporation."  Ex M at 2.   After the

Fintech Charter Decision was issued, the OCC immediately invited interested parties including

Fintech startup companies to come to the OCC's office in New York to discuss, among other

items, the new special purpose national bank charter.

### THE FINTECH CHARTER DECISION WILL SEVERELY UNDERMINE
### NEW YORK'S ABILITY TO PROTECT ITS FINANCIAL MARKETS AND CONSUMERS

43.     The economic fallout in New York from the Fintech Charter Decision will be destructive.  Because the OCC has set the bar for fintech-charter eligibility so low, *i.e.,* firms that are merely "engaged in paying checks or lending money," Manual Supplement at 5, the full scope of regulatory disruption is difficult to ascertain.  Most non-depository financial service firms that are presently subject to New York regulatory oversight and state-law enforcement proceedings are, however, in some form, "engaged in paying checks or lending money."  *Id.* And because the OCC maintains that "[s]tate law applies to a special purpose national bank in the same way and to the same extent as it applies to a full-service national bank," Fintech White Paper at 5, federal preemption claims will surely proliferate among fintech charter-holders in response to New York misconduct charges.

44.     Nevertheless, two examples of concrete harm to New York's financial market stability and consumer protection controls – which are directly attributable to the Fintech Charter decision – are readily identifiable.  To start, as regulated by Plaintiff, New York law imposes bonding requirements, liquidity and capitalization standards, and payment obligations to the New York State Transmission of Money Insurance Fund upon state-licensed money transmitters in order to protect consumers against loss in the event that such an institution fails.

45.     Under the Fintech Charter Decision, New York-licensed money transmitters using technologically innovative operating platforms could qualify for an OCC special purpose charter and thereby escape New York's regulatory requirements.  Yet, "a fintech company with a special purpose national charter that does not take deposits . . . is not insured by the Federal Deposit Insurance Corporation."  Fintech White Paper at 2.  The Fintech Charter Decision therefore strips customers of non-depository money transmitters of critical financial protections otherwise

guaranteed by New York law.  This result is especially troubling when you consider that a disproportionate number of consumers who use money transmitters are the most economically vulnerable.

46.    Similarly, the Fintech Charter Decision effectively negates New York's strict interest-rate caps and anti-usury laws.  Federal law provides that a bank chartered under the NBA "may take, receive, reserve, and charge on any loan . . . or other evidence of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located."  12 U.S.C. § 85.  Consequently, under the Fintech Charter decision, marketplace lenders that use the Internet can now gouge New York borrowers by receiving an OCC special purpose charter and locating in any number of other states that authorize interest rates considered usurious in New York.  *See* Exhibit C at 5 ("Giving federal bank charters to online lenders would create a race to the bottom where online lenders could set up shop in a state with lax consumer protection rules and flood more consumer protective states with dangerous, high interest loans.").

47.    This perverse regulatory outcome – which Congress plainly did not authorize – could realistically lead in New York to the proliferation of prohibited payday lending by out-of-state OCC chartered entities seeking to import their usurious trade into the state to exploit financially vulnerable consumers.   These platforms charge exorbitant interest rates that trap consumers in a cycle of high-interest borrowing that they can never repay, leading to the sort of economic and social devastation like that seen in the recent foreclosure crisis.

48.    In New York, payday and other high-interest, small-dollar lending is illegal under both state civil and criminal usury statutes.  New York has aggressively enforced the state's usury laws to stop predatory loans in the state.  Some lenders have attempted to skirt New York's prohibition on payday lending by offering usurious loans to New Yorkers over the internet, often

by affiliation with federally chartered or federally recognized institutions.  New York's usury laws apply to online payday lenders when those loans are offered or made in New York. Moreover, the courts have agreed with the DFS position when payday lenders have attempted to stop DFS from taking any action to protect New York consumers from payday lenders.  DFS has led in successfully fighting these practices through effective regulation and should not be forced by the Fintech Charter Decision to capitulate now.

