Exhibit C

January 17, 2017

The Honorable Thomas J. Curry
Comptroller
Office of the Comptroller of the Currency
400 7th Street SW
Mail Stop 9W-11
Washington, DC 20219

Re: *Exploring Special Purpose National Bank Charters for Fintech Companies*

Dear Comptroller Curry,

The New York State Department of Financial Services ("NY DFS") opposes the Office of the Comptroller of the Currency ("OCC")'s proposal to create a new national bank charter for any entity deemed by the OCC to fit within the amorphous category of "fintech" – an exceedingly broad and undefined term – as suggested in its publication of *Exploring Special Purpose National Bank Charters for Fintech Companies* ("Whitepaper"). Technology is not new to financial services and thus using the term "fintech" to potentially sweep all nonbank financial services companies not authorized by the National Bank Act into a new regulatory regime is highly problematic. The Whitepaper does not discuss, or even mention, the existing state regulatory regime covering these areas or identify any deficiency in this regime that needs to be filled. The imposition of an entirely new federal regulatory scheme on an already fully functional and deeply rooted state regulatory landscape will invite serious risk of regulatory confusion and uncertainty, stifle small business innovation, create institutions that are too big to fail, imperil crucially important state-based consumer protection laws and increase the risks presented by nonbank entities.

## 1. States Already Regulate Nonbank Financial Services Companies

NY DFS was created in 2011 as part of the merger of the New York State Banking and Insurance Departments, and is therefore the successor to the New York State Banking Department, which was created by the New York state legislature on April 15, 1851. In addition to 166 years of regulating traditional banking entities, NY DFS has been regulating nonbank financial services entities for over half a century. Our extensive experience includes the design and oversight of regulation carefully developed and tailored to address the specific risks presented by the types of institutions and activities ostensibly included within the OCC definition of "fintech." NY DFS currently licenses and supervises over 2,000 banking and nonbanking institutions, a significant number of which are nonbanking financial entities. NY DFS's current supervision includes banking and nonbanking entities that use technology as a core part of their business to lend or

transfer money, including money transmitters, licensed lenders, sales finance companies, premium finance agencies, mortgage banks and bankers and virtual currency exchanges.[1]

NY DFS supervises and examines each of these entities individually and deploys staff who are experts in these types of business activities, and can respond quickly to innovation. Indeed, NY DFS has a long record of being responsive to technological advancements including promulgation of a virtual currency licensing regime and, a first in the nation cybersecurity regulation. NY DFS opposes the OCC proposal to the extent it seeks to impact state regulatory authority in any way.

## 2. The Whitepaper Creates Regulatory Uncertainty

NY DFS disputes the OCC's claim that it has the authority under the National Bank Act for this proposed new charter. Nonbank financial institutions are not national banks nor are they similar to the entities encompassed by the National Bank Act. But even if the OCC had jurisdiction, a new charter would not be needed because there are already effective state regulators in place. The Whitepaper threatens to create an entirely new federal regulatory program, creating serious regulatory uncertainty that threatens to invade state authority and sovereignty. The regulatory uncertainty stems from many factors.

First, the Whitepaper creates significant uncertainty regarding the types of entities that could potentially apply for this new "special purpose charter" because it focuses on technology rather than types of financial services. Financial regulation cannot be based on technology – which is ever evolving and not confined to one-size-fits-all regulated entities. The type of regulation that may be appropriate instead depends on the activities that the companies undertake. Money transmitters and check cashers should not be subject to the same rules just because they both solicit new customers over the internet. Rather, the carefully tailored licensing regimes developed by states for these types of institutions address relevant differences on an ongoing basis. Attempting to impose more regulations on these different types of entities risks significant disruption of the existing regulatory regime and will endanger effective prudential oversight.

