Exhibit E



REBECA ROMERO RAINEY
*Chairman*

R. SCOTT HEITKAMP
*Chairman-Elect*

TIM ZIMMERMAN
*Vice Chairman*

DEREK B. WILLIAMS
*Treasurer*

J. MICHAEL ELLENBURG
*Secretary*

JACK A. HARTINGS
*Immediate Past Chairman*

CAMDEN R. FINE
*President and CEO*

January 17, 2017

The Honorable Thomas J. Curry
Comptroller of the Currency
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC  20219

Re:   Exploring Special Purpose National Bank Charters for Fintech Companies

Dear Comptroller Curry:

The Independent Community Bankers of America (ICBA)[1] appreciates the opportunity to provide comment on the White Paper *Exploring Special Purpose National Bank Charters for Fintech Companies*, which provides an overview of the Office of the Comptroller of the Currency's (OCC) intent to create a special purpose national bank charter for fintech companies.  ICBA strongly supports responsible innovation and welcomes the OCC establishing a new Office of Innovation that could potentially help those community banks that are interested in partnering with financial technology or "fintech" companies. However, ICBA has strong concerns about issuing special purpose national bank charters to fintech companies without spelling out clearly the supervision and regulation that these chartered institutions and their parent companies would be subject to.

While, as a chartering authority, the OCC has always maintained a broad framework for bringing new entrants to the national banking system, in the case of fintech charters, the agency has not adequately explained who would be eligible for a charter and how it would be supervised and regulated. In fact, the White Paper raises more questions than it answers concerning such issues as chartering authority, the definition of "fintech", coordination with other federal regulatory agencies, capital requirements, among many others too numerous to mention.  Without further clarification from agency officials, as

---

[1] The Independent Community Bankers of America®, the nation's voice for nearly 6,000 community banks of all sizes and charter types, is dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education and high-quality products and services.

With 51,000 locations nationwide, community banks employ 700,000 Americans, hold $3.9 trillion in assets, $3.1 trillion in deposits, and $2.6 trillion in loans to consumers, small businesses, and the agricultural community.  For more information, visit ICBA's website at www.icba.org.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC  ■  SAUK CENTRE, MN  ■  IRVINE, CA  ■  TAMPA, FL  ■  MEMPHIS, TN

1615 L Street NW, Suite 900, Washington, DC 20036-5623  |  800-422-8439  |  FAX: 202-659-1413  |  Email: info@icba.org  |  Website: www.icba.org

well as a more in depth explanation about the vital components of the special national bank charter proposed, ICBA cannot support such an initiative.  Furthermore, as ICBA has stated before in its previous comment letters to the OCC, to ensure a level playing field, fintech chartered institutions should be subject to the same supervision and regulation as community banks are subject to.

*OCC Lacks Explicit Statutory Authority to Issue Special Purpose Fintech Charters.*
**ICBA does not believe that the OCC has the necessary statutory authority for establishing a special purpose national bank charter that engages exclusively in non-depository core banking functions.**  While the OCC does have explicit statutory authority to charter and supervise special purpose banks with operations limited solely to providing fiduciary services or certain other types of specialized activities such as community development banking and bankers banks, there is no explicit authority under the National Bank Act to charter a fintech company as a special purpose national bank.

In its White Paper, the OCC relies almost entirely on Section 5.20 of the OCC's chartering regulations for its authority to charter special purpose national banks with business models that are within the "business of banking."  The OCC rules provide that a special purpose bank only needs to conduct at least one of the three core banking functions, namely receiving deposits, paying checks, or lending money.  However, other federal laws such as the Bank Holding Company Act, federal tax laws and federal bankruptcy laws, define the business of banking more broadly than the OCC does and requires banks to engage in deposit taking before they can be defined as a "bank." In fact, the Bank Holding Company Act has been held to limit the scope of the Comptroller's chartering authority.  By defining "bank" as an institution which accepts deposits and makes loans, the Bank Holding Company Act has been held to bar the Comptroller from conditioning the approval of a charter application on an institution that agrees to voluntarily refrain from engaging in either of these core banking functions, particularly deposit-taking.[2]

**Since the scope of the chartering authority under the National Bank Act is very unclear and since the federal agencies are inconsistent on how they define a "bank" or what constitutes the "business of banking", ICBA believes the OCC must seek explicit statutory authority from Congress prior to issuing a special purpose fintech national bank charter.**  This issue is too important to the financial community for the OCC to issue these charters pursuant to statutory authority that was enacted over a hundred years ago.  Congress needs to consider all the policy implications of a fintech charter including the scope of such a charter and how the business of banking should be defined under federal law.

