Exhibit F

RICHARD C. SHELBY, ALABAMA, CHAIRMAN

| | |
|---|---|
| MICHAEL CRAPO, IDAHO | SHERROD BROWN, OHIO |
| BOB CORKER, TENNESSEE | JACK REED, RHODE ISLAND |
| DAVID VITTER, LOUISIANA | CHARLES E. SCHUMER, NEW YORK |
| PATRICK J. TOOMEY, PENNSYLVANIA | ROBERT MENENDEZ, NEW JERSEY |
| MARK KIRK, ILLINOIS | JON TESTER, MONTANA |
| DEAN HELLER, NEVADA | MARK WARNER, VIRGINIA |
| TIM SCOTT, SOUTH CAROLINA | JEFF MERKLEY, OREGON |
| BEN SASSE, NEBRASKA | ELIZABETH WARREN, MASSACHUSETTS |
| TOM COTTON, ARKANSAS | HEIDI HEITKAMP, NORTH DAKOTA |
| MIKE ROUNDS, SOUTH DAKOTA | JOE DONNELLY, INDIANA |
| JERRY MORAN, KANSAS | |

WILLIAM D. DUHNKE III, STAFF DIRECTOR AND COUNSEL
MARK E. POWDEN, DEMOCRATIC STAFF DIRECTOR

**United States Senate**
COMMITTEE ON BANKING, HOUSING, AND
URBAN AFFAIRS
WASHINGTON, DC 20510–6075

January 9, 2017

The Honorable Thomas J. Curry
Comptroller
Office of the Comptroller of the Currency
400 7th Street SW
Washington, D.C. 20219

Dear Comptroller Curry:

Under your leadership, the Office of the Comptroller of the Currency (OCC) has demonstrated sharpened focus on its mission and worked diligently to implement important reforms to improve financial stability. We appreciate that while being tasked with those important duties, you and your staff have also thoughtfully considered the complexities of emerging financial technologies, and led a national conversation on their risks and rewards. The research the OCC has produced and its efforts to coordinate with other agencies reflects your desire to ensure that financial innovations make the banking system work better for all Americans.

While we share your goal of ensuring that affordable banking products are more accessible, we are concerned with the OCC's proposal to expand its powers by chartering non-bank institutions. Offering a new charter to non-bank companies seems at odds with the goals of financial stability, financial inclusion, consumer protection, and separation of banking and commerce that the OCC has upheld under your tenure.

The scope of the OCC's proposal appears to have expanded beyond accommodating fintech firms. The criteria for a charter presented thus far does not specify if a firm is required to create a new technology, nor does it limit the application of the charter to a fintech firm.[1] While the charter may be used for fintech firms, it does not appear to be limited to them. Given those factors, this letter will refer to this simply as an alternative non-bank charter.

**Charter Shopping**
In its December 2016 white paper, the OCC declared that it has the authority to grant alternative non-bank charters to special purpose banks that "conduct at least one of the following three core banking functions: receiving deposits, paying checks, or lending money."[2] It also noted that many of the companies it has researched offer a single product, such as "marketplace lenders providing loans to consumers and small businesses…payment-related services…digital currencies and distributed ledger technology, and…financial planning and wealth management products and services."[3]

---

[1] https://www.occ.gov/news-issuances/speeches/2016/pub-speech-2016-152.pdf Pg 3
[2] https://www.occ.gov/topics/bank-operations/innovation/special-purpose-national-bank-charters-for-fintech.pdf Pg 3
[3] https://www.occ.gov/topics/bank-operations/innovation/special-purpose-national-bank-charters-for-fintech.pdf Pg 2

1

However, the report did not explain why these firms, which would necessarily be engaged in a core banking function to be eligible for an alternative charter, would not already be eligible to apply for a national bank charter under the OCC's existing authorities and procedures. Because many of these firms evidently do not intend to accept deposits, it is far from clear whether the OCC has authority to grant national bank charters to them. Congress has given the OCC a very narrowly-defined authority to charter only three specific types of special-purpose national banks (bankers' banks, credit card banks, and trust banks) that do not accept deposits.[4]

The OCC's proposal also suggests that an alternatively chartered firm might only engage in narrow lines of business with varying legal requirements. For example, the paper notes that only firms that lend to consumers would be subject to the Equal Credit Opportunity Act while firms that choose not to be insured depositories would not be subject to the Federal Deposit Insurance Act.[5] In such a scenario, the OCC would not be ensuring that "all national banks are required to meet high supervisory standards." Instead, this charter allows non-bank firms to negotiate which provisions of a national banking charter they want, including preemption of state consumer protection laws, while avoiding the rules and regulations that would apply to a full-service bank.

