Exhibit J

NEW YORK STATE
DEPARTMENT *of*
FINANCIAL SERVICES

Andrew M. Cuomo
Governor

Maria T. Vullo
Superintendent

April 14, 2017

The Honorable Thomas J. Curry
Comptroller of the Currency
Office of the Comptroller of the Currency
400 7th Street SW
Mail Stop 9W-11
Washington, DC 20219

Re: Comptroller's Licensing Manual Draft Supplement: Evaluating Charter Applications From Financial Technology Companies

Dear Comptroller Curry,

The New York Department of Financial Services ("DFS") continues to oppose the proposal by the Office of the Comptroller of the Currency ("OCC") to create a new special purpose national bank charter for "fintech" companies. As explained in DFS's January 17, 2017 letter (attached), the regulation of non-bank financial institutions is within the jurisdiction of the states, not the OCC. DFS and other stakeholders that submitted comments in opposition to the OCC's December 2016 whitepaper "Exploring Special Purpose National Bank Charters for Fintech Companies" (the "Whitepaper") highlighted significant questions and concerns regarding the OCC's hasty and misguided effort to issue such national bank charters. Despite this strong opposition, the OCC published the "Comptroller's Licensing Manual Draft Supplement: Evaluating Charter Applications From Financial Technology Companies" (the "Manual"), a licensing manual to charter non-bank financial institutions.[1] In publishing the Manual, the OCC apparently has ignored these serious questions and concerns and has made clear that it intends to proceed – without authority – to seek to charter nonbank financial institutions and thereby create an uneven playing field for state banking institutions in derogation of state sovereignty. The

---

[1] *See e.g.* Letter from John W. Ryan, President & CEO, Conference of State Bank Supervisors, to Legislative and Regulatory Activities Division, Office of the Comptroller of the Currency (January 13, 2017) *available at* https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-csbs-comment-letter-special-purpose-national-bank-charters-fintech.pdf; Letter from Robert L. Hartwig, Legal Counsel, Iowa Bankers Association, to Office of the Comptroller of the Currency (December 29, 2016) *available at* https://www.occ.treas.gov/topics/responsible-innovation/comments/comments-robert-hartwig.pdf.. Many comments submitted in support of the OCC's new charter also expressed concerns regarding the OCC's approach to issuing bank charters to non-bank fintech companies and emphasized the importance of preserving consumer protections. *See e.g.* Letter from Jessie Cheng, Deputy General Counsel, Ripple, to Office of the Comptroller of the Currency (January 13, 2017) *available at* https://www.occ.treas.gov/topics/responsible-innovation/comments/comments-ripple.pdf; Letter from Jennifer J. Finger, EVP Strategy and Development, Beneficial State Bank, to Thomas J. Curry, Comptroller of the Currency, Office of the Comptroller of the Currency (January 11, 2017) *available at* https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-beneficial-state-bank.pdf

creation of such a new federal regulatory regime over non-bank financial institutions extends beyond the OCC's jurisdictional authority under the National Bank Act ("NBA") to charter national banks.

The National Bank Act authorizes the formation of associations to conduct the "business of banking."[2] It does not broadly authorize the OCC to regulate the entire financial system in this country. During the 160 years since the passage of the NBA, it has been well understood that there is a dual banking system for banking entities, but that non-bank institutions operate throughout the country under the supervision of the states as discussed in DFS's previous comment letter to the OCC dated January 17, 2017 and the comments submitted by other state regulators, as well as members of Congress.

In the Manual, the OCC purports to redefine the "business of banking," and without authority seeks to expand the OCC's regulation of financial institutions beyond historical and legal limits. In doing so, the OCC references its own prior regulation rather than congressional authority to extend its jurisdictional reach.[3] Clearly, regulation cannot expand the jurisdiction of the OCC, whose ability to regulate or attempt to preempt state regulation can only be authorized by a clear Congressional grant of authority.[4] Indeed, regulation by the OCC of non-depository financial institutions requires clear authority under the NBA, which it distinctly lacks.

The business of banking is, and has traditionally been recognized by the courts to be, inexorably linked to receiving deposits, while non-depository financial institutions have traditionally been classified as non-banks. In *Independent Bankers Ass'n of America v. Conover*,[5] the Court held, on facts remarkably similar to the OCC's fintech chartering proposal, that an institution that does not engage in accepting deposits cannot be chartered as a national bank because it would not be engaged in the "business of banking" within the meaning of the NBA. The Court further noted that the historical use of the term "business of banking" in the industry and in case law strongly suggests that accepting deposits is an essential element of the "business of banking," and that a financial institution that is legally unable to take deposits "cannot engage in the 'business of banking' within the meaning of the NBA."[6]

---

[2] 12 U.S.C. § 21. While the OCC has some flexibility in determining what activities national banks may engage in as "incidental powers … necessary to carry on the business of banking," the OCC incorrectly asserts that this flexibility additionally imbues it with the power to redefine what is a bank in the first place. *See* 12 USC §24 (Seventh); *NationsBank of North Carolina, N.A. v. Variable Life Annuity Co.*, 513 U.S. 251 (1995).

[3] *See* Manual at p. 2-5.

[4] *See Stark v. Wickward*, 321 U.S. 288, at 309 (1944) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance'" (quoting *Brown & Williamson*, 529 U.S. at 159)). *See also Medtronic, Inc. v. Lohr*, 518 U.S. 470, at 485-86 (1996) ("In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, [the Court] starts with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))).

[5] 1985 U.S. Dist. LEXIS 22529 (M.D. Fla. Feb. 15, 1985).

