Exhibit N

HBL8VULA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARIA T. VULLO,

                    Plaintiff,

             v.                        17 Cv. 3574 (NRB)

OFFICE OF THE COMPTROLLER
OF THE CURRENCY, et al.,

                    Defendants.

------------------------------x

                                     November 21, 2017
                                     11:00 a.m.

Before:

                    HON. NAOMI REICE BUCHWALD,

                                     District Judge

                         APPEARANCES

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
BY:  NATHANIEL J. DORFMAN
     MATTHEW L. LEVINE
     JAMES CAPUTO

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
CHRISTOPHER CONNOLLY
     Assistant United States Attorney

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HBL8VULA

(Case called)

THE DEPUTY CLERK:  Is the plaintiff present and ready to proceed?

MR. LEVINE:  Yes, we are, your Honor.

THE COURT:  State your name for the record, please.

MR. LEVINE:  Matthew Levine for the New York State Department of Financial Services.

MR. DORFMAN:  Nathaniel Dorfman for the Department of Financial Services as well.

MR. LEVINE:  And with us in court is James Caputo, who is also an attorney at the Department of Financial Services.

THE DEPUTY CLERK:  Is the defendant present and ready to proceed?

MR. CONNOLLY:  Yes.  Good morning, your Honor. Christopher Connolly, from the U.S. Attorney's Office, on behalf of the government.

THE COURT:  Let me start with an apology.  I should have advised you earlier that I would like today's argument to focus only on the standing, ripeness and finality issues.  If we get over those, I will call you back and deal with the merits.

So let me start with some questions.

First, Mr. Connolly, the acting comptroller -- and I know there has been a new one confirmed.

MR. CONNOLLY:  Yes.

HBL8VULA

THE COURT:  I don't know if he is there yet.

MR. CONNOLLY:  He is not.  He will be there at the beginning of next week, your Honor.  So Mr. Noreika is still right now the acting comptroller for a brief period.

THE COURT:  That's fine.

The acting comptroller in July, at the so-called Exchequer's speech, said that the Office of the Comptroller had not received any applications for special purpose charters from fintech companies.  Is that still true?

MR. CONNOLLY:  That remains true, your Honor.

THE COURT:  Mr. Levine, if the OCC never issues a 5.20(e)(1) charter to a fintech company, is it correct that none of the injuries which DFS alleges will ever occur?

MR. LEVINE:  I believe that's correct, your Honor.

THE COURT:  If that is correct, then is this case not premature?

MR. LEVINE:  I would respectfully say it is not, your Honor.  And there is evidence in the record already before you, which I believe establishes that.

Where I would start is not in the statements after we filed suit, but in the documents and statements before we filed suit.

So the first document that I would ask you to focus on is referenced on page 2 of their memorandum, and it's called the charters document.  It's their general manual for

Case 1:18-cv-08377-VM Document 1-14 Filed 09/14/18 Page 5 of 24    4
Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 4 of 23
HBL8VULA

licensing.  It's like a 60-page document.  I have a copy here if you'd like me to hand it up.

THE COURT:  If I have trouble sleeping.

MR. LEVINE:  What I would focus on is the process that they describe in there.  There is a four-stage process for licensing under the OCC.

One is the pre-application meetings.  They basically require you to come in and meet with them, and discuss with them your proposed application, so that they can get a sense of your business plan and make sure the application is not a waste of time.  Secondly, after they do that, then the applicant files the application.  The third step is consideration of the application by the OCC.  And the fourth step is the determination.

The second document, which is relevant here, is Exhibit B to our complaint, which is the December 2016 document which refers to charters for fintech companies.  And in that document the OCC says, We are going to follow the same process that's in our standard licensing manual for these proposed fintechs -- the prefiling meeting, the filing, the evaluation, and the decision.

And in that document the OCC says, We recommend potential applicants carefully review the OCC chartering regulation and the charters booklet -- the one I just referred to -- for a full description of the chartering application

Case 1:18-cv-08377-VM Document 1-14 Filed 09/14/18 Page 6 of 24    5
Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 5 of 23

HBL8VULA

process and requirements. The OCC strongly urges groups of individuals interested in an SPNB -- special purpose national bank -- charter to engage with the OCC well in advance of filing an application.

