**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARIA T. VULLO, in her official capacity as
Superintendent of the New York State
Department of Financial Services,

        Plaintiff,

   v.

OFFICE OF THE COMPTROLLER OF THE
CURRENCY and JOSEPH M. OTTING, in his
official capacity as U.S. Comptroller of the
Currency,

        Defendants.

18 Civ. 8377 (VM)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2761
Facsimile: (212) 637-2786

CHRISTOPHER CONNOLLY
Assistant United States Attorney
   —Of Counsel—

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND .......................................................................................................2

I.      OCC's Chartering Authority........................................................................2

II.     OCC's Fintech Initiative .............................................................................4

III.    Prior Fintech Charter Litigation .................................................................5

ARGUMENT ...........................................................................................................7

I.      THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER DFS'S
        CLAIMS ...................................................................................................7

        A.      DFS Still Lacks Standing Because It Has Not Suffered an Injury-In-Fact.............7

        B.      The Matter Remains Unripe for Judicial Review ...................................9

        C.      Any Challenge to OCC's 2003 Amendment to Section 5.20(e)(1) Is
                Time-Barred........................................................................................10

II.     THE COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE
        GRANTED ...............................................................................................11

        A.      OCC's Interpretation of the Ambiguous Term "The Business of Banking"
                in the National Bank Act Is Entitled to Deference .................................11

                1.      Because the Statutory Text Is Ambiguous, OCC Has Discretion to
                        Reasonably Interpret It..............................................................12

                        a.      In *NationsBank*, the Supreme Court Recognized OCC's
                                Authority to Interpret the Ambiguous Term "Business of
                                Banking .........................................................................13

                        b.      The D.C. Circuit Has Confirmed OCC's Authority to Issue a
                                Limited Purpose National Bank Charter........................15

                2.      OCC Reasonably Interpreted the Statutory Term "Business of Banking"
                        by Reference to Three Core Banking Activities Identified in
                        the National Bank Act................................................................17

        B.      Neither Section 5.20(e)(1) Nor Any Charter Issued Under Section 5.20(e)(1)
                in the Future Violate the Tenth Amendment .........................................19

i

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................................... 9

*Am. Ins. Ass'n v. Clarke*,
    865 F.2d 278 (D.C. Cir. 1988) ......................................................................... 14

*Arnold Tours, Inc. v. Camp*,
    472 F.2d 427 (1st Cir. 1972) ............................................................................ 15

*Attias v. Carefirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) ........................................................................... 8

*Barnett Bank of Marion Co. v. Nelson*,
    517 U.S. 25 (1996) ........................................................................................... 19

*Chevron, Inc. v. NRDC, Inc.*,
    467 U.S. 837 (1984) ......................................................................................... 11

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ....................................................................................... 7, 8

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ........................................................................... 11, 17, 18

*CSBS v. OCC*,
    313 F. Supp. 3d 285 (D.D.C. 2018) ......................................................... *passim*

*Cuomo v. Clearing House, Ass'n, LLC*,
    557 U.S. 519 (2009) ......................................................................................... 11

*Cuzzo Speed Tech., LLC v. Lee*,
    136 S. Ct. 2131 (2016) ................................................................................ 11, 12

*Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*,
    458 U.S. 141 (1982) ......................................................................................... 19

*Franklin Nat'l Bank v. New York*,
    347 U.S.   (1954) ............................................................................................ 19

*Harris v. FAA*,
    353 F.3d 1006 (D.C. Cir. 2004) ....................................................................... 10

iii

*Independent Community Bankers Association of South Dakota, Inc. v. Board of Governors of the Fed. Reserve System,*
    820 F.2d 428 (D.C. Cir. 1987) ................................................................................ 15, 16

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 7, 9

*M&M Leasing Corp. v. Seattle First Nat'l Bank,*
    563 F.2d 1377 (9th Cir. 1977) .............................................................................. 14, 15

*Marchi v. Bd. of Coop. Educ. Servs.,*
    173 F.3d 469 (2d Cir. 1999) .................................................................................. 10

*N.Y. Civil Liberties Union v. Grandeau,*
    528 F.3d 122 (2d Cir. 2008) .................................................................................. 9

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,*
    513 U.S. 251 (1995) ........................................................................................ 11, 13, 14

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ............................................................................................ 9

*Plant City v. Dickinson,*
    396 U.S. 122 (1969) ............................................................................................ 18

*Simmonds v. INS,*
    326 F.3d 351 (2d Cir. 2003) .................................................................................. 10

*Smiley v. Citibank (South Dakota),*
    517 U.S. 735 (1996) ........................................................................................ 11, 19

*Spannaus v. U.S. Dep't of Justice,*
    824 F.2d 52 (D.C. Cir. 1987) ................................................................................ 11

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ........................................................................................ 8

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) .............................................................................................. 7

*U.S. v. Mead Corp.,*
    533 U.S. 218 (2001) ............................................................................................ 11

