UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIA T. VULLO, in her official capacity as Superintendent of the New York State Department of Financial Services,<br><br>            Plaintiff,<br><br>      v.<br><br>OFFICE OF THE COMPTROLLER OF THE CURRENCY and JOSEPH M. OTTING, in his official capacity as U.S. Comptroller of the Currency,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 18 Civ. 8377 (VM)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF STEPHEN A. LYBARGER, DEPUTY COMPTROLLER FOR LICENSING, OFFICE OF THE COMPTROLLER OF THE CURRENCY, IN SUPPORT OF THE OCC'S MOTION TO DISMISS**

I, Stephen A. Lybarger, do hereby declare:

1. I am Deputy Comptroller for Licensing with the Office of the Comptroller of the Currency (OCC). I have held this position leading the OCC's Licensing Division since October 1, 2010. I joined the OCC as a bank examiner in 1984 and have performed licensing work since 1989.

2. The Licensing Division is responsible for assuring that the corporate structure of national banks and Federal savings associations is established and maintained in accordance with the principles of a safe and sound banking system. In this role, pursuant to authority

delegated from the Comptroller, the Licensing Division receives, analyzes, and decides applications to establish, change the structure of, or change the activities performed by national banks, Federal savings associations, and Federal branches and agencies. The Licensing Division works closely with the OCC's supervisory and legal divisions to render independent decisions, supported by a strong record of facts and in compliance with applicable laws and regulations.

3. As Deputy Comptroller for Licensing, I lead the day-to-day activities of the OCC's Licensing Division. I oversee a staff of approximately forty-one (41) OCC employees located in Washington, D.C., at OCC headquarters, and located in the OCC's four district offices around the United States. Of those approximate 41 members of the Licensing Division, approximately twenty-nine (29) employees perform work related to processing applications for charters for national banks, Federal savings associations, and Federal branches and agencies.

4. In my capacity as Deputy Comptroller for Licensing, I am aware of all applications for national bank charters. Additionally, based on communications between the Licensing Division and potential applicants, I am aware of all applications that the OCC anticipates receiving. This knowledge includes all submitted and anticipated applications for special purpose national bank charters from financial technology companies that propose to engage in one or more of the core banking activities of paying checks or lending money, but would not take deposits ("SPNB Charters").

5. In my capacity as Deputy Comptroller for Licensing, I also have firsthand knowledge of the process and timeframes for receiving, processing, and potentially approving applications for national bank charters, including SPNB Charters.

6. As of the date of this declaration, no application for an SPNB Charter has been filed with the OCC.

7. As of the date of this declaration, the OCC has not, pursuant to 12 C.F.R. 5.20(e)(1), chartered a national bank that engages in one of the two core banking activities of paying checks or lending money, but does not take deposits.

8. The process and procedures for preparing to file an application for a national bank charter, including SPNB Charters, are described at 12 C.F.R. Part 5, Subpart B and in the Comptroller's Licensing Manual available at https://www.occ.gov/publications/publications-by-type/licensing-manuals/index-licensing-manuals.html, specifically in the Charters Booklet (rev. Sept. 2016), available at https://www.occ.gov/publications/publications-by-type/licensing-manuals/charters.pdf

9. Application of these general processes and procedures to financial technology companies seeking SPNB Charters is further explained in the Comptroller's Licensing Manual Supplement published July 31, 2018 and entitled Considering Charter Applications From Financial Technology Companies, available at https://www.occ.gov/publications/publications-by-type/licensing-manuals/file-pub-lm-considering-charter-applications-fintech.pdf .

10. The process for applying for an SPNB Charter involves several phases, including (a) the pre-filing phase, which may include the opportunity for a potential applicant to submit a draft application for feedback from the OCC; (b) the filing phase; (c) the review phase; and (d) the approval phase, involving (i) preliminary conditional approval, (ii) organization, (iii) pre-opening examination, and (iv) final approval.

11. Only with final approval is a national bank issued a charter and authorized to open for business. *See* 12 C.F.R. §§ 5.20(d)(3), (i)(5)(ii)(B).