49.     The Fintech Charter Decision would exempt its new fintech chartered entities from existing federal standards of safety and soundness, liquidity and capitalization.  New York has for years regulated non-depository institutions including those using financial technology and has clear laws addressing their safety and soundness.  DFS has dedicated staff that specializes in licensing, supervising and examining non-depository institutions.  These specialized examiners have extensive experience examining the unique compliance challenges presented by these institutions and have the tools needed to supervise these entities, including training and examination protocols that are tailored to non-depository institutions.  DFS has been examining and supervising these entities for decades and has brought enforcement actions against those that have Bank Secrecy Act and Anti-Money Laundering ("BSA-AML") deficiencies.  DFS has also issued transaction monitoring regulations that apply to its nonbank regulated entities that establish specific regulatory requirements for their BSA-AML programs.

50.     Finally, the OCC's actions will also injure DFS in a directly quantifiable way. Pursuant to statute, DFS operating expenses are funded by assessments levied by the agency upon New York State licensed financial institutions.  *See, e.g.,* N.Y. Fin. Serv. L § 206(a) ("Persons regulated under the banking law shall be assessed by the superintendent for the operating expenses of the department that are solely attributable to regulating persons under the

banking law in such proportions as the superintendent shall deem just and reasonable.").  For example, as of December 31, 2016, $13.5 million of DFS annual assessments for 2016-17 were collected from New York State licensed financial services firms, such as money transmitters and check cashers.  For that same period, $13.1 million of DFS annual assessments were collected from New York State licensed mortgage banks and servicers.  Other DFS-licensed non-depository institutions are similarly assessed.

51.     The negative fiscal implications of the Fintech Charter Decision for DFS are thus immediately obvious.  Every non-depository financial firm that receives an OCC special purpose charter in place of a New York license to operate in the state deprives DFS of crucial resources that are necessary to fund the agency's regulatory function.   Regardless of intent, the OCC's actions pose an insidious threat to the health of New York's regulatory environment that seeks to protect New York's markets and consumers.

<u>DFS's PRIOR RELATED CIVIL ACTION AGAINST THE OCC</u>

52.     On May 12, 2017, Plaintiff Maria T. Vullo commenced a similar action in this Court against the OCC and then Acting Comptroller Noreika.  See *Vullo v. Office of the Comptroller of the Currency et al*., Case No. 17-cv-3574-NRB (S.D.N.Y.).  This related case was assigned to the Honorable Naomi Reice Buchwald, United States District Judge, and, like the present action, also sought a declaratory judgment that the OCC's issuance of a license to a non-depository "fintech" company was illegal under the National Bank Act, and an injunction preventing the OCC and then acting Comptroller Noreika from issuing a special purpose charter pursuant to 12 C.F.R. § 5.20(e)(1).

53.    On August 18, 2017, the Defendants OCC and Acting Comptroller filed a motion to dismiss on ripeness and other grounds.  At the oral argument on the motion to dismiss held on

November 29, 2017, counsel for Defendants OCC and Acting Comptroller admitted that

litigation over the validity of the OCC's Fintech Charter actions would become ripe at the

moment that the OCC decided to go ahead and accept charter applications:

> THE COURT: I don't see any point in going through
> this a second round. At some point we ought to get clarity.
> Maybe [the OCC's] arguments are good now, but at some point they are
> going to evaporate. I mean, they have to evaporate at some
> point, if you decide to go ahead. If you never go ahead, they
> are happy, I'm happy; I don't know how you feel, but in any
> event, we are done. ***But if the comptroller says, we have
> decided to go ahead and we will accept applications, would that
> not be the perfect time to decide the merits*** before the fintech
> companies spend all of the money, time and effort to put in
> applications? They may decide to go ahead, but at least at
> that moment they are on notice that it's possible that a court
> is going to say you have just wasted your time.
>
> MR. CONNOLLY: ***Correct***.

Transcript of November 29, 2017 Oral Argument, Case No. 1.17-cv-03574-NRB, Docket Entry

No. 27 at 12:7 - 20, annexed hereto as Exhibit N (emphasis supplied).