Second, the Whitepaper proposal threatens regulatory certainty because the OCC does not have clear authority to create a new technology based charter. To propose disrupting an existing regulatory scheme without clear and concrete legislative authorization would risk significant disruption to the regulatory oversight of financial institutions and tread on state sovereignty. Moreover, history has shown that charter changes from state to federal can be followed by serious regulatory omissions, as was demonstrated when HSBC switched from a NY state charter to a

---

[1] The OCC asks "Are there particular products or services offered by fintech companies, such as digital currencies, that may require different approaches to supervision to mitigate risk for both the institution and the broader financial system?" This question only reinforces that it is state regulators that have the deep experience in this area. Each of the types of financial services has different features and risks, and requires separate laws, regulations and supervisory protocols to address the particular area, as NY law provides. "Fintech" is not a one-size-fits-all category for regulatory or legal purposes.

national charter.[2]  Further disruption could be created if the OCC's authority is questioned or limited by either legislative or judicial action.

Third, the Whitepaper creates uncertainty because it would create a class of institutions for which the scope and applicable law is unclear.  The Whitepaper raises the possibility that these OCC special purpose chartered technology companies may become member banks under the Federal Reserve, may be required to get FDIC insurance, and "may be subject to oversight by the Consumer Finance Protection Bureau." [Whitepaper at p.7]  While the OCC states that it will coordinate among regulators, it does not confirm precisely what laws would apply or clarify how these laws that were designed for banks would apply to nonbank financial services companies.[3]

Fourth, the regulatory uncertainty could be compounded by myriad proposals to revamp the regulatory landscape in Washington, including proposals to repeal Dodd-Frank and other banking regulations, and to reshape the OCC.  It is particularly problematic during this time of regulatory uncertainty to propose an unnecessary disruption of existing state regulation by creating a wholly new, federal regulatory program applicable to companies that have never been subject to federal regulation before and which potentially could evade the established and effective system of state regulation.  Simply put, if at all, now is not the time to create yet another regulatory regime that would uproot existing regulation that is working and create market uncertainty and disruption.

---

[2] HSBC Bank US was chartered by NY DFS until June 2004 when it became regulated by the OCC.  At the time of the charter switch, HSBC was under a Written Agreement with NY DFS and the Federal Reserve due to shortcomings in its BSA/AML program.  HSBC's conversion to a federal charter terminated NY DFS's oversight of the enforcement action and, despite OCC examiners issuing supervisory letters detailing 30 BSA-related Matters Requiring Attention over a 12-month period, the OCC terminated the Written Agreement in 2006.  The Senate Permanent Subcommittee on Investigations looked into HSBC's BSA related failures and the OCC's regulatory supervision and found that "OCC's failure to compel HBUS to remedy the AML deficiencies repeatedly identified by its examiners over a six-year period indicates that systemic weaknesses in the OCC's AML oversight model require correction."  The Committee's report concluded that to "fulfill its AML obligations, the OCC needs to strengthen its AML oversight and revamp its AML supervisory and enforcement approach."  In December 2012, the U.S. Department of Justice ("DOJ") entered into a deferred prosecution agreement with the bank and its UK parent for serious and significant sanctions and BSA violations. In short, the switch in regulators did not enhance supervision of HSBC's faulty compliance program or encourage remediation of the flaws that NY DFS had identified.

[3] The following are among the questions raised by wedging divergent sets of businesses under the federal banking law:  Would fintech non-bank banks be eligible to access the Fed discount window? Would they be considered banks under other areas of the federal banking law like the Bank Holding Company Act? Would they be subject to the same consumer and compliance requirements as banks that also offer online services?

### 3. A National Charter Would Encourage Large "Too Big to Fail" Institutions

The recent financial crisis has reminded us of the risks created by large financial institutions that are too big to fail. These national behemoths, and regulators who empower them, point to efficiency and simplicity, and the advantages of uniform business models and uniform regulation, to make the case for lax regulation. However, bigger does not necessarily mean better and surely does not mean a more secure financial system. Rather, bigger often means less transparency and more risk to the financial system and the public that relies on them for financial security.