*OCC Should Issue Rules Under the Administrative Procedure Act and Consult with the Other Banking Agencies.* **ICBA strongly recommends that the OCC propose rules, subject to notice and comment, concerning a special purpose national bank charter**

---

[2]  See Independent Bankers Ass'n of America v. Conover, 1985 U.S. Dist. LEXIS 22529, at *34 -*36 (M.D. Fla. Feb. 15, 1985) (IBAA v. Conover) (holding that an institution which does not engage in both accepting deposits and making loans cannot be chartered as a national bank because it would not be engaged in the "business of banking" within the meaning of the NBA).

The Nation's Voice for Community Banks.®

WASHINGTON, DC  ■  SAUK CENTRE, MN  ■  IRVINE, CA  ■  TAMPA, FL  ■  MEMPHIS, TN

1615 L Street NW, Suite 900, Washington, DC 20036-5623  |  800-422-8439  |  FAX: 202-659-1413  |  Email: info@icba.org  |  Website: www.icba.org

**for fintech companies.** ICBA opposes the OCC approving fintech charters on a case-by-case basis pursuant to a broadly worded policy statement that could be changed at the discretion of the agency or tailored based on the types of entities seeking national bank powers. The OCC should convene a public hearing as well as a formal rule-making process subject to the Administrative Procedure Act allowing the public to comment on any proposal by the agency. Because the OCC is attempting to establish a whole new category of bank charters and because of the potential implications of the charter for consumers, small businesses, local communities, and the financial system, outreach meetings should be included as part of the agency's due process. Proposed rules should be issued that clearly define both the scope and the policy reasons for such a charter and clearly lay out the requirements for obtaining such a charter.

ICBA also recommends that other federal banking regulators, as well as state banking agencies be consulted with regard all aspects of the proposal.  In particular, we believe the OCC should coordinate directly with the Federal Reserve. Of particular concern are issues relating to access to the discount window and payments systems by such special purpose national banks.  Since the White Paper does not specify any limitations on the types of companies that can charter a fintech bank, ICBA is concerned that large commercial entities such as Walmart or Google would be allowed to own, as subsidiaries, special purpose national banks, therefore mixing commerce with banking.  In fact, the White Paper appears to contemplate a holding company framework for fintech charters that is comparable to industrial loan companies or diversified unitary savings and loan holding companies.

**In ICBA's opinion, allowing corporate conglomerates to own banks violates the U.S. policy of maintaining the separation of banking and commerce, jeopardizes the impartial allocation of credit, creates conflicts of interest and a dangerous concentration of commercial and economic power, and unwisely extends the federal safety net to commercial interests.** Since as non-depository banks, these entities may not be subject to the Bank Holding Company Act and possibly other "source of strength" requirements, such commercial entities would pose systemic risks to our banking system. These issues should be thoroughly assessed by the OCC in conjunction with the Federal Reserve and the public should be allowed to comment on that aspect of the proposal-- whether allowing a commercial firm to own a special purpose national bank inappropriately mixes commerce with banking.

Since, according to the White Paper, some fintech chartered institutions would be allowed to take deposits, the FDIC should also be consulted prior to the issuance of a charter particularly since that agency must eventually approve an institution that takes deposits.  ICBA believes that some online marketplace lenders could pose significant risks to the Deposit Insurance Fund if they were allowed to take deposits as a federally regulated banking entity, particularly because of their narrowly-focused lines of business and their lack of diversification.  The liquidity problems that some of these firms recently experienced should raise serious concerns about whether such entities could be chartered as either special or general purpose national banks.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC   ■   SAUK CENTRE, MN   ■   IRVINE, CA   ■   TAMPA, FL   ■   MEMPHIS, TN

1615 L Street NW, Suite 900, Washington, DC 20036-5623 | 800-422-8439 | FAX: 202-659-1413 | Email: info@icba.org | Website: www.icba.org

The OCC should also consult with the CFPB and with the state banking agencies and, in particular, the Conference of State Bank Supervisors on all aspects of consumer lending and preemption of state law.  These supervisors should be asked to comment on what aspects of state consumer law, such as state usury laws, would be preempted should a special or general purpose national bank charter be issued to a fintech firm.  Special purpose national banks should not be used as a way to evade important state consumer protections and usury limits.