Establishing a new charter gives the OCC the ability to impose requirements on a case-by-case basis and risks repeating the mistakes of the financial crisis by encouraging charter shopping in order to avoid unfavorable state and federal laws.[6] A 2010 report by the University of North Carolina's Center for Community Capital demonstrates that as a result of the OCC's assertion of national bank preemption authorities over state anti-predatory mortgage laws in the run up to the financial crisis, state regulated banks were crowded out of the market by firms making riskier loans. As underwriting standards fell, default risk increased for mortgages originated by lightly-regulated OCC lenders compared to those lenders which remained subject to more stringent state laws.[7]

Hard working Americans continue to bear the burden of the last financial crisis. Allowing an alternative charter for companies that only want to provide one type of banking service may undermine full service banking and decrease access to low-cost checking and savings accounts and other key aspects of the traditional baking system, further impacting working class people.

**Financial Inclusion**
Providing a more favorable charter to companies engaged only in narrow lines of bank services would have a detrimental impact on the consumers who are supposed to benefit from financial innovation. A core assumption of federal efforts toward a more inclusive banking system is for the underbanked to "establish a mainstream banking relationship that provides them the opportunity to deposit funds securely, conduct basic financial transactions, accumulate savings, and access credit on fair and affordable terms."[8] It is unclear to us how the OCC's proposal, which would normalize the delivery of a la carte services by non-depository firms, aligns with

---

[4] See 12 U.S.C. 27 and 1841(c)
[5] https://www.occ.gov/topics/bank-operations/innovation/special-purpose-national-bank-charters-for-fintech.pdf Pg 6
[6] https://www.occ.gov/topics/bank-operations/innovation/special-purpose-national-bank-charters-for-fintech.pdf Pg 2 "The OCC acknowledges, however, that to approve a fintech charter the agency may need to account for differences in business models and the applicability of certain laws."
[7] http://ccc.sites.unc.edu/files/2013/02/PreemptionImpact.pdf
[8] https://www.fdic.gov/householdsurvey/2015/2015report.pdf Pg 11

2

the goal of providing the underbanked with access to a full range of "safe, secure, and affordable banking services."[9]

An alternatively chartered firm that does not take deposits by offering transaction or savings accounts, and therefore does not encourage the fundamental banking act of building wealth by encouraging savings, should not be able to refer to itself as a "bank." Retail customers have an idea what this term connotes base on decades of experience – safety, stability, and a spectrum of services regulated, and in some cases insured, by the federal government.

As shown by federal statutes such as the Equal Credit Opportunity Act and the Community Reinvestment Act, the benefits provided to national banks through a charter, such as preemption of state licensing laws, were provided in consideration of a set of social benefits they return to the communities in which they operate. The OCC has not offered any examples of how an alternatively chartered firm could be required to provide all of these same social benefits to the communities in which they operate, such as access to check cashing services or a safe place to store money, when these firms are not designed to offer basic banking services like deposit taking at all.

Not only would this plan put working class Americans at risk by conflicting with national efforts toward inclusion in the banking industry, but it could also allow predatory alternative financial services providers to spread more quickly given the blessing of the federal government and elimination of state-based protections for working class Americans.

**Consumer Protection**
An obvious and desired benefit to the companies that might receive an alternative charter is exemption from state regulatory and consumer protection requirements that some of these companies consider to be little more than an "inefficiency."[10] Many state Attorneys General are already fighting back against online payday lenders that circumvent state licensing requirements – a preemptive alternative charter would undermine many of these state-based payday protections.[11] Even if the OCC has no current plans to allow payday lending, it is impossible to know now the breadth of potentially predatory companies that might use a federal banking charter either to avoid consumer and small business protections enforced through state licensing requirements, or whether a future OCC might allow a large national company a competitive advantage over locally-owned and operated, state chartered companies.