[6] *IBAA v. Conover*, at *34 -*36 (M.D. Fla. Feb. 15, 1985).

2

The OCC's jurisdictional expansionism results in the creation of a new regulatory regime with neither the regulatory infrastructure nor clear standards to protect consumers. The NBA was designed to create regulation for depository institutions and existing federal regulatory structures and oversight of national banks demonstrate that they are specifically tailored to the regulation of depository institutions. Throughout the Manual, the OCC acknowledges that critical features of its existing federal regulatory requirements for depository institutions will not be sensible for non-depository institutions and the OCC declares that these standards will not apply to the new "special purpose charter" it has created.[7]

Tellingly, the OCC's Manual, if allowed to proceed, would exempt its new fintech chartered entities from existing federal standards of safety and soundness, liquidity and capitalization. By contrast, New York and other existing state regulators, who for years have regulated non-depository institutions including those using financial technology, have clear laws addressing safety and soundness for non-depository institutions. As appropriate for different types of non-bank entities, New York has bonding requirements,[8] liquidity and capitalization standards,[9] and in the case of money transmitters a State Transmission of Money Insurance Fund[10] that protects the purchasers and holders of New York instruments in the event of a failure of a money transmitter. DFS has demonstrated its leadership as an innovative regulator by the actions it has taken in the virtual currency industry. Moreover, DFS has dedicated staff and regulation designed to address the challenges of regulating non-depository institutions including the Bank Secrecy Act and Anti-Money Laundering ("BSA-AML") challenges that these institutions present. In implementing regulations for the licensing and supervision of virtual currency entities,[11] DFS enhanced trust and legitimacy of a promising emerging financial services technology, while also providing for both minimum capital standards and surety bond or deposit requirements based in each case on the specific risk factors of the entity.[12] In this way, New York both supported and enabled innovation while also protecting consumers and requiring that all companies operate in a safe and sound manner within the financial services marketplace.

---

[7] Inexplicably, fintech companies licensed under the new charter will be exempt from safety and soundness standards applicable to all other national banks. *See* Manual Footnote 21 ("A SPNB that does not take deposits will not be subject to certain requirements that apply only to ensure depository institutions: for example the safety and soundness standards contained and 12 CFR 30"). The Manual also states that capitalization and liquidity will be tailored for "special purpose national banks," but fails to establish clear standards for these important requirements. *See* Manual p.11.

[8] For example, licensed money transmitters in New York are subject to bonding or deposit requirements pursuant to Section 643 of the Banking Law and Parts 406.13 and 406.14 of the Superintendent's Regulations. In addition, Section 651 of New York's Banking Law mandates that licensed money transmitters must maintain liquid assets approximating the value of their money transmission obligations. Further, pursuant to Article XIII-C of the Banking Law, New York maintains a State Transmitter of Money Insurance Fund to protect certain users of licensed money transmitters. The OCC's proposed charter includes none of these important protections.

[9] For example, licensed lenders in New York are subject to minimum liquid asset requirements pursuant to Sections 341.5 and 342 of the Banking Law and minimum net worth requirements pursuant to Parts 401.1(b) and 401.2(b) of the Superintendent's Regulations.

[10] As noted in footnote 8 above, Article XIII-C of the Banking Law created a State Transmitter of Money Insurance Fund to protect users.

[11] 23 NYCRR Part 200.

[12] *See* 23 NYCRR § 200.8 and 200.9.

As evidenced by its Manual, the OCC has not created critical standards for safety and soundness, liquidity or capitalization, nor does the OCC have the jurisdiction, expertise or authority to set them for non-banks. The OCC provides none of the protections that DFS provides for New York consumers – including usury protections -- and has no answer to concerns that New York consumers would have no recourse if a chartered money transmitter or other non-depository institution fails. New York vigorously opposes back-door attempts to prey on consumers with payday loans. Likewise the OCC has not addressed the unique challenges of, or standards that will be applied to, these entities with respect to critical BSA-AML regulation and supervision. This is unacceptable to DFS.

Quite simply, the OCC was not granted the authority to set the boundaries of its own power, or to unilaterally stretch and twist the contours of banking beyond recognition in order to cover traditionally non-bank activities and non-bank companies. Such a sweeping remake of the financial system and the financial regulatory structure of the entire country would require an act of Congress, and would come at the expense of the valuable role and experience of state regulators. The OCC has no authority to create non-depository, low-regulation, no-reserves, capital-markets-dependent non-banks with little regard for the safety and soundness of the existing banking system.

Rather than unilaterally seeking to empower so-called "fintech" companies at the expense of existing banks and consumer protection, the OCC should work together with other federal and state banking regulators to improve the capacity of banks to innovate while maintaining appropriate standards. Responsible innovation in financial services and banking can come from the deeply experienced state regulators and existing federal regulators of national banks. Indeed, the OCC irrationally seeks to create an unauthorized and hasty loophole for fintech companies, without legislative approval and at the expense of state sovereignty and consumers. [13]

For these, as well as all previously stated reasons submitted in comments, DFS continues to oppose the OCC's national non-bank bank charters applicable to any financial services company making use of technology. DFS seeks to preserve a safe and sound banking system, and to protect consumers.

Respectfully,

Maria T. Vullo
Superintendent
New York State Department of Financial Services

---

[13] Comments received by the OCC requested that the OCC preempt state regulatory authority – calling for it to "supersede" or "harmonize" state laws. The OCC should not be catering to requests to create regulatory arbitrage and avoid consumer protections. Indeed, the OCC simply does not have the legal authority to preempt state regulation without a constitutional and clear congressional mandate.