So they are in this document in December inviting people to come in and talk, the pre-meeting.

In March, they issue the two documents, which essentially say the same thing. This is the supplement, so it's essentially a supplement to the large licensing manual that I referenced.

THE COURT: Isn't the word "draft" on every page?

MR. LEVINE: That would be elevating form over substance, your Honor. If every agency just put draft on a document, they could try to avoid a challenge until the last possible moment. I think that's what is happening here.

THE COURT: Well, we will discuss what might be the possible moment. Isn't part of -- let me let you finish.

MR. LEVINE: I was just going to say, the other thing is the law establishes when the process gets far enough such that there is really nothing left to do from the agency's point. They have said we have the authority. That's the issue here. They have said that over and over and over again in the documents and the speeches.

THE COURT: Maybe your objections will persuade them that they shouldn't exercise their authority. Why do you give

Case 1:18-cv-08377-VM Document 1-14 Filed 09/14/18 Page 7 of 24

Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 6 of 23    6

HBL8VULA

up on your objections, objections that others have raised? Maybe it will have an impact.

MR. LEVINE: Well, we have written to them twice. We wrote to them in January --

THE COURT: And you wrote to them after the March documents as well, because you didn't take them as absolutely final. You put in additional comments, which they invited.

MR. LEVINE: By simply inviting comments doesn't mean the process isn't sufficiently ripe to get a decision of this court. Because they have said they have the legal authority. They have said it over and over. And there is really nothing left for them to do except grant an application, and at that point --

THE COURT: They haven't even received an application.

MR. LEVINE: They have had discussions. And that's in Acting Noreika's statement on July 7 or July 15.

THE COURT: July 19?

MR. LEVINE: Yes. He says two things:

"Does the OCC have the authority to grant national bank charters to financial technology companies that don't take deposits? The answer to that question is a rather simple yes."

Then, here is the other relevant piece, or one of the other relevant pieces. "The OCC will continue to hold discussions with interested companies while we evaluate our options."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:18-cv-08377-VM Document 1-14 Filed 09/14/18 Page 8 of 24   7

HBL8VULA

They are having those initial discussions. Step one, stage one, which is in the December 16 paper, the March paper, and in their charters licensing manual, 60 pages long. They are taking the first step. It is not just a matter of hypothetical, they are actually acting on it. They need to do that stage one before they accept the application. So it's actually already happening, your Honor.

Again, later, in Acting Comptroller Noreika's speech, he says, "Companies interested in exploring chartering options should review the comptroller's licensing manual, charters booklet" -- the big one -- "and contact the OCC's office of innovation for initial discussion."

Initial discussion is stage one. It's their standard process. So they are acting on their standard process to go ahead and license.

So it's more than theoretical, your Honor; it is likely.

THE COURT: Your argument is, any statement made by the comptroller after you filed your case is a statement that I should ignore because it's simply a litigation-based statement. Is that correct?

MR. LEVINE: No, that's not correct. I would ask you to apply maybe some extra scrutiny.

THE COURT: Or you like some parts of what they said because they help your argument.

HBL8VULA

MR. LEVINE:  I would add additional scrutiny to them.

For example, it is consistent with their prior statements, in the July post-litigation --

THE COURT:  What Comptroller Curry said doesn't by law bind anybody, does it?  In other words, the new comptroller is free to take a totally different position.  I am not saying he's going to, but he is free to do so.  Nothing that has happened binds the comptroller going forward, correct?

MR. LEVINE:  The current comptroller, he was just confirmed.

THE COURT:  Nothing that has happened up to now prevents the new comptroller, when he comes on Monday, from totally changing the policy leanings of, first, the prior administration, presidentially speaking, and the prior acting head of the office.

MR. LEVINE:  That is correct, your Honor.  And I would argue that's the case of any new agency head, to come in and undo or start to undo something that's been in place before.  I think we are far enough along, because of the definitive nature of their statement about their authority and because they have started taking first steps towards licensing, I believe we are far enough along for you to make that decision.  They could moot the case now.  The new comptroller could just simply say, we are not going to do this, in which case we will withdraw our complaint.  They haven't done it.