*Vullo v. OCC ("Vullo I"),* No. 17 Civ. 3574,
    2017 WL 6512245 (S.D.N.Y. Dec. 12, 2017) ...................................................... 5, 6, 7, 9

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007) ................................................................................................ 19

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................................................ 8

## STATUTES

12 U.S.C. § 1 ........................................................................................................ 2, 3

12 U.S.C. § 1(a) ..................................................................................................... 2

12 U.S.C. § 21 ...................................................................................................... 2, 12

12 U.S.C. § 24 ..................................................................................................... 12, 13

12 U.S.C. § 26 ...................................................................................................... 2, 12

12 U.S.C. § 27 ........................................................................................................ 2

12 U.S.C. § 27(a) .............................................................................................. 2, 3, 12

12 U.S.C. § 27(b)(1) .............................................................................................. 12

12 U.S.C. § 36 ........................................................................................................ 17

12 U.S.C. § 36(j) .................................................................................................... 17

12 U.S.C. § 81 ........................................................................................................ 17

12 U.S.C. § 93a ...................................................................................................... 2

28 U.S.C. § 2401(a) ............................................................................................... 10

## RULES AND REGULATIONS

Fed. R. Civ. P. 12(b)(1) .......................................................................................... 1

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 1

12 C.F.R. § 5.20(e)(1) ..................................................................................... *passim*

## OTHER AUHORITIES

68 Fed. Reg. 70122 (Dec. 17, 2003) .................................................................. 3, 11

## PRELIMINARY STATEMENT

Defendants the Office of the Comptroller of the Currency and Joseph M. Otting, in his official capacity as Comptroller of the Currency (together, "defendants" or "OCC"), by their attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the Complaint (ECF No. 1) ("Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction, and 12(b)(6), for failure to state a claim on which relief may be granted.

The New York State Department of Financial Services ("DFS") challenges OCC's decision to consider applications for a particular form of bank charter—a Special Purpose National Bank ("SPNB") Charter—from financial technology (or "fintech") companies. Like its prior lawsuit challenging OCC's fintech chartering authority, which was dismissed in December 2017, this action is premature. Although OCC has announced its intention to accept and consider applications for SPNB charters from fintech companies, it has not even received such an application, let alone granted a charter. Accordingly, the injuries that DFS claims it will suffer as a result of OCC's anticipated actions—all of which are premised on OCC issuing a SPNB charter to a fintech company, and the charter recipient commencing the business of banking within the state of New York—are speculative, and insufficient to establish DFS's standing to sue. Likewise, and for fundamentally the same reasons, this matter is not ripe for judicial review.

Should the Court nonetheless reach the merits of OCC's authority to issue SPNB charters to fintech companies, the Complaint should be dismissed for failure to state a claim. The regulation pursuant to which OCC intends to issue such charters, 12 C.F.R. § 5.20(e)(1), reflects

a reasonable interpretation of OCC's statutory authority under the National Bank Act. Specifically, OCC has interpreted the ambiguous statutory term "the business of banking" to encompass three core banking functions: receiving deposits, paying checks, or lending money. So long as an institution engages in at least one of those core activities, it is engaged in the business of banking under the National Bank Act. Thus, the charters at issue here—which would be issued to applicants who do not take deposits—are statutorily permissible. That reasonable interpretation of ambiguous statutory language is entitled to deference under the *Chevron* framework. DFS's remaining argument—that the issuance of SPNB charters under § 5.20(e)(1) would violate the Tenth Amendment—is likewise without merit. Accordingly, the Court should dismiss the Complaint.

## BACKGROUND

### I.   OCC's Chartering Authority

OCC is an independent bureau of the U.S. Department of the Treasury with primary supervisory responsibility over national banks. *See* 12 U.S.C. § 1 *et seq.* It is charged with ensuring that national banks (and other institutions under its jurisdiction) operate in a safe and sound manner in compliance with applicable laws and regulations, and that they offer fair access to financial services and provide fair treatment to customers. *See* 12 U.S.C. § 1(a). OCC's activities in furtherance of its mission include determining whether to grant new national bank charters to associations formed to carry out the "business of banking." *See, e.g.*, 12 U.S.C. §§ 21, 26, 27. In implementing OCC's chartering authority, "the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office." 12 U.S.C. § 93a.

Under the National Bank Act, OCC may grant a charter "[i]f . . . it appears that such association is lawfully entitled to commence the business of banking." 12 U.S.C. § 27(a).