12. To initiate the pre-filing phase, those contemplating applying for an SPNB Charter are directed to contact the OCC's Office of Innovation to initiate a dialogue concerning the requirements to become a special purpose national bank and to discuss proposed business models. Supplement at 2, 4. Exploratory meetings with appropriate OCC staff, including the Licensing Division, will be scheduled to give a potential applicant an opportunity to understand the application process, to explain its proposal and reasons for seeking a charter, and to become acquainted with the bank regulatory environment. *Id.* If a company decides it may wish to pursue an SPNB Charter, it will meet with the Licensing Division in additional pre-filing meetings to more formally discuss the proposed bank's business plan, including a description of the proposed activities, the underlying marketing analysis supporting the business plan, the capital and liquidity needed to support the business plan, and the company's commitment to financial inclusion. *Id.*; Charters Booklet at 31-32.

13. At the discretion of the OCC, a potential applicant may be invited or allowed to submit a draft application during the pre-filing phase if it will help the OCC and the potential applicant better understand potential challenges inherent in unusual or complex proposals. The review of a draft application does not entail all steps involved in review of an application in the filing phase and the OCC's review of a draft application does not obligate the OCC to grant preliminary approval to an application subsequently filed.

14. If, after the pre-filing phase, a party remains interested in pursuing an SPNB Charter, it will then enter the filing phase. In the filing phase, the organizers of a proposed national bank will file an application with the Licensing Division that must detail the experience and expertise of the organizing group, management, and directors; contain a comprehensive business plan; address capital, liquidity, and funds management; and describe the proposed bank's commitment to financial inclusion.

15. The applicant must "publish a public notice of its filing in a newspaper of general circulation in the community in which the applicant proposes to engage in business, on the date of the filing, or as soon as practicable before or after the date of the filing." 12 C.F.R. § 5.8(a). Generally, a public comment period runs for 30 days following published notice. 12 C.F.R. § 5.10.

16. In the review phase, the OCC will analyze the application to assess whether the proposed bank has a reasonable chance of success, will be operated in a safe and sound manner, will provide fair access to financial services, will promote fair treatment of customers, will ensure compliance with laws and regulations, and will foster healthy competition. 12 C.F.R. § 5.20(f); Supplement at 5. The OCC generally seeks to decide whether to grant preliminary conditional approval to a charter application within 120 days of filing or as soon as possible thereafter. Charters Booklet at 34, 39. An applicant may withdraw a charter application at any time.

17. At the conclusion of the review phase, the OCC will either deny the charter application or grant preliminary conditional approval. Charter Booklet at 39. A grant of preliminary conditional approval is not an assurance that the OCC will grant final approval for a bank charter. *Id.* Rather, preliminary conditional approval allows the OCC to impose standard and special requirements and conditions that the organizing group must satisfy before receiving a charter, *id.*, such as attaining minimum capital levels and developing a recovery and resolution plan. Supplement at 9-11.

18. Following preliminary conditional approval, the organizing group of the proposed national bank raises capital and prepares for opening for business. Preliminary conditional approval expires if a proposed national bank does not raise the required capital within 12 months from the date the OCC grants preliminary approval, absent an extension. 12 C.F.R. § 5.20(i)(5)(iv). Preliminary conditional approval also expires if a proposed national bank is not prepared to commence business within 18 months of the preliminary approval being issued. *Id.*

19. The OCC's bank examiners will visit the proposed national bank at least 14 days before its proposed opening to perform an examination to determine if the proposed national bank has met the conditions of the preliminary approval and to evaluate whether management and the board of directors are prepared for operations to commence. The OCC will not grant a final approval, and thus will not issue a charter, unless the proposed national bank passes this exam. Charters Booklet at 47.

20. Until final approval is granted and a charter issued, the OCC may alter, suspend, or revoke preliminary conditional approval should the OCC deem that any interim development warrants such action.  Charters Booklet at 48.  The OCC will issue a final approval once it determines that all key phases of organizing the bank have been completed, all requirements and conditions for final approval have been met, and the organizers have received any other necessary regulatory approvals.  Supplement at 12.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Executed February 25, 2019 in Washington, D.C.

Stephen A. Lybarger

7