54.  On December 12, 2017, the Court granted the Defendant's motion only to the extent

that it determined that the prior action was not yet ripe, and thus determined that it lacked

jurisdiction and declined to rule on the motion's other grounds.  The prior related case was then

dismissed without prejudice.  Mem. and Order, Case No. 1.17-cv-03574-NRB, Docket Entry No.

30 at 26-27 (Dec. 12, 2017).

## CLAIMS FOR RELIEF

### COUNT I

### THE FINTECH CHARTER DECISION EXCEEDS
### THE OCC'S AUTHORITY UNDER THE NBA

55.     Plaintiff repeats and re-alleges paragraphs 1-54 of the complaint as if fully set forth here.

56.     The NBA empowers the OCC to charter national banks that engage in the "business of banking," which at a minimum requires taking deposits unless Congress has expressly authorized otherwise.

57.     The Fintech Charter Decision purports to authorize the establishment of special purpose, non-depository banks for which there is no express congressional authorization.

58.     The Fintech Charter Decision therefore exceeds the OCC's statutory authority, and the Court should declare it unlawful, set it aside, and enjoin Defendants from taking any further actions to implement its provisions.

### COUNT II

### 12 C.F.R. § 5.20(e)(1) IS NULL AND VOID BECAUSE
### IT EXCEEDS THE OCC'S AUTHORITY UNDER THE NBA

59.     Plaintiff repeats and re-alleges paragraphs 1-58 of the complaint as if fully set forth here.

60.     In promulgating 12 C.F.R. § 5.20(e)(1), the OCC improperly defined the "business of banking" to include non-depository institutions.

61.     The definition included in 12 C.F.R. § 5.20(e)(1) lacks any express congressional authorization.

62.     The OCC therefore exceeded its statutory authority in approving the rule, and the Court should declare 12 C.F.R. § 5.20(e)(1) unlawful, set it aside, and enjoin Defendants from taking any further actions to implement its provisions.

COUNT III

THE FINTECH CHARTER DECISION VIOLATES
THE TENTH AMENDMENT TO THE U.S. CONSITUTION

63.     Plaintiff repeats and re-alleges paragraphs 1-62 of the complaint as if fully set forth here.

64.     The Tenth Amendment to the U.S. Constitution provides that each state retains those sovereign powers not expressly delegated under the U.S. Constitution to the federal government.   The police power to regulate financial services and products delivered within a state's own geographical jurisdiction is among a state's most fundamental sovereign powers.

65.     Federal law preempts state law under the Supremacy Clause of the U.S. Constitution, provided only that Congress has clearly expressed its intent to do so.

66.     The Fintech Charter Decision conflicts with state law insofar as it claims to insulate OCC-chartered non-depository institutions from state regulation.

67.     Because Congress did not authorize the OCC to charter fintech companies that provide non-depository financial services, it did not intend to preempt state regulation of such entities.

68.     Accordingly, the Fintech Charter Decision violates the U.S. Constitution and the Court should declare it null and void.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for a judgment and order:

69.     Declaring that the Fintech Charter Decision exceeds the OCC's statutory authority under the NBA because it creates federal special-purpose charters for non-depository financial service providers.

70.     Declaring 12 C.F.R. § 5.20(e)(1) null and void because its promulgation exceeded the OCC's statutory authority under the NBA.

71.     Declaring the Fintech Charter Decision null and void because it violates the Tenth Amendment of the U.S. Constitution.

72.     Permanently enjoining Defendants from implementing the Fintech Charter Decision and issuing any other special purpose charter pursuant to 12 C.F.R. § 5.20(e)(1).

73.     Awarding such other and further relief as the Court deems just and proper.


Date:   September 14, 2018                    Respectfully submitted,

/s/ Matthew L. Levine
Matthew L. Levine (ML-6247)
Executive Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street Plaza
Executive Division, 19th Floor
New York, NY  10004-1511
Office:  212-709-5461
Fax:  212-709-3520
Matthew.levine@dfs.ny.gov

Attorney for Plaintiff

23