One of the most important impacts of the current developments in financial technology is that it is enabling new and different companies to compete to provide services to consumers. It is not in the public interest to have a small number of technology-savvy firms dominate different types of financial services simply because they were able to get a national charter. A national charter would result in increased business lines and personnel crowded under one roof, rather than the development of mono- or dual-line businesses that fill specific consumer needs and provide jobs in our communities. Bigger means management will seek to sweep any violation under the rug as "not material."[4] Bigger may mean more pressure to chase profits at the expense of safety and soundness. More uniform means any defect becomes widely duplicated and infects the entire economy. Size may also bring about the perceived need and potential capacity to bend the rules.

A deregulatory experiment has already been proven to infect the national economy. The unleashing of subprime lending through the vehicles of national banks contributed to a national crisis. The lingering effects of the Great Recession and the failure of large and significant banks are still with us. The sentiment of both the public and many elected representatives is to avoid creating large institutions that pose similar risks to our economy. In the wake of these experiences, the OCC should not rush to grant national status to unknown and unproven business models thereby enabling them to become financial giants. Many of these new technological start-ups will fail. State and federal regulators should work together to make sure that those that fail impact the fewest number of consumers, rather than stretch existing law to give a national platform to a few companies that could cause systemic risk.[5]

---

[4] Regulators Danced With Wells Fargo For Years Before Penalties (Sep. 20, 2016) ("The Wells CEO also told Congress he did not err in signing off on quarterly reports filed with the Securities and Exchange Commission that said the company's internal controls were strong, maintaining that the problems did not reflect a material event warranting a notice to investors. "It was not a material event," Stumpf told the Senate Banking Committee in sometimes testy testimony.")

*http://www.mcclatchydc.com/news/politics-government/congress/article103008152.html#storylink=cpy*

[5] Federal regulators were not the first to identify and prosecute the significant failures at Wells Fargo Bank N.A. Despite having examiners embedded on site at Wells Fargo, and having received complaints as early as March 2012, the misconduct that led to Wells Fargo employees fraudulently opening over 2 million accounts continued for years. The answer to the Wells Fargo debacle is not to create a new national charter that may attempt to undermine the states' effective regulatory reforms. *See* OCC DESERVES MORE SCRUTINY IN WAKE OF WELLS FRAUD, (Oct. 13, 2016), http://www.americanbanker.com/bankthink/occ-deserves-more-scrutiny-in-wake-of-wells-fraud-1091901-1.html

4

### 4. A Special Purpose Charter Threatens to Undermine Important Consumer Protections

Allowing fintech companies to obtain special purpose bank charters could permit these companies to engage in regulatory arbitrage and seek to avoid important state consumer protection laws solely on the ground of being a technology company. For example, under the OCC proposal, online lenders might attempt to avoid state usury laws designed to protect consumers from falling into dangerous cycles of debt. While the internet provides choice, it also has allowed lenders to spring up from anywhere and aggressively market fast loans to consumers. In particular, the payday lending industry -- which sometimes charges interest rates in excess of 1,000 percent -- engages in predatory tactics that harm struggling borrowers. Federal and state regulators and consumer advocates have repeatedly reported on the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices. The answer is not to give these bad actors a possible avenue to skirt state law.

In New York, payday and other high-interest small-dollar lending is illegal under both state civil and criminal usury statutes. New York has aggressively enforced the state's usury laws to stop predatory loans in the state. Some lenders have attempted to skirt New York's prohibition on payday lending by offering usurious loans to New Yorkers over the internet, often by affiliating with federally chartered or federally recognized institutions. New York's usury laws apply to online payday lenders when those loans are offered or made in New York. Moreover, the courts have agreed with the NY DFS position when payday lenders have attempted to stop NY DFS from taking any action to protect New York consumers from online payday lenders.[6]

Giving federal bank charters to online lenders would create a race to the bottom where online lenders could set up shop in a state with lax consumer protection rules and flood more consumer protective states with dangerous, high-interest loans. This would be an unconscionable assault on state consumer protections that would leave Americans in many states newly vulnerable to predatory lending practices. NY DFS will continue to protect New Yorkers from unscrupulous practices and will oppose any attempt to evade New York's laws.