*"Fintech" Is Not Adequately Defined*.  The OCC has failed to properly define the scope of entities, business activities, persons, and boundaries surrounding the use of the special purpose fintech charter.  As technological advances in commerce continue to evolve, the complement of financial services available to meet market demands will need innovation accordingly.  But not all financial activities in a new age economy are suitable for inclusion in the national banking system.  What is the definition of a fintech entity?  **Will credit unions, non-bank mortgage lenders, or even payday lenders be eligible to apply for a special purpose national bank charter?** Will the OCC issue a fintech charter to a firm engaged exclusively in money transfer services?  These questions need to be answered pursuant to appropriate rulemaking prior to the OCC issuing a fintech charter.  Furthermore, ICBA questions whether the OCC would have the technical expertise and resources to properly supervise and regulate fintech companies that are very specialized and use very advanced technology.

*Examination and Supervision of Fintech Charters Must Be Spelled Out*.  The OCC has also failed to explain how it will supervise and examine a special purpose national bank.  Will these banks be examined every year for safety and soundness?  Will examiners utilize the CAMELS Rating system to rate these banks, evaluating not only capital, but asset quality, management, earnings and liquidity?  If so, what types of penalties will these banks be subject to if their ratings drop too low.  All of these issues should be thoroughly vetted and spelled out as part of the rulemaking.

*Regulatory Capital Requirements Are Not Defined*.  As the OCC is well aware, all banks in the United States are subject to a rigorous set of regulatory capital standards that focus on maintaining healthy amounts of high quality capital and are applicable to all institutions regardless of size or impact to the domestic or global financial system.  Prudential bank regulators have consistently pointed to the importance of having sufficient capital available to absorb losses in uncertain economic times.  Regulators have supported the use of various capital surcharges on activities that they believe might introduce a heightened level of risk.  Activities that might be construed as anything other than "safe" are assessed capital penalties that require the bank to hold additional capital even when the bank is very experienced in managing the risks around the penalized activity.

However, the OCC has yet to describe the capital requirements for fintech-chartered financial institutions and how those capital requirements will change as the risk of the

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC  ▪  SAUK CENTRE, MN  ▪  IRVINE, CA  ▪  TAMPA, FL  ▪  MEMPHIS, TN

1615 L Street NW, Suite 900, Washington, DC 20036-5623  |  800-422-8439  |  FAX: 202-659-1413  |  Email: info@icba.org  |  Website: www.icba.org

firm changes.  Are there certain lending arrangements that will require capital surcharges?  What about capital requirements for companies engaged in payments facilitation and processing? Will the OCC even consider a risk-based capital framework for these firms?  Without comparable capital requirements, traditional banks will operate at a competitive disadvantage.  Community banks, in particular, could be at risk of losing market share.

At a minimum, the OCC should promulgate minimum capital requirements particularly for special purpose national banks that engage primarily in small business or consumer lending, and those engaged in payments activities.  While supplemental capital requirements can be tailored for more risky activities, the OCC as part of its rulemaking should establish minimum capital requirements for all special purpose national banks that are comparable to the Basel III capital requirements of commercial banks.

*Financial Inclusion and Community Reinvestment Act-Type Obligations are Vague.*  The OCC acknowledges that fintech chartered institutions that do not accept deposits would not be subject to the Community Reinvestment Act (CRA) as they are not insured depository institutions.  The OCC expects any charter application to include a discussion of the applicant's commitment to financial inclusion that supports fair access and fair treatment of customers.  **However, the OCC falls short of explaining whether fintech charter applicants would be subject to financial inclusion requirements similar to CRA, and how such requirements would be met.**  The only indication that an applicant would need to meet any inclusion or fair access requirement is the expectation that requirements be contained in the business plan.  A discussion of fair access for a financial firm that engages consumers and small businesses over the internet cannot be held without first addressing the fact that many potential customers lack the access or sophistication required to seek credit using the tools provided by the product offering.  What is the OCC's expectation for these new entities?  In ICBA's opinion, these expectations should be spelled out in the chartering rules so it clear to all special purpose national bank applicants what the financial inclusion requirements are for a fintech charter.