Prior to the financial crisis, the Office of Thrift Supervision (OTS) claimed banks could offer "low-cost credit to the public free from undue regulatory duplication and burden" if the firms it supervised were exempted from "a hodgepodge of conflicting and overlapping state requirements."[12] The OTS failed so spectacularly in its supervisory duties over the subprime lenders that emerged in competition with traditional bank lenders that it was dissolved and all of its powers were transferred to the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation and the Board of Governors of the Federal Reserve System by the Wall

---

[9] ibid.
[10] http://www.americanbanker.com/news/law-regulation/state-regulators-balk-at-occ-fintech-charter-1090823-1.html
[11] https://ag.ny.gov/sites/default/files/nyag_comment_on_cfpb_payday_lending_rules_10_07_16_final.pdf
[12] FCIC http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf Pg 96

3

Street Reform and Consumer Protection Act.[13] The Act intended to eliminate and prevent these failed policies from all the federal banking agencies.

**Separation of Banking and Commerce**
Technology firms have specifically cited undermining the separation of banking and commerce as reason to support the OCC's charter plan.[14] There are several important reasons to preserve the separation of banking and commerce, including limitation of conflicts of interest, the risk that a special purpose entity controlled by a commercial firm would make credit decisions based on its parent firm's business strategies rather than objective evaluation of credit risk, and to limit the concentration of financial and economic power, especially via cross-selling or anti-competitive practices.[15] Under the OCC's plan, large commercial firms could acquire alternative charters and offer preferential treatment to their own financial services products to lock customers or manufacturers into uncompetitive rates and terms by relying on the market power of their commercial platforms. They would also have an anticompetitive advantage over firms that do not possess an alternative banking charter. Moreover, allowing commercial firms to acquire alternatively chartered firms could increase the scope of the federal safety net to include large parts of the commercial sector. The health of the alternatively chartered institutions would be tied to the parent companies that own them, encouraging regulators to protect commercial entities as they do critical parts of the banking system.

A Senate report on the Competitive Equality in Banking Act of 1987, an act which closed a non-bank loophole similar to the one the OCC is moving to open, noted: "At the foundation of American financial law is a longstanding tradition of separating banking and commerce."[16] In the years since, Congress has continued to strengthen that separation.[17]

As the OCC is well aware, in the aftermath of the financial crisis members of Congress instructed agencies to review growing threats to the firewall between banking and commerce. In September, the OCC issued a Dodd-Frank required report with the FDIC and Federal Reserve in which the OCC identified risks to banks involved in merchant banking and other investment activities, and in which the OCC joined other regulators in limiting the scope of such activities.[18] The alternative charter plan presented by the OCC is at odds with the findings and recommendations of this report.

As state banking supervisors have pointed out, because many companies under an alternative charter would be exempt from the Bank Holding Company Act, nothing would ensure that both bank and currently impermissible non-bank activities were intermingled in one company, and that a commercial entity could not create or acquire an alternatively chartered company.[19] This

---

[13] Public Law 111-203, Title III -- Transfer of Powers to the Comptroller of the Currency, the Corporation and the Board of Governors.
[14] https://financialinnovationnow.org/wp-content/uploads/2016/07/Examining_the_Extensive_Regulation_of_Financial_Technologies.pdf Pg 4
[15] S. Report 100-19, Pp 7-9
[16] S Report 100-19, at Pg 2
[17] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=984103&download=yes
[18] https://www.occ.gov/news-issuances/news-releases/2016/nr-ia-2016-107a.pdf
[19] https://www.csbs.org/regulatory/policy/Documents/2016/CSBS%20Comment%20Letter%20on%20OCC%20Receiverships%20for%20Uninsured%20National%20Banks%20NPRM.pdf Pg 7

erosion of the separation of banking and commerce would harm competitive markets and reduce market discipline, encouraging risky and abusive behavior.

**Conclusion**

Emerging financial technologies present challenges that Congress has failed to adequately study. While the OCC's leadership on these issues is indispensable, we believe that the OCC's plan to offer alternative charters to nonbank and fintech firms as explained could upset the current financial regulatory structure. We would urge the OCC to refrain from offering any alternative or special purpose charters. It is up to Congress to take action on these important matters, and while it does we would encourage the OCC to devote its resources to collaborating with other federal and state regulators to aid innovative financial services providers in navigating the current landscape of laws.

Sincerely,

Sherrod Brown
United States Senator

Jeffrey A. Merkley
United States Senator