Case 1:18-cv-08377-VM  Document 1-14  Filed 09/14/18  Page 10 of 24    9
Case 1:17-cv-05574-NRB  Document 27  Filed 11/29/17  Page 9 of 23
HBL8VULA

Yes, he has only been there a little while, but the alternative, your Honor, is we are going to end up running into court for a TRO before your Honor once they issue a license. And I would suggest that, because we are far enough along, because the statement of authority is definitive, and because they have actually said, we are already starting this process, come in and talk to us, we are meeting with people, that you can make the decision now.

Another thing I would suggest is, if your Honor has some doubts about it, we could have limited jurisdictional discovery. Yes, you have the representation from Mr. Connolly they haven't actually received an application yet, but they may be very close; they may be inviting applications; they may be days away. We don't know that.

THE COURT: Mr. Connolly, assume that I agree with you that this case is not ready for decision. At what point or what action do you acknowledge would be sufficient to moot the threshold arguments? What next step?

MR. CONNOLLY: There are at least two, and perhaps three steps that would need to be taken before we would have an injury, in fact, sufficient to confer standing or, in addition, to get over that threshold of a final agency action for purposes of APA review.

First, and most fundamentally, OCC needs to make a final determination that it's going to issue 5.20(e)(1)

Case 1:18-cv-08377-VM Document 1-14 Filed 09/14/18 Page 11 of 24    10
Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 10 of 23
HBL8VULA

charters to fintech companies. They have not made that final decision. It's certainly something they are considering; it's something they have been considering for a very long time. But they have also persisted in saying that it's not their only option for supporting fintech innovation, and so you may ultimately have a different course than the one that DFS is premising its complaint upon.

So first you need a final agency decision, yes, we are going to be issuing these types of charters to fintech companies.

Then you need the consideration of applications, in other words, you have a framework in place and you have people who are applying for them. There I think you reach the point where DFS might credibly be able to say, there are going to be harms that flow from this because they have applications that are under consideration and the next step is going to be, presumably, the granting of the charter that we believe is going to lead to all of these harms.

So, at the outer limit, at least those two things need to happen. The most fundamental thing, of course, your Honor, would be the actual issuance of a charter; in other words, you put flesh on the bones of who is going to be getting these charters, under what circumstances, and then you have clearly the ability of the agency, of the state to argue there are actual or imminent harms. But we are, again, at least two or

Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 11 of 23

HBL8VULA

three steps removed from that at this point.

THE COURT:  But as a matter of sensible policy as well as law, a policy from all perspectives -- the comptroller, DFS, potential applicants -- does it not moot the threshold argument if and when the OCC says that it has decided to proceed to accept applications from fintech companies for special purpose charters under 5.20?

In other words, once you make that final decision and you announce it, isn't that the point at which these standing and ripeness issues and final agency action issues come to an end, and come to an end sensibly?  In other words, there is no benefit to having companies spend all sorts of money applying for these charters if, in fact, it turns out that a court says you don't have any right under the law to issue them.  In a sense, what else do we need to know and aren't we sort of considering all of the relevant interests?

MR. CONNOLLY:  Your Honor, you may well be right.

THE COURT:  I am asking you to take a position, in the context of this case, as to at what point do these arguments that you have been making, which I think do have some currency, come to an end by virtue of what the comptroller decides to do?

MR. CONNOLLY:  When OCC says -- and I suspect that it would be a two-part statement -- we have decided to issue 5.20(e)(1) charters to fintech companies and are accepting applications for them, in other words, the decision is made and

Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 12 of 23

HBL8VULA

the process is commencing, at that point, the standing arguments that the government has made and the final agency action arguments that the government has made would likely -- we would likely be in a very different posture then, your Honor. Then DFS would be able to make better arguments with respect to the harms.

THE COURT: I don't see any point in going through this a second round. At some point we ought to get clarity. Maybe your arguments are good now, but at some point they are going to evaporate. I mean, they have to evaporate at some point, if you decide to go ahead. If you never go ahead, they are happy, I'm happy; I don't know how you feel, but in any event, we are done. But if the comptroller says, we have decided to go ahead and we will accept applications, would that not be the perfect time to decide the merits before the fintech companies spend all of the money, time and effort to put in applications? They may decide to go ahead, but at least at that moment they are on notice that it's possible that a court is going to say you have just wasted your time.