Reflecting the variety of ways an association seeking a charter can engage in the "business of banking," national banks may be chartered to carry out differing activities.  New banks may be chartered to carry out a full complement of the powers accorded to national banks under the National Bank Act, or they may seek authority for more focused "special purpose" operations, such as those of trust banks, credit card banks, bankers' banks, community development banks, cash management banks, and other business models based on limited activities.  *See* Office of the Comptroller of the Currency, Comptroller's Licensing Manual, Charters 1 (2016) ("Licensing Manual"), *available at* https://www.occ.treas.gov/publications/publications-by-type/licensing-manuals/charters.pdf (last accessed Feb. 25, 2019).  In some instances, such as the limited purpose charter granted to trust banks, Congress has expressly recognized and ratified OCC's authority to grant a limited purpose national bank charter.  *See* 12 U.S.C. § 27(a)  In other instances, OCC properly relies on its broad discretion to interpret the National Bank Act in order to determine whether a particular set of banking activities is consistent with the statutory meaning of being engaged in the "business of banking" for the purpose of granting a limited or special purpose charter.

In 2003, OCC adopted the current version of 12 C.F.R. § 5.20(e)(1), which sets forth OCC's authority to grant a national bank charter to an institution that is engaged in some, but not all, of the core banking functions.  68 Fed. Reg. 70122 (Dec. 17, 2003).  Section 5.20(e)(1) provides that OCC may charter a "special purpose bank" that conducts activities other than fiduciary activities if it engages in at least one "core banking function"—receiving deposits, paying checks, or lending money.  The regulation states:

> The OCC charters a national bank under the authority of the National Bank Act of 1864, as amended, 12 U.S.C. 1 *et seq*.  The bank may be a special purpose bank that limits its activities to fiduciary activities or to any other activities within the business of banking.  A special purpose bank that conducts activities other than

> fiduciary activities must conduct at least one of the following three core banking
> functions: Receiving deposits; paying checks; or lending money.

12 C.F.R. § 5.20(e)(1).  Since its adoption, OCC has not relied on 12 C.F.R. § 5.20(e)(1) to

charter a national bank that engages in one of the two core banking activities of paying checks or

lending money, but that does not take deposits.  *See* Declaration of Stephen A. Lybarger, dated

February 25, 2019 ("Lybarger Decl.") ¶ 7.

## II.     OCC's Fintech Initiative

On July 31, 2018, OCC announced that it would start accepting applications from

fintechs for special purpose bank charters for national banks that engage in one of the two core

banking activities of paying checks or lending money, but that do not take deposits.  *See* Press

Release, Office of the Comptroller of the Currency, OCC Begins Accepting National Bank

Charter Applications from Financial Technology Companies (July 31, 2018) (ECF No. 1-11) (the

"July 31 Announcement").  OCC's application of its established chartering authority to grant

special purpose bank charters in the fintech area emerged out of an initiative launched in 2015 by

former Comptroller of the Currency Thomas J. Curry.  This initiative examined the broader

question of how OCC could best support responsible innovation in the financial services

industry.  In December 2016, OCC published a white paper on the topic.  *Exploring Special*

*Purpose National Bank Charters for Fintech Companies* (Dec. 2016) (ECF No. 1-2).  OCC

solicited comments on its white paper and, after reviewing the comments that it received, it

issued a draft supplement to its Licensing Manual, again inviting public comment.  *Evaluating*

*Charter Applications from Financial Technology Companies* (Mar. 2017) (ECF No. 1-9).

OCC's July 31 Announcement coincided with the Treasury Department's issuance of a

report that expressed strong support for OCC's efforts in the fintech area.  *See* U.S. Dep't of the

Treasury, A Financial System that Creates Economic Opportunities—Nonbank Financials,

Fintech, and Innovation (2018), https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation_0.pdf ("Treasury Report") (last accessed Feb. 25, 2019).  The Treasury Report noted the advantages of OCC's SPNB charter, concluding that it "may provide a more efficient, and at least a more standardized, regulatory regime than the state-based regime in which [fintech companies] operate."  Treasury Report 70.  The Treasury Department recommended that "the OCC move forward with prudent and carefully considered applications for special purpose national bank charters."  *Id.* at 73, 201.

OCC's July 31 Announcement was accompanied by a finalized version of the *Comptroller's Licensing Manual Supplement*, *Considering Charter Applications from Financial Technology Companies* ("Licensing Manual Supplement") (ECF No. 1-13), as well as a statement of OCC policy, *Policy Statement on Financial Technology Companies' Eligibility to Apply for National Bank Charters* ("Policy Statement") (ECF No. 1-12) that enunciates OCC's regulatory approach and expectations associated with SPNB Charters.