### 5. Nonbank Financial Institutions Present Unique Risks

The Whitepaper points to the OCC's experience regulating banking institutions, yet, it fails to recognize or discuss the unique challenges presented by nonbank financial service companies which have not previously been regulated by the OCC. Compared to traditional banks, non-depository institutions are cash intensive businesses that have frequent changes to their product mix, location and beneficial owners. In addition, these businesses generally do not have ongoing customer relationships, like depository institutions that by definition open deposit accounts for customers. These factors make compliance processes, including consumer identification and transaction monitoring, particularly challenging and pose significant and unique risks for regulators. As a result, close and expert supervision is particularly important to make sure that

---

[6] *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. N.Y. 2014).

these entities are not used to finance terrorism or perpetrate fraudulent schemes targeting the elderly and other vulnerable victims. Any attempt to reduce supervision in this age of great risk is a big mistake.

NY DFS has dedicated staff that specializes in licensing, supervising and examining non-depository institutions. These specialized examiners have extensive experience examining the unique compliance challenges presented by these institutions and have the tools needed to supervise these entities, including training and examination protocols that are tailored to non-depository institutions. NY DFS has been examining and supervising these entities for decades and has brought enforcement actions against those that have BSA-AML deficiencies. NY DFS has also issued transaction monitoring regulations that apply to its nonbank regulated entities that establish specific regulatory requirements for their BSA-AML programs. NY DFS also has coordinated with similar specialists in other states through CSBS and MTRA in conducting multistate examinations.

Similarly, fintech companies obviously present unique and significant cybersecurity risks. For years, NY DFS has had a team of dedicated examiners who have extensive training and expertise that qualifies them to examine both depository and non-depository entities for cybersecurity. NY DFS's long experience in this area has culminated in the publication of a first in the nation cybersecurity regulation that will set minimum standards for these financial services entities. Experience regarding cybersecurity and technology risks is critical when approaching the unique risks presented by technology driven nonbank institutions. Without this critical experience, a new regulatory framework for large national technology based nonbank financial institutions presents substantial risk.

### 6. The Proposed Charter May Stifle Rather than Encourage Innovation and Small Businesses by Encouraging Large Companies at the Expense of Small Businesses

On October 26, 2016, the OCC announced the establishment of an Office of Innovation to encourage and foster technological advancement in the banking and financial services industry. "By establishing an Office of Innovation, we are ensuring that institutions with federal charters have a regulatory framework that is receptive to responsible innovation and … the supervision that supports it." NY DFS supports efforts to encourage responsible innovation in the financial services industry. However, such efforts by the OCC should not be used as an excuse to widely extend and expand the OCC's jurisdiction, beyond the National Bank Act's reach, to types of entities, that the OCC has not previously regulated.

Indeed, the creation of a national charter is likely to stifle rather than encourage innovation because it would be an avenue for larger, more dominant firms to control the development of technology solutions in the financial services industry. Currently, small businesses can enter the fintech field and explore different technologies. The ability to start and license a business through a state licensing regime is the appropriate way to foster the development of technological enhancements and encourage small businesses. Numerous fintech companies have already succeeded and grown under this regulatory framework.

Development of new technological solutions by new businesses is also important to the efforts of state regulators like NY DFS to expand financial services to underserved communities. There are many communities and people that are not being served by large nationally licensed institutions and NY DFS is actively working with some of these newer types of nonbanking entities to provide financial services in these markets. Serving communities is squareby within the wheelhouse of state regulators who know their communities, and not a federal regulator necessarily separated from the local communities in every state across the county.