*Liquidity Requirements Must Be Developed.*  Fintech firms, as start-up ventures that aim to disrupt traditional financial services activities, generally are not accustomed to the extensive constraints placed on banking entities like community banks with regard to asset concentrations, fair lending, cybersecurity, risk-based capital, geographical limitations, and underwriting scrutiny.  This lack of understanding could certainly lead to volatile working capital needs as firms realize the struggle of operating a dynamic business model under heavy examiner scrutiny.  In some cases, the fintech charter could be subject to risks outside of the control of the entity where risk mitigation or hedging strategies would be too costly to implement to the extent required to give regulators comfort.  Otherwise prudent lending solutions that a local government deems predatory could force the fintech firm to exit the business very quickly, causing the firm to expend capital at a rapid rate to provide stability to other operations.  Some risks simply cannot be predicted or quantified but are ever present within many fintech businesses.  For

The Nation's Voice for Community Banks.®

WASHINGTON, DC ■ SAUK CENTRE, MN ■ IRVINE, CA ■ TAMPA, FL ■ MEMPHIS, TN

1615 L Street NW, Suite 900, Washington, DC 20036-5623 | 800-422-8439 | FAX: 202-659-1413 | Email: info@icba.org | Website: www.icba.org

example, a financial technology company that clears cryptocurrency transactions would be subject to monetary policy risks of any nation, especially those nations that could make monetary policy decisions that trigger regional economic strain that drives volatility in the underlying currency.

Because the business ventures that may seek fintech charters from the OCC have not reached maturity and operate in a fluid, international marketplace, what precautions will the OCC take to ensure that these firms maintain acceptable levels of liquidity to guard against many of the unforeseen risks that appear when a financial firm ventures beyond traditional banking activities?  What steps will the agency take to ensure examination personnel are properly trained to identify and understand liquidity risks that are not present today in national banks?

*Reporting Requirements and BSA Requirements Must Be Comparable to Banks.*
Traditional banking entities, including the smallest community banks in the country, are subject to extremely robust and burdensome quarterly call reporting requirements that require extensive preparation time, reliance on multiple third party systems, and key bank resources on a quarterly basis.  Regulators have repeatedly defended the need for maintaining existing reporting requirements due to the value added from the data provided by the banks.  What is the OCC's vision for fintech national bank reporting requirements?  Will the OCC hold these institutions to the same level of scrutiny and data gathering as they do for community banks?  Will the OCC require the completion of additional schedules that traditional banking entities would not be required to complete?  Will the OCC require the data to be submitted with the same frequency as data collections for community banks?  Any disclosure requirements need to be clearly described in the chartering rules so applicants are aware of the requirements.  Also, applicants will need to understand the agency's expectations for compliance under the Bank Secrecy Act as well as expectations concerning cybersecurity.

*A Level Playing Field Must Be Maintained.*  **ICBA opposes the issuance of any fintech charter that is not subject to the same supervision and regulation as a community bank is subject to.**  To ensure a level playing field, the OCC must not allow a special purpose national bank charter to have a competitive advantage over traditional bank charter.  Otherwise regulatory arbitrage will occur and the value of the traditional bank charter will significantly decline.

**Conclusion**

Since the OCC is planning to establish a new category of bank charters and since its statutory authority under the National Bank Act is not explicit, ICBA strongly believes that the OCC must seek Congressional approval for such a charter.  In lieu of approving these special purpose national bank charters on a case-by-case basis pursuant to a broadly worded policy statement, ICBA also strongly recommends that the OCC issue new chartering rules pursuant to the Administrative Procedure Act and in consultation with the other agencies that clearly spell out the agency's expectations for capital, liquidity,

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC  ■  SAUK CENTRE, MN  ■  IRVINE, CA  ■  TAMPA, FL  ■  MEMPHIS, TN

1615 L Street NW, Suite 900, Washington, DC 20036-5623  |  800-422-8439  |  FAX: 202-659-1413  |  Email: info@icba.org  |  Website: www.icba.org

supervision and examination and addresses whether these new institutions will have direct access to the Federal Reserve's clearing and payment system and its discount window. The OCC must ensure that these new institutions are subject to the same supervision and regulation to which community banks are subject.

ICBA appreciates the opportunity to comment on the White Paper. If you have any questions or would like additional information, please do not hesitate to contact either Christopher Cole at chris.cole@icba.org or James Kendrick at james.kendrick@icba.org.

Sincerely,

/s/

Christopher Cole
Executive Vice President and Senior Regulatory Counsel

/s/

James Kendrick
First Vice President, Accounting and Capital Policy

The Nation's Voice for Community Banks.®

WASHINGTON, DC ■ SAUK CENTRE, MN ■ IRVINE, CA ■ TAMPA, FL ■ MEMPHIS, TN

1615 L Street NW, Suite 900, Washington, DC 20036-5623 | 800-422-8439 | FAX: 202-659-1413 | Email: info@icba.org | Website: www.icba.org