MR. CONNOLLY: Correct.

THE COURT: So as a matter of sensible policy, there is nothing else -- you have taken a position. You're consistent in your position even now that you have the right to do this. But as of now, you are still saying we may be persuaded by the eloquence of New York state and others.

Case 1:18-cv-08377-VM   Document 1-14   Filed 09/14/18   Page 14 of 24    13
Case 1:17-cv-03574-NRB   Document 27   Filed 11/29/17   Page 13 of 23
HBL8VULA

MR. CONNOLLY:  That OCC has indicated that it believes it has this authority does not mean that it will actually exercise that authority.  And that is a consistent theme that comes throughout any of the documents before the Court, including the acting comptroller's statements from July 2017.

THE COURT:  Mr. Levine.

MR. LEVINE:  Just two short responses to Mr. Connolly's statement.

First, the OCC could announce that determination when they issue a license to a fintech company.  Nothing requires them to make an announcement beyond what they have done so far. So we could find out because an institution that we currently license sends us the letter from the OCC and says, we are licensed by the OCC, we no longer are subject to your jurisdiction.  There is nothing requiring them to do anything before that.

Secondly, I believe it has already evaporated, the term you used.  Their statements have evaporated.  And here's where they are.  They have already said they are going to consider applications.  This is in Exhibit H to our complaint, the explanatory statement at page 2.  "In December 2016, Comptroller Curry announced that the OCC would move forward with considering applications from fintech companies to become special purpose national banks."  It's right there, and this is prior to our litigation, and this is Exhibit H, page 2.

Case 1:18-cv-08377-VM Document 1-14 Filed 09/14/18 Page 15 of 24    14
Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 14 of 23

HBL8VULA

Then, in Comptroller Curry's statement, March 6, 2017, Exhibit J to our complaint, "We will be issuing charters to fintech companies engaged in the business of banking because it is good for consumers, business, and the federal banking system."

Your Honor, they have already said we are moving forward to consider applications and we will be issuing these charters. I believe that indicates this matter is ripe for decision.

THE COURT: In Acting Comptroller Noreika's statement before the Exchequer Club in July, he said, and I quote, "That said, at this point, the OCC has not determined whether it will actually accept or act upon applications from non-depository fintech companies for special purpose national bank charters that rely on this regulation. And to be clear, we have not received, nor are we evaluating, any such applications from non-depository fintech companies."

It goes on, "While OCC has no imminent or concrete plans to use Section 5.20 to charter an uninsured special purpose fintech national bank, clearly, other statutory chartering options exist for the OCC and many fintech business models to achieve the same result."

So it seems to me that, to accept your argument, I have to basically find the acting comptroller to be lying; and, regardless of my general skepticism in the world, to ask me, to

HBL8VULA

ask any court to find that a head of an agency who makes a statement that's clear on its face is lying, simply because the statement is post-litigation, I think is a very aggressive argument.

MR. LEVINE:  Your Honor, we are asking to look at the totality of the allegations in our complaint.  And in those totality, I believe there is sufficient evidence for you to move forward.  If there isn't sufficient evidence, you can certainly order limited jurisdictional discovery.

THE COURT:  The jurisdictional discovery isn't going to tell me ultimately whether the comptroller is actually going to proceed or not.

MR. LEVINE:  We have no position that I took away from Mr. Connolly's statement as to when we are actually going to know.

THE COURT:  I agree.  Really, he is the assistant U.S. attorney in the courtroom.  He is in no position to be speaking as to a future policy of the comptroller.  I wouldn't ask him to do that.  But I will press him on some of the standing issues.

MR. LEVINE:  Sure.  I would just say that today, after this argument, the new comptroller could issue a memo internally saying, accept applications, move on them, etc., and we still may not know about that.

THE COURT:  What would be so awful if that happened

Case 1:17-cv-03574-NRB   Document 27   Filed 11/29/17   Page 16 of 23

HBL8VULA

and you came back to court and we address the merits?  Let's assume on the merits you win.  And, honestly, that's an assumption, not because I have a view, it's because I have really not spent the time studying the merits.  So it is an honest statement that it's an assumption.