While OCC has announced that it will begin accepting applications for SPNB Charters, it has not yet approved an application for an SPNB Charter from a fintech company that does not take deposits.  *See* Lybarger Decl. ¶¶ 7-8.  Indeed, as of the date of this brief, OCC has not received an application for a SPNB Charter.  *See id.*

## III.    Prior Fintech Charter Litigation

This is DFS's second attempt to challenge OCC's SPNB chartering authority.  In December 2017, Judge Buchwald granted OCC's motion to dismiss DFS's prior complaint.  *See Vullo v. OCC ("Vullo I")*, No. 17 Civ. 3574, 2017 WL 6512245, at *1 (S.D.N.Y. Dec. 12, 2017).  First, the court held that DFS lacked standing to challenge OCC's purported "fintech charter

decision" because OCC had not made a final determination that it would issue such charters.  *See id.* at *7-8.  The court explained that DFS's "alleged injuries will only become sufficiently imminent to confer standing once the OCC makes a final determination that it will issue SPNB charters to fintech companies. . . . [N]one of its alleged injuries will actually occur if the OCC never issues an SPNB charter to a fintech company."  *Id.* at *7.  The court also dismissed the complaint on ripeness grounds, holding that it failed to satisfy the standard for constitutional ripeness because DFS had not suffered a cognizable injury-in-fact, and that DFS's claims were also not prudentially ripe because they were "contingent on future events that may never occur, namely the decision by the OCC to issue SPNB charters to fintech companies."  *Id.* at *9 (citation and quotation marks omitted).

Relatedly, in April 2018, a district court in the District of Columbia dismissed a similar complaint brought by the Conference of State Bank Supervisors ("CSBS").  *See CSBS v. OCC*, 313 F. Supp. 3d 285 (D.D.C. 2018).  The court held that it only needed "to reach the first requirement [for establishing standing]—injury in fact—to resolve this case," *id*. at 295, because "each of [the] harms" identified by CSBS was "contingent on whether the OCC charters a Fintech," *id.* at 296  (citing *Vullo I*, 2017 WL 6512245, at *7-8).  The court further observed that:

> [s]everal contingent and speculative events must occur before the OCC charters a Fintech: (1) the OCC must decide to finalize a procedure for handling those applications; (2) a Fintech company must choose to apply for a charter; (3) the particular Fintech must substantively satisfy regulatory requirements; and (4) the OCC must decide to grant a charter to the particular Fintech.

*Id.*  Because OCC had not yet decided to "grant a charter to [a] particular Fintech," this "chain of speculative events" failed to clear the bar posed by the "certainly impending" test or the alternative "substantial risk" test for establishing standing.  *Id.* at 297.

Finally, like Judge Buchwald in *Vullo I*, the court in *CSBS* also concluded that the case was constitutionally unripe, and that considerations of prudential ripeness weighed in favor of deferring adjudication.  *Id.* at 299-300.  Specifically, the court observed that "[t]his dispute would benefit from a more concrete setting and additional percolation.  In particular, this dispute will be sharpened if the OCC charters a particular Fintech—or decides to do so imminently."  *Id.* at 300.

## ARGUMENT

### I.   THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER DFS'S CLAIMS

#### A.   DFS Still Lacks Standing Because It Has Not Suffered an Injury-In-Fact

The Court should dismiss DFS's Complaint pursuant to Rule 12(b)(1) because DFS still cannot satisfy Article III's case-or-controversy requirement, which necessitates that a plaintiff have standing to sue.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The "irreducible constitutional minimum" for standing contains three elements: "injury in fact," "causation," and "redressability."  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-03 (1998).  DFS, as the party invoking this Court's jurisdiction, bears the burden of establishing each element.  *Id.* at 103-04.  But DFS cannot meet this burden because it cannot establish that it has been injured by OCC's decision to accept applications for SPNB Charters.  Consequently, DFS has not met its burden of showing a "concrete," "actual or imminent" injury-in-fact.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also Vullo I*, 2017 WL 6512245, at *7-8; *CSBS I*, 313 F. Supp. 3d at 295.

As was the case in its prior lawsuit, all of the alleged injuries that DFS identifies in its complaint are future-oriented and speculative, and therefore insufficient to confer standing.  *See Lujan*, 504 U.S. at 561 (injury must be "likely" as opposed to merely "speculative").  For

7

example, DFS identifies a host of "risks" that it claims flow from OCC's decision to entertain SPNB Charter applications.  Compl. ¶ 3.  But all of those risks are predicated on OCC issuing an SPNB Charter to an applicant who does business in New York, and the charter recipient actually commencing the business of banking—acts that still have not occurred.  *See* Lybarger Decl. ¶¶ 7-8.  Similarly, DFS speculates that OCC's decision to entertain applications "might realistically lead" to certain harms if fintech companies who engage in "payday lending" receive charters. Compl. ¶ 47.  But again, those alleged harms could only occur once such an entity is chartered and commences the business of banking in New York.  "A 'concrete' injury must be *de facto*; that is, it must actually exist."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  Put simply, none of DFS's alleged harms exist.  Indeed, as DFS admits, "the full scope of [the] regulatory disruption" it alleges might occur "is difficult to ascertain."  Compl. ¶ 43.  That is because none of these alleged harms can materialize, or even be identified with the requisite certainty, until the OCC issues a SPNB Charter and the charter recipient commences the business of banking in New York.  *See CSBS*, 313 F. Supp. 3d at 297.