Small business growth and development depends on the on-the-ground work within the states. Separate licensing and supervisory regimes among the states, with coordination and cooperation among state regulators that has existed for decades, provide the opportunity for new entrants to test and develop a business model on a smaller scale, and for many smaller companies to launch. As such companies grow and expand to different states, longstanding state coordination mechanisms exist to help ensure consistent regulatory treatment.[7]

Creation of a national charter would undermine the ability of small firms to enter or remain in the financial services business -- those companies that have the funding to nationalize would have the ability to squelch small business and competition rather than encouraging the development of a broad range of business models. The laboratory of the states is where such firms are given the chance to develop, test alternatives and provide financial services to all communities within the state's borders. The OCC should not rush to help the first company to start the race – or the one or two best funded – to clear the field of robust competition. A national fintech charter could allow a well-funded money-losing fintech company, which underprices its services and skirts state consumer regulatory protections, to profit on the backs of smaller established competitors. Such a result would harm the ability of small businesses to compete, the ability of new entrants to develop new technological solutions, and the rights of consumers to financial choice and protection from predatory practices.

Large-scale national banking operations are one model for delivering banking and other financial services. However, large firms do not meet all financial service needs, and are more likely to drop less profitable customers and lines of business in underserved communities. Smaller institutions can meet a broader range of financial needs, and have a longer term perspective due to their relationship to their communities. In fact, community banks remain the primary source of credit to small businesses, and should not be placed at a disadvantage by a claim that innovation requires a new "fintech" national charter. Critically important, the states know best the needs of consumers who live and work within a state's borders, as recognized by state banking regulation of community banks since this country's founding. When fintech companies chase and then run out of easy growth, they may leave a scarred landscape behind. We must protect the tried-and-true financial services business models that grew with the history of their communities. NY DFS will

---

[7] The Conference of State Banking Supervisors ("CSBS") and Money Transmitters Regulator Association ("MTRA") are two organizations through which state regulators have long coordinated licensing, examination and supervision of nonbank financial services companies. Through these organizations, state regulators conduct effective oversight of entities that may cross state lines through, among other things, coordinated multistate examinations.

continue to advance innovation while actively supporting access to financial services in all communities in New York State.

## 7. State Licensing and Supervision Is Attuned to State Needs and Risks

NY DFS and other state regulators are the first responders to the financial regulatory needs of financial services customers and institutions. We are closer to the entities that we regulate and able to spot trends and issues that may not be visible on a national scale. NY DFS pays close attention to developments in every corner of the state, as well as financial innovation that may impact New York consumers. NY DFS has taken the lead in investigating and developing regulations in novel areas such as virtual currency, online lending and cybersecurity. The smaller scale of focus, and the more direct contact with consumers and regulated institutions, often translates to easier and more frequent communications and a quicker response to customer and institution concerns.

As a regulator of national banks, and discrete categories of other types of financial services under specific statutory grants, the OCC does not have the foundation or regulatory framework to regulate these novel types of non-bank financial services. This is compounded where, as here, the OCC would propose to regulate new technology enhancements in these businesses.

Moreover, by its own admission, the OCC would not regulate the majority of these institutions, but rather just the small number that employ internet technology and are capable of achieving a national license. More troubling, the OCC acknowledges that it would not be fashioning comprehensive regulation for these entities, pointing out that it could customize specific requirements in an operating agreement for particular institutions. Thus, the Whitepaper appears to suggest that the OCC would regulate a couple of large and technologically advanced money transmitters, by creating bespoke operating agreements for such entities, while the states continue to regulate the majority of such entities. Such limited and piecemeal regulation is likely to mean lesser regulatory standards and requirements for this important segment of the financial services industry and will not promote regulatory fairness or create the best structure to protect the public.

\* \* \*

In sum, the proposed "fintech" charter substitutes an effort to appear innovative for a complicated, problematic, new regulatory regime. NY DFS opposes any new regulatory regime that impacts state regulation and the protection of our consumers and markets. The proposed OCC special purpose charter fails on each ground.

Sincerely,

*[signature]*

Maria T. Vullo
Superintendent
New York State Department of Financial Services