Let's assume you then win and that a fintech company loses its national charter at the end.  If there is no temporary restraint, and there might not be, they exist for a few months.  Or the other possibility is you lose the argument, in which case they continue.  Why is that such a bad result, because it adds the other factor, which really is part of the ripeness argument.  Any court would be in a better position to decide whether this special purpose charter is consistent with the law or not if we knew what the fintech entity was, what they were doing.  Maybe the comptroller will require certain consumer protections that are similar to New York's.  Again, you're asking that I should assume, without their taking action, that they don't view themselves as a protective agency.

MR. LEVINE:  We do view them as not a protective agency, and I want to give an example of that in a moment.

Respectfully, I don't believe any further factual development is necessary here.  I think the legal issue is completely teed up for your Honor's consideration.  The entity that will be licensed, the fintech entity, will either lend money or pay checks, because it won't have to accept deposits.

Case 1:18-cv-08377-VM Document 1-14 Filed 09/14/18 Page 18 of 24    17
Case 1:17-cv-03574-NRB Document 27 Filed 11/29/17 Page 17 of 23

HBL8VULA

So we know it's going to do one of those two things. Knowing that, I respectfully submit, your Honor, won't inform the legal decision at all. So I don't think there is any additional factual development that needs to be made there.

Secondly, what I would say is, in those several months, and I know your Honor would move this matter along quickly, as you do all your matters, but even in those several months, then the potential harms, if the OCC were to take over, could come into place. They will not ensure the kind of fair lending that we require, and that our enforcement actions have required. They will not ensure that payday lending doesn't occur. Here, there is no payday lending in New York. The civil usury rate is 16 percent. When those restrictions come off, they can do payday lending. They are only limited by the interest rate of the state in which they are located. That will come off in those months. Those consumers will be affected in New York. Also affected in New York, certain institutions are subject to being used to commit human trafficking, small money transmitters for example. Those protections will come off. The OCC in Washington, in the Treasury Department, doesn't care about enforcing those kind of things. We do, and even in those several months, those harms will happen.

So I submit, your Honor, it does make a difference.

THE COURT: If a special purpose charter were given to

HBL8VULA

a fintech company that's currently regulated by another state, how does New York suffer an injury in fact?

MR. LEVINE: I guess it depends on the entity. If it's somebody like Western Union, obviously, all 50 states regulate Western Union to some extent or another. So if it's given to Western Union, it's certainly going to impact us. If it's a small money transmitter in Delaware, I don't know off the top of my head where we would immediately receive injury, but I certainly think it would encourage other entities --

THE COURT: Doesn't that question actually point out that there could be charters given that might not have the same impact on New York state?

I understand the situation where the company is currently regulated by New York, and I gather if they get the national charter, they no longer need to follow New York's rules. And I can see, based on the arguments you have made, why that is a direct consequence to New York and to its citizens. But what if it is, as I said, a company that's currently chartered in Hawaii, make it very far away, how is New York affected in reality if the Hawaii state chartered entity now has a federal charter?

MR. LEVINE: They can certainly try to come to New York. I guess, if they are far away, that's unlikely. They can certainly come and try to exercise their national charter here.

Case 1:17-cv-03574-NRB   Document 27   Filed 11/29/17   Page 19 of 23

HBL8VULA

THE COURT:  But one that's a little more hypothetical, and certainly one of your arguments, that New York state loses revenue would not be applicable at all.

MR. LEVINE:  That's correct.  Look, I just want to say one thing about fintechs.  It's really a misnomer.  To use Western Union as an example, when they got the telegraph back 100-plus years ago, it became a fintech.  When Citibank started using ATMs in the 70s, it was a fintech.

THE COURT:  So it's not a dirty word.

MR. LEVINE:  It's not a dirty word.  These are just traditional financial services, not some new class of financial services.

THE COURT:  Haven't we always had national banks? Wasn't that one of those early constitutional cases that we all learned about?

MR. LEVINE:  We had both national banks and state banks.  They are certainly entitled -- banks are certainly entitled to go either way.  We have had this wonderful system of dual regulation.  We have 200-plus banks that we regulate in this state.  It works well.  But for these non-depository institutions that would be subject to this charter, those have been almost exclusively regulated by states for 150 years or more.