Furthermore, although "certainly impending" threats of future injury can constitute injury-in-fact for standing purposes, *Clapper*, 568 U.S. at 409, OCC remains several steps removed from issuing a charter, *see CSBS I*, 313 F. Supp. 3d at 296 (identifying four steps that must occur before CSBS's alleged harms would transpire); *see also* Lybarger Decl. ¶¶ 7-8. Thus, DFS's "[a]llegations of possible future injury do not satisfy the requirements of Article III."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  Nor can DFS establish injury-in-fact under the "substantial risk" test.  *See Clapper*, 568 U.S. at 414 n.5.  That test considers costs incurred by a plaintiff to "mitigate or avoid" future harm, *id.*, but nevertheless focuses on "the ultimate alleged harm . . . as the concrete and particularized injury."  *Attias v. Carefirst, Inc.*, 865

8

F.3d 620, 627 (D.C. Cir. 2017).  DFS has not identified any efforts to mitigate or to avoid the

alleged harm.  *See CSBS I*, 313 F. Supp. 3d at 297.  Moreover, DFS's claims depend on OCC's

potential regulation of future third-party applicants, meaning that DFS must allege or show that

these third-party applicants will indeed submit successful applications and subsequently be

chartered in a way that creates the substantial risk.  *See Lujan*, 504 U.S. at 562.  DFS does not

make this showing.  Because DFS cannot demonstrate injury-in-fact at this stage, its Complaint,

like its prior complaint, is premature, and subject to dismissal.

     **B.**    **The Matter Remains Unripe for Judicial Review**

     Relatedly, the absence of OCC action to date means that this matter is not yet ripe for

judicial review.  *See Vullo I,* 2017 WL 6512245, at *8-10.  The matter is not constitutionally ripe

for the same reasons DFS lacks standing: "constitutional ripeness is a subset of the injury-in-fact

element of Article III standing," and therefore the Court's "constitutional ripeness analysis here

is coterminous with" the standing analysis.  *Id.* at *8.  Moreover, even where standing exists

under Article III, there may still be "prudential reasons for refusing to exercise jurisdiction."

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  Courts assess the

prudential ripeness of a case based on a two-prong inquiry: "'[1] the fitness of the issues for

judicial decision and [2] the hardship to the parties of withholding court consideration.'"  *N.Y.

Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131-32 (2d Cir. 2008) (quoting *Abbott Labs. v.

Gardner*, 387 U.S. 136, 149 (1967)).  DFS cannot satisfy either prong of this test.  *See Vullo I*,

2017 WL 6512245, at *8-9.

     The first prong, fitness, turns on, among other things, "whether the issues sought to be

adjudicated are contingent on future events or may never occur."  *Grandeau*, 528 F.3d at 132

(citation and quotation marks omitted).  As explained above, all of the alleged harms DFS

identifies are premised on events that have not yet occurred—OCC's acceptance, review, and

approval of an application from a fintech company that does business in New York.  *See Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999) (claim unripe when the court "would be forced to guess at how [the defendant] might apply the [challenged] directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical"); *CSBS I*, 313 F. Supp. 3d at 300 ("To address whether the OCC can issue Fintech charters may require the Court to imagine the 'unimaginably wide' range of possible Fintechs, and to draw distinctions between them.  Courts are ill-equipped to prospectively draw lines as to which hypothetical Fintechs, if any, may be chartered.").

The second prong, hardship, turns on "whether the challenged action creates a direct and immediate dilemma for the parties."  *Marchi,* 173 F.3d at 478.  "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship."  *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003).  Here, for the reasons addressed above, DFS will not suffer any immediate or significant hardship if this Court were to delay review of this matter because any alleged injuries DFS can identify are contingent on future actions.  In the absence of concrete hardship, this matter is not yet ripe for judicial review.

C.    **Any Challenge to OCC's 2003 Amendment to Section 5.20(e)(1) Is Time-Barred**

To the extent DFS's claims present a facial challenge to Section 5.20(e)(1), that cause of action is time-barred by the statute of limitations applicable to civil actions against federal agencies.  "Except as provided [in the Contract Disputes Act of 1978], every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).  A cause of action under the APA accrues on the date of the final agency action.  *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004).  "Unlike an ordinary statute of limitations, § 2401(a) is a jurisdictional condition

attached to the government's waiver of sovereign immunity, and as such must be strictly construed." *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987). Insofar as the adoption of the amendments to Section 5.20(e)(1) constitutes a final agency action that DFS seeks to challenge here, any cause of action would have accrued on January 16, 2004, when the Final Rule became effective. 68 Fed. Reg. 70122 (Dec. 17, 2003). Accordingly, the time for filing a facial challenge to the regulation expired on January 16, 2010.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED

### A.    OCC's Interpretation of the Ambiguous Term "The Business of Banking" in the National Bank Act Is Entitled to Deference

If the Court were to reach the merits of DFS's claims, the Complaint should be dismissed for failure to state a claim because, under the framework articulated in *Chevron, Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), Section 5.20(e)(1) represents a reasonable OCC interpretation of the undefined and ambiguous statutory term "business of banking."