THE COURT:  We tried to find, through a little Internet research, on whether the new comptroller has taken a

HBL8VULA

position on special purpose national bank charters to fintech companies. Are you aware whether he has ever spoken on this topic at all?

MR. CONNOLLY: Your Honor, I am not aware of whether he has ever spoken on the topic.

MR. LEVINE: There is one thing I wanted to add, which is this. The entities likely to seek these fintech charters are not going to be a small, nice service business; they are going to be the large entities.

THE COURT: Like who?

MR. LEVINE: Western Union, like Apple Pay, entities like PayPal. PayPal has a license in every state. We regulate PayPal. PayPal does not receive deposits; it's a non-depository institution. They transmit money, they pay checks, or they make payments between parties. We license them through all the other 50 states. They would be withdrawn from our jurisdiction. Those are the entities likely to seek these charters, not a small entity in another state.

THE COURT: And they would prefer to be nationally chartered because they would rather be governed by one set of rules instead of 50 sets of rules?

MR. LEVINE: That's certainly an argument. But, also, maybe they don't want to have to comply with the strong protections for consumers and businesses that we have in New York.

Case 1:18-cv-08377-VM   Document 1-14   Filed 09/14/18   Page 22 of 24   21
Case 1:17-cv-03574-NRB   Document 27   Filed 11/29/17   Page 21 of 23
HBL8VULA

THE COURT:  Isn't it automatically obvious that if PayPal receives a national charter, that the charter would have fewer restrictions and controls to protect consumers?

MR. LEVINE:  Yes, your Honor.  Here's the example I would point to.  In a slightly different procedural context, a couple of weeks ago a bank we regulated BTMU, a Japanese bank, was under our charter.  They flipped to an OCC charter.  They did it through a different process; not a new charter, but a conversion from a state branch to a federal branch.  And I can tell you the reason they did it was to get out from under us because they had a number of problems.  This has been in the press recently.  They have had a number of problems, and they wanted to get out because they didn't want to solve those problems.  The OCC didn't care about those problems.  They put some stuff in their conversion papers to recognize they had problems but, in actuality, they really don't care; they are not known for their vigorous enforcement.  So there is an argument, a strong argument, that they are seeking to avoid the protections that are in New York.

THE COURT:  I am out of questions.  Let me give each of you a chance to say anything that you haven't had a chance to say up to now.

Mr. Connolly.

MR. CONNOLLY:  Your Honor, if the Court has no further questions for the government, I would just again reiterate, we

HBL8VULA

are talking about a challenge to a decision that OCC has not made and, indeed, might not ever make. And that's really at the crux of this case, and that's why the government's motion to dismiss should be granted.

Thank you.

THE COURT: Do you have any quibble with me that at the moment, if they ever decide to proceed, that that would be a ripe and appropriate time to get to the merits?

MR. CONNOLLY: I don't want to foreclose any arguments that the government might have, depending on what posture we are in, but certainly if a decision is made to issue 5.20(e)(1) charters to non-depository fintech companies, and that decision is presumably going to come hand and glove with, the doors are open now to the acceptance of these applications, certainly then we are talking about a final decision being made and a process being in motion that DFS is certainly more plausibly going to be able to argue leads to imminent harm.

THE COURT: Mr. Levine.

MR. LEVINE: I would just say, your Honor, the key word there is presumably. Again, we have no idea how that announcement would come, whether it would be a declaration or a speech, or simply the issuance of a license, which is our greatest concern.

If your Honor is considering dismissing this case on ripeness, I would query whether your Honor would want to do it

HBL8VULA

on some condition about the statement or the position of the comptroller about whether they are going to proceed or not.  We believe they have already said they have, but assuming Mr. Connolly's position.  Otherwise we are out of this court and we are going to have to, I think very likely, come back to you on a rush basis.

THE COURT:  OK.  Thank you very much.  We will give you a decision as soon as we can.

MR. LEVINE:  Thank you, your Honor.

MR. CONNOLLY:  Thank you, your Honor.

(Adjourned)