The Supreme Court has repeatedly applied the *Chevron* framework to OCC's interpretations of terms in the National Bank Act. *Cuomo v. Clearing House, Ass'n, LLC*, 557 U.S. 519, 525 (2009); *Smiley v. Citibank (South Dakota),* 517 U.S. 735, 739 (1996); *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403-04 (1987). *Chevron* sets out two steps for evaluating an agency's statutory interpretation. "Where a statute is clear, the agency must follow the statute." *Cuzzo Speed Tech., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016). "But where a statute leaves a 'gap' or is 'ambigu[ous],' we typically interpret it as granting the agency leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute." *Id.* (citing *U.S. v. Mead Corp.*, 533 U.S. 218, 229 (2001)); *Chevron,* 467 U.S. at 843.

Because the National Bank Act does not provide a plain meaning for the term "business of banking," OCC has the "leeway" to address that ambiguity or "gap" in the statute by enacting rules that are "reasonable in light of the text, nature, and purpose of the statute." *Cuzzo Speed Tech.,* 136 S. Ct. at 2142.  Applying this test, OCC's interpretation is reasonable and entitled to deference: OCC's interpretation is not precluded by statutory text, its reading is supported by judicial authority, and its interpretation of the term is consistent with the text, nature, and purpose of the statute.

> **1.** **Because the Statutory Text Is Ambiguous, OCC Has Discretion to Reasonably Interpret It**

An examination of the relevant text of the National Bank Act makes clear that, under the *Chevron* framework, the phrase "business of banking" is ambiguous, having no fixed meaning that precludes OCC's interpretation set forth in Section 5.20(e)(1).  The term "business of banking" appears in several National Bank Act provisions, without definition or textual elaboration that could add meaning.  *See* 12 U.S.C. §§ 21 ("Associations for carrying on the business of banking"); 24(Seventh) (dealing with bank powers); 26 (requirements to be complied with before an association may commence "the business of banking . . . ."); and 27(b)(1) (the Comptroller of the Currency may issue a "certificate of authority to commence the business of banking" to a bankers' bank).  Section 27, the general chartering provision, states:

> If, upon a careful examination of the facts so reported, and of any other facts which may come to the knowledge of the Comptroller  . . . it appears that such association is lawfully entitled to commence the *business of banking*, the Comptroller shall give to such association a certificate . . . that such association has complied with all the provisions required to be complied with before commencing the *business of banking* and that such association is authorized to commence such business.

12 U.S.C. § 27(a) (emphasis added).  The National Bank Act does not set forth any mandatory activities that must be performed in order for a bank to be engaged in the "business of banking."

12

Indeed, the text in general is permissive and therefore consistent with an expansive grant of discretion in the Comptroller to assign content to the phrase.  Accordingly, there is nothing in the text of the National Bank Act that precludes the OCC's interpretation codified at 12 C.F.R. § 5.20(e)(1).

### a.   In *NationsBank*, the Supreme Court Recognized OCC's Authority to Interpret the Ambiguous Term "Business of Banking"

The Supreme Court has afforded *Chevron* deference to an OCC interpretation of a statutory phrase embracing "the business of banking." Section 24(Seventh) provides that national banks are authorized:

> To exercise . . . **all such incidental powers as shall be necessary to carry on the business of banking**; by discounting and negotiating promissory notes drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes [and provisions limiting securities and stock sales].

12 U.S.C. § 24(Seventh) (emphasis added).  The Supreme Court explicated this text definitively in *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995).  OCC had interpreted the Section 24(Seventh) text to permit the Comptroller to authorize national banks to sell annuities to bank customers.  513 U.S. at 254.  That interpretation was challenged by an association of insurance agents that argued that the text should be read to limit the scope of permissible banking powers under Section 24(Seventh) to activities connected with the five statutorily-enumerated powers: discounting, deposit-taking, trading in exchange and money, lending, and dealing in notes.  Under this theory, the general authorization to "exercise . . . all such incidental powers as shall be necessary to the business of banking" would be circumscribed by the succeeding text listing specific powers.  513 U.S. at 257-58.  The Supreme Court squarely rejected that argument.

13

First, the Court reviewed OCC's interpretation through the framework of *Chevron* deference. 513 U.S. at 256-57.  Applying this deferential standard of review, the Court affirmed the OCC's construction of the Section 24(Seventh) phrase "incidental powers . . . necessary to carry on the business of banking" as an independent grant of authority, not limited by the specified enumerated grants of authority, *id.* at 257, rejecting the argument by the insurance agents to the contrary:

> We expressly hold that the 'business of banking' is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated.  The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds. Ventures distant from dealing in financial investment instruments – for example, operating a travel agency – may exceed those bounds.

*Id.* at 258 n.2.  The Supreme Court's analysis resolved the question whether there is a distinction between "business of banking" and "all such incidental powers as shall be necessary to carry on the business of banking."  Before *NationsBank*, there were active questions whether a given power was "part of" the business of banking or "incidental to" the business of banking.  By equating the Section 24(Seventh) text with the "business of banking," *NationsBank* established that it is a unitary inquiry.

*NationsBank* marked a watershed in construing the term "business of banking," resolving an analytical dispute that had sharply divided courts of appeals for two decades.  On one side of the divide, the D.C. Circuit had prefigured *NationsBank* by rejecting a narrow interpretation of Section 24(Seventh), instead deferring to the "expert financial judgment" of the Comptroller. *Am. Ins. Ass'n v. Clarke*, 865 F.2d 278 (D.C. Cir. 1988) (municipal bond insurance part of the business of banking).  On the other side of the divide, two courts of appeals had adopted a more restrictive test limiting the scope of permissible powers to those related to the enumerated powers in Section 24(Seventh).  *See M&M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d

14

1377, 1382 (9th Cir. 1977) (power "must be 'convenient or useful' in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act") (equipment leasing); *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 431 (1st Cir. 1972) (test is whether the activities were "directly related to one or another of a national bank's express powers") (travel agency not authorized).  *NationsBank* rejected that test, implicitly superseding *Arnold Tours*, *M&M Leasing*, and other decisions that had relied upon them.[1]

### b.    The D.C. Circuit Has Confirmed OCC's Authority to Issue a Limited Purpose National Bank Charter

Just as in *NationsBank* the Supreme Court afforded OCC deference in interpreting the term "business of banking," OCC has received similar deference in interpreting that term to authorize a charter for an institution that would not exercise the full complement of banking powers.  *Independent Community Bankers Association of South Dakota, Inc. v. Board of Governors of the Fed. Reserve System*, 820 F.2d 428 (D.C. Cir. 1987).  In a chartering decision made long before the 2003 amendment of Section 5.20(e)(1), OCC issued a limited purpose national bank charter authorizing a national bank that would exercise only limited deposit-taking powers so as to comply with state law.  These limitations allowed the bank to engage in interstate banking under the Bank Holding Company Act ("BHCA").[2]

---

[1]      While the *NationsBank* holding displaced the test applied by *M&M Leasing*, it nonetheless vindicated the broader policy observation articulated in *M&M Leasing* that "the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking."  *M&M Leasing*, 563 F.2d at 1382.

[2]      At the time, the BHCA accorded states some control over the ability of bank holding companies to acquire a national bank in a state other than the institution's home state.  820 F. 2d at 430-31.  Then-applicable South Dakota law limited the operations of such national

15

The Independent Community Bankers Association of South Dakota ("ICBA") filed suit, challenging (1) the Federal Reserve Board's approval of the acquisition of a South Dakota-based national bank, newly created to carry out the credit card business of a Texas-based bank holding company; and (2) OCC's issuance of a charter to that credit card national bank with powers limited to conform to the South Dakota restrictions.[3]  Among the arguments made by the ICBA against the validity of the Federal Reserve's approval was that there is "no such institution as a 'special purpose' national bank," and that the limited bank charter granted by the Comptroller was otherwise inconsistent with federal law because the institution could not exercise the full panoply of bank powers under the National Bank Act.  820 F.2d at 438-40.  The D.C. Circuit rejected those arguments and held the authority to charter a limited purpose bank to be within the Comptroller's "particular expertise":

> We have no doubt but that the Comptroller's construction and application of the National Bank Act in this context is reasonable.  There is nothing in the language or legislative history of the National Bank Act that indicates congressional intent that the authorized activities for nationally chartered banks be mandatory. Restriction of a national bank's activities to less than the full scope of statutory authority conflicts with the purposes of the Act only if it undermines the safety and soundness of the bank or interferes with the bank's ability to fulfill its statutory obligations. That judgment requires consideration of the particular legal and business circumstances of the individual banks—a judgment within the particular expertise of the Comptroller and reserved to his chartering authority.

820 F.2d at 440.  Accordingly, the D.C. Circuit's reasoning further supports OCC's authority to promulgate Section 5.20(e)(1) and issue charters pursuant to it.

---

banks, in particular the deposit-taking function, in order to protect state-chartered institutions from competition.  *Id.* at 431.

[3]      The national bank charter application at issue in *ICBA v. FRB*, while proposing the primary activity of the new bank to be credit card services, also proposed to provide limited deposit-taking, lending, and checking services to the local community to the extent permitted under state law.  820 F.2d at 439.  There is nothing in the reasoning of the D.C. Circuit opinion that placed any weight on the existence of those nominal activities.

      **2.**      **OCC Reasonably Interpreted the Statutory Term "Business of Banking" by Reference to Three Core Banking Activities Identified in the National Bank Act**

At the second step in the *Chevron* analysis, OCC has reasonably interpreted the term "business of banking" to mean that the conduct of one of three statutorily identified "core activities" suffices to make an applicant eligible for a national bank charter. In considering the 2003 amendment to Section 5.20(e)(1), OCC weighed the ways in which to give content to the statutory term "business of banking" to determine eligibility for a national bank charter. Consistent with its interpretation, OCC's Final Rule provided: "A special purpose bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking functions: receiving deposits; paying checks; or lending money." 12 C.F.R. § 5.20(e)(1).

In the preamble to the Final Rule that promulgated amendments to Section 5.20(e)(1), OCC explained that it added the "core banking activities" requirement by reference to 12 U.S.C. § 36, which defines a national bank "branch" as a place of business "at which deposits are received, or checks paid, or money lent." 12 U.S.C. § 36(j). While Section 36 does not include the term "business of banking," OCC looked for guidance to a Supreme Court decision that invoked the core activities of Section 36 to construe the statutory phrase the "general business of each national banking association" in 12 U.S.C. § 81, a provision that restricts the locations where a bank can do business. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987).

In *Clarke*, OCC had approved a national bank's application to offer discount brokerage services at, among other places, non-branch locations both inside and outside the bank's home state, rejecting the argument that Section 81's phrase "general business of each national banking association" should be read more broadly, thereby limiting where such services could be

conducted.  479 U.S. at 406.  The Supreme Court affirmed OCC's interpretation.  The Court noted that the phrase "the general business of each national banking association" is ambiguous, and held that the Comptroller's interpretation was entitled to deference.  *Id.* at 403-04.  The Court observed that national banks engage in many activities, and there was no evidence that Congress intended all of those activities to be subject to the geographical limitations of Sections 81 and 36.  *Id.* at 406-09.  Instead, the Court found reasonable OCC's conclusion that the general business of the bank under Section 81 included only "core banking functions," and not all incidental services that national banks are authorized to provide.  *Id.* at 409.  The Court also held that OCC reasonably equated "core banking functions" with the activities identified in Section 36, which defined "branch" as any place "at which deposits are received, or checks paid, or money lent."  *Id.*

The Court's endorsement of OCC's analysis—that national banks engage in many activities, but that only these three activities represent "core banking functions" and so define the "general business" of the bank—provides support for treating any one of these same three activities as the required core activity for purposes of the chartering provisions.  Just as the "general business" of each national bank is undefined in the location restriction of Section 81, the "business of banking" is undefined in the chartering provisions of Sections 21 and 27(a). The natural reading of the two phrases is similar in meaning, which supports the reasonableness of using the common source of Section 36(j) for the interpretation of each.  Because the terms of Section 36 are linked by "or," performing only *one* of the activities is sufficient to meet the statutory definition and to cause the location restrictions to apply.  *See First Nat'l Bank in Plant City v. Dickinson*, 396 U.S. 122, 135 (1969).  This interpretation provides symmetry and

consistency between the chartering and the location provisions of the National Bank Act and thereby reasonably interprets the ambiguous term "business of banking."

> ### B.   Neither Section 5.20(e)(1) Nor Any Charter Issued Under Section 5.20(e)(1) in the Future Violate the Tenth Amendment

Finally, neither Section 5.20(e)(1) nor any SPNB charters issued pursuant to that regulation run afoul of the Tenth Amendment.  It is well established that the Supremacy Clause operates in concert with the National Bank Act to displace state laws or state causes of action that conflict with federal law or that prevent or significantly interfere with national bank powers. *See, e.g., Barnett Bank of Marion Co. v. Nelson,* 517 U.S. 25 (1996); *Franklin Nat'l Bank v. New York*, 347 U.S. 25 (1954).  As a federal regulation, Section 5.20(e)(1) preempts contrary state law.  *See, e.g., Smiley v. Citibank (South Dakota),* 517 U.S. 735 (1996); *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141 (1982).  A fintech chartered as a national bank under Section 5.20(e)(1) therefore would be entitled to the protections of the National Bank Act against state interference.  "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 22 (2007).  "Regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses." *Id.* Accordingly, issuance of SPNB charters to fintechs under Section 5.20(e)(1) would not run afoul of the Tenth Amendment.

19

**<u>CONCLUSION</u>**

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Date:   New York, New York
        February 26, 2019

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney for the
                            Southern District of New York
                            *Attorney for Defendants*

                    By:   /s/ Christopher Connolly
                          CHRISTOPHER CONNOLLY
                          Assistant United States Attorney
                          86 Chambers Street, 3rd Floor
                          New York, New York 10007
                          Tel.: (212) 637-2761
                          Fax: (212) 637-2786
                          christopher.connolly@usdoj.gov