UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MARIA T. VULLO, in her official capacity as
Superintendent of the New York State Department
of Financial Services,

               Plaintiff,

               -- against --

OFFICE OF THE COMPTROLLER OF
      THE CURRENCY,

and

JOSEPH M. OTTING, in his official capacity
as U.S. Comptroller of the Currency,

               Defendants.
-------------------------------------------------------------x

                        18-cv-8377 (VM)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

FACTUAL BACKGROUND....................................................................2

ARGUMENT ...................................................................................4

   I. THIS COURT HAS JURISDICTION OVER DFS'S
   CLAIMS .................................................................................4

      A.  DFS has Standing to Challenge the Fintech Charter
      Decision ...........................................................................4

      B.  The Unlawful Fintech Charter Decision is Ripe for
      Judicial Review..................................................................6

      C.  DFS's Challenge to OCC's Fintech Charter Decision
      is Timely ..........................................................................7

   II. DFS's CHALLENGE TO THE FINTECH CHARTER
   DECISION STATES A CLAIM ...................................................9

      A.  Congress Intended That The "Business of Banking"
      Include Deposit Taking......................................................9

          1.  Applicable Rules of Statutory Construction ...........................10

          2.  The NBA's Structure Demonstrates That Deposit
          Taking Is Central to the "Business of Banking"...........................12

          3.  The Fit of the NBA in the Overall Scheme of Federal
          Banking Law Demonstrates That the "Business of Banking"
          Must Include Deposit Taking.......................................................14

               a.   To Be Lawfully Entitled to Commence the
               "Business of Banking," the NBA, FDIA, and FRA,
               Require that a National Bank Receive Deposits ................................15

               b.  "Business of Banking" Should Be Interpreted
               Consistently with the BHCA Definition of a "Bank," Which
               Encompasses Only Deposit-Taking Institutions ................................16

          4.  Common Sense and the History of the Regulation of
          Non-Depository Institutions Dictates that Deposit Taking Is Central
          to the "Business of Banking" .......................................................17

B.  The OCC's Interpretation of the "Business of Banking"
Is Unreasonable.........................................................................................................18

    1.  OCC's Interpretation of Section 5.20(e)(1) Is
Unreasonable Because It Fundamentally Changes the OCC's
Regulatory Role ...................................................................................................18

    2.  The OCC Unreasonably Equates "Business of Banking"
with the Definition of a "Branch" ................................................................19

    3.  Attempts by the OCC to Unlawfully Charter Entities That
Would Not Carry on the "Business of Banking" Have Routinely
Been Struck Down by the Courts..................................................................22

C.  DFS Has Alleged a Valid Tenth Amendment Claim ..........................................24

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Heckler*,
582 F. Supp. 1155 (S.D.N.Y. 1984)....................................................................5

*Alaska v. U.S. Dep't of Transp.*,
868 F.2d 441 (D.C. 1989) ...............................................................................5

*Atwater v. D.C. Dep't of Consum. & Reg. Affairs*,
566 A.2d 462 (D.C. 1989) .............................................................................20

*Bowen v. Public Agencies Opposed to Social Security Entrapment*,
477 U.S. 41 (1986)............................................................................................5

*Brown v. Gardner*,
513 U.S. 115 (1994).......................................................................................14

*Cemet Kiln Recycling Coal. V. EPA*,
493 F.3d 207 (D.C. Cir. 2007).........................................................................7

*Chevron v. NRDC, Inc.*,
467 U.S. 837 (1984).................................................................................*passim*

*CITA-Wireless Ass'n v. FCC*,
466 F.3d 105 (D.C. Cir. 2006) ........................................................................8

*Citizens Against Casino Gambling in Erie County v. Chaudhuri*,
802 F.3d 267 (2d Cir. 2015)............................................................................8

*City of Yonkers v. Downey*,
309 U.S. 590 (1940)......................................................................................17

*Clarke v. Sec. indus. Ass'n*,
479 U.S. 388 (1987).......................................................................................21

*Coalition for Responsible Regulation, Inc. v. EPA*,
684 F.3d 102 (D.C. Cir. 2012)........................................................................7

*Colo. Nat'l Bank v. Bedford*,
310 U.S. 41 (1940)...................................................................................15, 17

*Columbia Falls Aluminum Co. v. EPA*,
139 F. 3d 914 (D.C. Cir. 1998).......................................................................8

*CSBS v OCC*,
  313 F. Supp. 3d 285 (D.D.C. 2018) .............................................................5

*Cuomo v. Clearing House Ass'n, LLC*,
  557 U.S. 519 (2009) ...........................................................................10, 11

*Davis v. FEC*,
  554 U.S. 724 (2008) .................................................................................6

*ETSI Pipeline Project v. Missouri*,
  484 U.S. 495 (1988) ...............................................................................14

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...............................................................................11

*Federal/Postal/Retiree Coal. v. Devine*,
  751 F.2d 1424 (D.C. Cir. 1985) ..................................................................7

*First Nat'l Bank of Logan v. Walker Bank & Trust Co.*,
  385 U.S. 252 (1966) ...............................................................................22

*First Nat'l Bank v. Missouri*,
  263 U.S. 640 (1924) ...............................................................................21

*Gen. Dynamic Land Sys., Inc. v. Cline*,
  540 U.S. 581 (2004) ...............................................................................18

*Indep. Bankers Ass'n of Am. v. Conover*,
  1985 U.S. Dist. Lexis 22529 (M.D. Fla. 1985) ........................................17, 23

*Indep. Cmty. Bankers Assoc. v. Bd. of Governors of the Fed. Reserve Sys.*,
  820 F.2d 428 (D.C. Cir. 1987) ..................................................................24

*Indep. Ins. Agents of Am., Inc. v. Hawke*,
  211 F.3d 638 (2000) ...............................................................................19

*Independent Bankers Asso. v. Smith*,
  534 F.2d 921 (D.C. Cir. 1976) ..................................................................21

*Leonardi v. Chase Nat'l Bank*,
  81 F.2d 19 (2d Cir. 1936) ........................................................................20

*Li v. Renaud*,
  654 F.3d 376 (2d Cir. 2011) .....................................................................11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................4

*MCI Telecomm. Corp. v. AT&T*,
    512 U.S. 218 (1994)................................................................18, 19, 22

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)................................................................................25

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ...............................................................6

*Nat'l Ass'n of Mfrs. v. DOI*,
    134 F.3d 1095 (D.C. Cir. 1998) ..............................................................8

*National Bank of Elizabeth, N.J. v. Smith*,
    591 F.2d 223 (3d Cir. 1979)............................................................12, 13

*National State Bank v. Smith*,
    No. 76- 1479, 1977 U.S. Dist. LEXIS 18184 (D.N.J. Sept. 16, 1977) ....................23

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*,
    513 U.S. 251 (1995)......................................................................9, 10, 18

*New York v. FERC*,
    535 U.S. 1 (2002).....................................................................................25

*New York v. Shore Realty Corp.*,
    759 F.2d 1032 (2d Cir. 1985)..................................................................13

*New York v. United States DOC*,
    No. 18-CV-2921 (JMF), 2019 U.S. Dist. LEXIS 6954 (S.D.N.Y. Jan. 15, 2019) ....6

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018) ......................................................................6

*Nutritional Health All. v. Shalala*,
    144 F.3d 220 (2d Cir. 1998)......................................................................7

*Pineland State Bank v. Proposed First Nat'l Bank*,
    335 F. Supp. 1376 (D.N.J. 1971) ..........................................................20

*Presley v. Etowah County Comm'n*,
    502 U.S. 491 (1992)................................................................................18

*Republic of Iraq v. ABB AG,*
　　920 F. Supp.2d 517 (S.D.N.Y. 2013) ......................................................5

*Robin. v. Shell Oil Co.,*
　　519 U.S. 337 (1997) ..............................................................................10

*Sierra Club v. EPA,*
　　551 F.3d 1019 (D.C. Cir. 2008) .............................................................8

*Sullivan v. Stroop,*
　　496 U.S. 478 (1990) ..............................................................................14

*Texas & Pacific Ry. Co. v. Pottorff,*
　　291 U.S. 245 (1934) ..............................................................................17

*Texas Office of Pub. Utility Counsel v. FCC,*
　　183 F.3d 393 (5th Cir. 1999) .................................................................5

*United States v. Quinones,*
　　313 F.3d 49 (2d Cir. 2002) ....................................................................7

*Utility Air Regulatory Group v. EPA,*
　　134 S. Ct. 2427 (2014) ...................................................................18, 19

*Vullo v. OCC,*
　　2017 U.S. Dist. LEXIS 205259 (S.D.N.Y. Dec. 12, 2017) ....................6

*Whitney National Bank v. Bank of New Orleans & Trust Co.,*
　　379 U.S. 411 (1965) ..............................................................................16

*Williams v. Taylor,*
　　529 U.S. 420 (2000) ..............................................................................14

*Wyoming v. U.S.,*
　　539 F.3d 1236 (10th Cir. 2008) .............................................................5

**STATUTES**

12 U.S.C. § 21 ................................................................................15, 20

12 U.S.C. § 24 ..................................................................................passim

12 U.S.C. § 26 ..........................................................................................15

12 U.S.C. § 27 ..................................................................................passim

12 U.S.C. § 30......................................................................................21

12 U.S.C. § 36................................................................................*passim*

12 U.S.C. § 81.................................................................19, 20, 21, 22

12 U.S.C. § 92a....................................................................................13

12 U.S.C. § 221 et seq..........................................................................14

12 U.S.C. § 222....................................................................................15

12 U.S.C. § 378....................................................................................16

12 U.S.C. § 501a..................................................................................15

12 U.S.C. § 1811 et seq........................................................................14

12 U.S.C. § 1815..................................................................................15

12 U.S.C. § 1841...........................................................................14, 24

12 U.S.C. § 1841 et seq........................................................................14

12 U.S.C. § 1842..................................................................................16

12 U.S.C. § 1843..................................................................................16

Garn-St Germain Depository Institutions Act of 1982,
    Pub. L. 97-320, § 404, 96 Stat. 1469, 1511 (1982).....................13

N.Y. Banking L. Article 9.....................................................................13

N.Y. Banking L. Article 9-A .................................................................13

N.Y. Banking L. Article 11-B................................................................13

N.Y. Banking L. Article 12-A ...............................................................14

N.Y. Banking L. Article 12-B................................................................14

N.Y. Banking L. Article 12-C................................................................14

N.Y. Banking L. Article 12-D ...............................................................14

N.Y. Banking L. Article 13-B................................................................14

**RULES AND REGULATIONS**

12 C.F.R. § 5.20 .................................................................................................................*passim*

**OTHER AUTHORITIES**

68 FR 70122-01 (Dec. 17, 2003) ...........................................................................................3

S. Rep. No. 536, 97th Cong., 2d Sess. (1982) ....................................................................13

"National Banks and The Dual Banking System" OCC, September 2003,
     available at https://www.occ.treas.gov/publications/publications-by-type/
     other-publications-reports/pub-national-banks-and-the-dual-banking-system.pdf ...13

## PRELIMINARY STATEMENT

On behalf of the Superintendent of the New York State Department of Financial Services ("DFS"), we respectfully submit this memorandum of law in opposition to the motion to dismiss filed by defendants Office of the Comptroller of the Currency and Comptroller Joseph Otting (collectively, "OCC").  In this action – and in order to ensure that New York consumers are adequately protected from predatory practices that violate New York law – DFS challenges the OCC's unlawful final administrative determination that, pursuant to 12 U.S.C. § 24 (Seventh) of the National Bank Act ("Section 24 (Seventh)"), the OCC has the statutory authority to grant national bank charters to non-depository financial technology companies.  This determination by the OCC would preempt state laws and regulatory authority over these entities.  The OCC maintains that this Court lacks subject-matter jurisdiction over the complaint, and that, in any event, DFS fails to state a claim for relief.  The OCC is wrong on both counts.

Running through its checklist of jurisdictional defenses, the OCC first argues that the DFS lacks standing to challenge the Fintech Charter Decision, that the Fintech Charter Decision is not ripe for review, and that DFS's action is time-barred.  None of these arguments is persuasive.  The Fintech Charter Decision preempts New York State law and, as an arm of a sovereign state, DFS is uniquely entitled to contest the OCC's *ultra vires* intrusion upon New York's regulatory authority.  This matter is ripe for adjudication: on July 31, 2018, the OCC publicly announced its decision to immediately begin accepting applications from, and grant special-purpose national bank charters to, a boundless class of undefined and so-called "financial technology" ("fintech") companies, including companies that do not accept deposits (the "Fintech Charter Decision").  And there is no statute of limitations defense available to the OCC. The causes of action accrued on July 31, 2018; and DFS's challenges to 12 C.F.R. § 5.20(e)(1) are timely under the intermediate action and reopening doctrines.

1

On the merits, the OCC insists that Section 24 (Seventh)'s reference to the "business of banking" is ambiguous and that, according to *Chevron v. NRDC, Inc.*, 467 U.S. 837 (1984) ("*Chevron*"), the agency's interpretation of that phrase by borrowing the definition of a "branch" is entitled to controlling deference.  But the most basic tools of statutory construction leave no doubt that Congress intended the "business of banking" to include deposit taking.  Given the clarity of contrary congressional intent, the OCC's misguided definition cannot stand.

In any event, even if the statutory language were unclear, the OCC's interpretation is unreasonable and therefore invalid under *Chevron*.   The federal regulation at issue – 12 C.F.R. 5.20(e)(1) – interposes the definition of "branch" as the definition of "business of banking" and, in doing so, supplants a regulatory regime that has existed and worked well for almost 150 years and fundamentally changes the OCC's heretofore non-existent role in regulating non-depository financial institutions.  That sort of radical restructuring of banking policy cannot succeed under the guise of statutory "interpretation."  Indeed, courts have consistently struck down the OCC's prior attempts to extend its chartering authority to non-depository institutions.

## FACTUAL BACKGROUND

In relevant part, Chapter 12, section 24 of the United States Code enables the OCC to charter national banking associations by granting them "all such incidental powers as shall be necessary to carry on the *business of banking*; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . ."  This section has been an anchor of the National Bank Act ("NBA") since that statute was first enacted in 1863.  It is long-settled that the historical phrase "business of banking" defines the scope of financial activities in which a national bank charted by the OCC may or must engage. Cmplt. at ¶ 22.

Pursuant to this authority, the OCC has promulgated regulations (12 C.F.R. § 5.20) for the organization of national banks.  In 2003, the OCC amended this regulation to create, *for the first time in nearly 140 years*, a new category of nationally chartered institutions described as "special purpose" banks. *Id.* (*citing* 68 FR 70122-01 (Dec. 17, 2003)).  According to the amended rule – 12 C.F.R. § 5.20(e)(1)(i) – an OCC-chartered firm could "be a special purpose bank that limits its activities to fiduciary activities *or to any other activities within the business of banking*." *Id.*  The new regulation further provides that a "special purpose bank that conducts activities other than fiduciary activities must conduct *at least one* of the following core banking functions: Receiving deposits, paying checks, *or* lending money." *Id.* (emphasis added).  This definition of "business of banking" – i.e., an entity that receives deposits, pays checks or lends money – was copied from the definition of a "branch" in 12 U.S.C. § 36(j).

On July 31, 2018, the OCC and Comptroller Otting announced that the OCC will "begin accepting applications for national bank charters from non-depository financial technology (fintech) companies engaged in the business of banking." Cmplt. at ¶ 39.  In addition to the Press Release, the OCC published on July 31 a (i) Policy Statement and (ii) final supplement to the Comptroller's Licensing Manual. Both unequivocally state the OCC has decided to issue federal charters to non-depository fintech companies charter pursuant to 12 C.F.R. § 5.20(e)(1).  Since July 31, 2018, the Comptroller has continued to tout the Fintech Charter.  Mr. Otting publicly stated that a number of institutions are already going through the OCC's application process, and that the OCC expected to receive its first application by the end of 2018 or early this year—in other words, any minute. *See* ECF Doc. No. 15 at 3.

On September 14, 2018, this action was filed.  DFS had previously commenced a similar action in this Court on May 12, 2017 against the OCC and then-Acting Comptroller Noreika seeking a declaratory judgment that the OCC's issuance of a license to a non-depository fintech

company was illegal under the NBA. *See Vullo v. Office of the Comptroller of the Currency* et al., 17-CV-3574 (Buchwald, J.). On August 18, 2017, the OCC and then-Acting Comptroller filed a motion to dismiss the complaint on ripeness and other grounds, arguing, *inter alia*, that the OCC had not made a final decision to issue fintech charters to non-depository institutions.

At oral argument on the Defendants' motion to dismiss in that case, counsel for Defendants conceded to Judge Buchwald that litigation over the validity of the OCC's Fintech Charter actions would become ripe at the moment that the OCC decided to go ahead and accept charter applications—an event that had not yet occurred during pendency of the 2017 case:

> THE COURT: .... Maybe [the OCC's] arguments [concerning ripeness] are good now, but at some point they are going to evaporate. .... **But if the comptroller says, we have decided to go ahead and we will accept applications, would that not be the perfect time to decide the merits before the fintech companies spend all of the money, time and effort to put in applications?** …
> MR. CONNOLLY [counsel for the OCC]: **Correct.**

Cmplt. Ex. N. at 12 (emphasis added). On December 12, 2017, Judge Buchwald granted the Defendants' motion to dismiss without prejudice on the exclusive ground of ripeness.

## ARGUMENT

## I.     THIS COURT HAS JURISDICTION OVER DFS'S CLAIMS

The OCC's motion to dismiss asserts three jurisdictional grounds for dismissal: standing, ripeness, and a limitations period defense. Not one of these jurisdictional claims has any merit.

### A. DFS has Standing to Challenge the Fintech Charter Decision

The Complaint pleads facts that clearly demonstrate an injury in fact that is both "concrete and particularized" and "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). DFS is responsible for enforcing New York's banking, insurance, and financial services laws, and for supervising virtually all entities subject to those laws. Cmplt. ¶¶ 16-18. Because the OCC has made the final determination that it will issue fintech charters and as such preempt New York banking, financial service, and consumer protection laws,

4

Cmplt. ¶ 42-51, the Fintech Charter Decision undermines DFS's regulatory authority over the financial services industry within its borders.

Federal "regulatory interference with a state is indeed a concrete and particularized injury" within the meaning of the "actual" injury prong in establishing standing. *CSBS v OCC*, 313 F. Supp. 3d 285, 296 (D.D.C. 2018). "[T]here is no question concerning [a] State's standing to bring [an] action" where it alleges an "interest in the preservation of its own sovereignty, and a diminishment of that sovereignty." *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 50 n.17 (1986). Thus, a state may acquire standing by "seek[ing] to invoke 'the power to create and enforce a legal code.'" *Republic of Iraq v. ABB AG*, 920 F. Supp.2d 517, 531 (S.D.N.Y. 2013); *see also Texas Office of Pub. Utility Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999). It follows that "[f]ederal regulatory action that preempts state law" sufficiently invades state sovereignty to afford standing. *Wyoming v. U.S.*, 539 F.3d 1236, 1242 (10th Cir. 2008); *see also Alaska v. U.S. Dep't of Transp*., 868 F.2d 441, 443-44 (D.C. 1989) (same); *accord Abrams v. Heckler*, 582 F. Supp. 1155, 1161-62 (S.D.N.Y. 1984) (NYS Superintendent of Insurance held to have standing to challenge Medicare regulation that negated state insurance law).

This is a point Judge Buchwald emphasized at oral argument in the prior case. Questioning the OCC's attorney, Judge Buchwald asked: "once you[, the OCC,] make that final decision and you announce it, isn't that the point at which these standing and ripeness issues and final agency action issues come to an end, and come to an end sensibly?" to which counsel for the OCC, stated "Your Honor, you may well be right." Cmplt. Ex. N at 11. Counsel for the OCC went on to concede that once the OCC decided to accept applications, it would be the perfect time to adjudicate the merits of the issue now before the is Court. Cmplt. Ex. N at 12. We have now arrived at that "perfect" moment that Judge Buchwald identified for ripeness purposes.

Second, even if DFS's injuries are not yet actual, standing can still be established where the injury is "actual *or imminent*," *NRDC v. NHTSA*, 894 F.3d 95, 103 (2d Cir. 2018), or where government action increases the risk of future harm, *see, e.g., Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996).   This Court has previously ruled, in the prior case, that the injuries alleged by DFS will "become sufficiently imminent to confer standing once the OCC makes a final determination that it will issue SPNB charters to fintech companies." *Vullo v. OCC*, 2017 U.S. Dist. LEXIS 205259, at *21 (S.D.N.Y. Dec. 12, 2017).  That has now occurred.

Further, the OCC's argument that "OCC remains several steps removed from issuing a charter" does not defeat DFS's showing of imminent injury.  Recent Supreme Court precedent "makes plain that the risk of future injury may satisfy Article III's injury and causation requirements even if several steps on the causal chain still stand between a defendant's conduct and the plaintiff's injury when the case is filed." *New York v. United States DOC*, No. 18-CV-2921 (JMF), 2019 U.S. Dist. LEXIS 6954, at *190 (S.D.N.Y. Jan. 15, 2019) (discussing *Davis v. FEC*, 554 U.S. 724 (2008)).  DFS has standing, now, to assert the claims in this case.

## B. The Unlawful Fintech Charter Decision is Ripe for Judicial Review

"There are two forms of ripeness: constitutional and prudential." *Vullo v. OCC* at *23. Now that the OCC has publicly announced that it will accept applications for Fintech Charters and that it has taken substantial steps to charter non-depository institutions, this matter is constitutionally and prudentially ripe for adjudication.

As "constitutional ripeness is a subset of the injury-in-fact element of Article III standing" the OCC's argument that the case is not now ripe fails for the same reasons as its standing arguments. *Id.* at *24.  With respect to prudential ripeness, Judge Buchwald previously held that prudential ripeness was best served "[b]y waiting for a final 'Fintech Charter Decision'[,]" *i.e.*, a decision by the OCC that it will issue such charters. *Id.* at *25.  The action contemplated by Judge

6

Buchwald has now undisputedly taken place.  The OCC's assertion that DFS must wait until the OCC actually approves a charter is squarely contradicted by its own public statements that it has begun accepting applications under its policy statement and finalized manual. *See* Cmplt. Ex. K.

Further, this case presents pure legal questions eminently fit for judicial review. *See United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002); *Nutritional Health All. v. Shalala*, 144 F.3d 220, 227 (2d Cir. 1998); *Federal/Postal/Retiree Coal. v. Devine*, 751 F.2d 1424, 1426 (D.C. Cir. 1985).  Indeed, courts have held that "a purely legal claim in the context of a facial challenge . . . is presumptively reviewable[.]" *Cemet Kiln Recycling Coal. V. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007) (quotation omitted).  OCC cannot overcome this presumption.  Moreover, further action by the OCC is not necessary to enhance the prudential ripeness of this controversy.  Because the OCC has determined an applicant's eligibility for the charter solely based on an illegal regulation – Section 5.20(e)(1) – the specifics of a charter recipient are irrelevant to this case.

## C. DFS's Challenge to OCC's Fintech Charter Decision is Timely

The OCC also asserts in its motion that Plaintiff's claims are time-barred, by attempting to connect this case with the promulgation date of 12 C.F.R. § 5.20(e)(1).  There are several reasons why the OCC's argument fails.

First, because DFS is challenging *recent* actions by the OCC, specifically the Fintech Charter Decisions which the OCC contends it did not make until July 31, 2018, it is immaterial that OCC previously promulgated a more general regulation for "special purpose" banks. *Cf. Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 129-32 (D.C. Cir. 2012) (applying doctrine of "after-arising grounds" to find timely EPA's application of an older regulation to specific industries), *rev'd in part on other grounds sub nom*, *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014).  Indeed, the OCC further admits that it has never before relied upon § 5.20(e)(1) to issue national bank charters to non-depository intuitions. *See* ECF Doc. No.

21 at 10 ("Since its adoption, OCC has not relied on 12 C.F.R. § 5.20(e)(1) to charter a national bank that engages in one of the two core banking activities of paying checks or lending money, but that does not take deposits.").  These facts are fatal to the OCC's statute of limitations defense and establish that this action accrued on July 31, 2018.  It is duplicitous for the OCC to have successfully argued to Judge Buchwald that this action was not yet ripe and then argue to this Court a year later that, though now ripe, the six-year statute of limitations for this case has expired.

Second, it is firmly established that when "a final agency action is presented for review, intermediate actions leading up to that final action are reviewable as well." *Citizens Against Casino Gambling in Erie County v. Chaudhuri*, 802 F.3d 267, 279 (2d Cir. 2015) (internal quotation marks omitted).  With respect to the Fintech Charter Decision, the amendment of Section 5.20(e)(1) in 2004 is an "intermediate" agency action, leading up to the recent decision to actually issue Fintech charters at issue here, that negates the OCC's limitations period defense.

Third, the reopening doctrine prevents the OCC from asserting a limitations defense in this case.  The reopening doctrine "arises where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." *CITA-Wireless Ass'n v. FCC*, 466 F.3d 105 (D.C. Cir. 2006).  "Once an agency reopens an issue, whether by soliciting comments or indicating a willingness to reconsider, a new review period is triggered." *Columbia Falls Aluminum Co. v. EPA*, 139 F. 3d 914, 921 (D.C. Cir. 1998).  "An agency may be deemed to have 'constructively reopened' a previously unchallenged decision if its original rulemaking did not give adequate notice or incentive to contest the agency's decision." *Nat'l Ass'n of Mfrs. v. DOI*, 134 F.3d 1095, 1104 (D.C. Cir. 1998).  Specifically, "changed circumstances can constructively reopen a rule by the change in the regulatory context." *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008).

As noted above, the OCC admits that this is the first time it has applied § 5.20(e)(1) to non-depository entities.  Further, the OCC asserted in the previous case before Judge Buchwald that it had not, at the time of filing of that action in 2017, even made the decision how or under what authority it would license fintechs.  Thus, the OCC's argument, that its first ever application of a regulatory provision in a manner which upsets hundreds of years of understanding of banking regulation, is properly challenged by a complaint filed less than two months after the OCC's decision.  There are no jurisdictional or procedural defenses available to the OCC in this case.

## II.   DFS's CHALLENGE TO THE FINTECH CHARTER DECISION STATES A CLAIM

The OCC also seeks dismissal of the complaint on its merits, arguing that "under the framework articulated in [*Chevron*], Section 5.20(e)(1) represents a reasonable OCC interpretation of the undefined and ambiguous statutory term 'business of banking.'" OCC Br. at 11.  The agency's argument is thoroughly flawed.  First, insofar as identifying essential banking functions under Section 24 (Seventh) for *chartering purposes*, Congress unquestionably intended the phrase "business of banking" to include deposit taking.  *Chevron* deference thus has no place here.

But even accepting the deficient argument that Congress left a gap for the OCC to fill, Section 5.20(e)(1) constitutes a manifestly unreasonable interpretation of the NBA.  The OCC's conclusion that Section 24 (Seventh) empowers the agency to grant national bank charters to non-depository institutions warrants no deference, as it rests upon a clear distortion of Supreme Court precedent and will trigger a seismic restructuring of financial-services regulation nationwide.

### A.   Congress Intended That The "Business of Banking" Include Deposit Taking

Relying on *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995), the OCC argues that the phrase "business of banking" is ambiguous, and therefore the agency's interpretation demands *Chevron* deference.  *See* OCC Br. at 15-16.  *NationsBank* does not aid the OCC's position.

In *NationsBank*, the Supreme Court only considered whether the "*incidental powers*" that can be exercised by a national bank are limited to those powers specified in 12 U.S.C. 24 (Seventh) or whether the OCC has discretion to authorize activities beyond those specifically enumerated. *NationsBank*, 513 U.S. at 258 n.2.  In other words, *NationsBank* addressed the outer bounds of conduct that a national bank could engage in.  By way of illustration, in *NationsBank*, the OCC determined that, among other services, the "business of banking" included the sale of annuities. Id. at 254.  The Supreme Court did not hold that the OCC could charter a bank that would only sell annuities.  *NationsBank* did not address the issue that is now before the Court.  The Supreme Court did *not* address what threshold activities must be undertaken by an entity in order to be engaged in the "business of banking" and be eligible for a national bank charter.  And the Supreme Court did *not* hold that the phrase "business of banking" was ambiguous for all purposes.  Applying ordinary rules of statutory construction, it is clear that Congress intended that the phrase "business of banking" in the NBA necessarily included deposit taking.

     1.   Applicable Rules of Statutory Construction

In statutory construction, context matters. *See Robin. v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").  The Fintech Charter Decision involves a class of non-depository businesses that the OCC has never before chartered as national banks and that have been solely licensed and regulated by the 50 states.  Because the OCC never issued charters for this class of businesses for 150 years, it cannot credibly claim that *NationsBank* supports their new position and that they now have the statutory right to preempt state laws that have been on the books for many generations.

Fourteen years after *NationsBank* was decided, the Supreme Court made this point crystal clear, specifically with regard to the OCC's power to interpret the NBA.  In *Cuomo v. Clearing*

*House Ass'n, LLC*, 557 U.S. 519 (2009), the Court invalidated an OCC regulation that purported to interpret the NBA to prohibit states from "prosecuting enforcement actions" against national banks.  There, as here, the OCC had claimed that the NBA's prohibition against states exercising "visitorial powers" over national banks was ambiguous, and therefore its regulation was valid under *Chevron*. *See id.* at 524-25.   The Court rejected the OCC's position.   Although acknowledging that there is "necessarily some ambiguity as to the meaning of the statutory term "visitorial powers," the Court emphasized that "the presence of some uncertainty does not expand *Chevron* deference to cover virtually any interpretation of the [NBA]." *Cuomo*, 557 U.S. at 525. Rather, the Supreme Court explained that it could "discern the outer limits" by examining "[e]vidence from the statute's enactment, a long line of . . . cases, and application of normal principles of construction to the National Bank Act[.]" *Id.*

Using these same methods of statutory construction, it becomes eminently clear that the "business of banking" must include deposit taking.  In order to determine congressional intent, "a reviewing court must first exhaust the traditional tools of statutory construction," and if considering "its text, legislative history, structure, and purpose, a statute is found to be plain in its meaning, then Congress has expressed its intention, and deference is not appropriate." *Li v. Renaud*, 654 F.3d 376, 382 (2d Cir. 2011). Where, as here, the nationwide regulation of non-depository financial institutions is at stake, the court also "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

There are multiple indicia of Congress' intent that the "business of banking" include depositing taking.  First, where Congress has wanted the OCC to license non-depository institutions, it has provided specific grants of authority to do so. Second, the NBA is just one piece

of the overall federal law governing banking regulation.  These statutes cannot be read in harmony unless the "business of banking" requires that national banks engage in receiving deposits.  Third, the history of the regulation of non-depository institutions as well as common sense indicate that from 1863 through today, Congress intended that business of banking" include depositing taking.

2. The NBA's Structure Demonstrates That
Deposit Taking Is Central to the "Business of Banking"

The structure of the NBA confirms that the reference to the "business of banking" in the NBA necessarily includes deposit taking.  Prior to 1978, Section 27 – entitled "Certificate of authority to commence banking" – was limited to the following:

> If, upon a careful examination of the facts so reported, and of any other facts which may come to the knowledge of the Comptroller, whether by means of a special commission appointed by him for the purpose of inquiring into the condition of such association, or otherwise, it appears that such association is lawfully entitled to commence the business of banking, the Comptroller shall give to such association a certificate, under his hand and official seal, that such association has complied with all the provisions required to be complied with before commencing the business of banking, and that such association is authorized to commence such business. But the Comptroller may withhold from an association his certificate authorizing the commencement of business, whenever he has reason to suppose that the shareholders have formed the same for any other than the legitimate objects contemplated by title 62 of the Revised Statutes.

12 U.S.C. § 27 (1977), *amended* 1978.  Since 1977, Section 27 has been twice amended to specifically allow the issuance of a national bank charter to a non-depository institution.

First, in 1978, Section 27 was amended to authorize the issuance of a national bank charter to a particular type of bank, a trust bank, through the addition of the following sentence in the statute: "A National Bank … is not illegally constituted solely because its operations are or have been required by the Comptroller of the Currency to be limited to those of a trust company and the activities related thereto."  Such "trust banks" expressly are *non-depository*. *See National Bank of Elizabeth, N.J. v. Smith*, 591 F.2d 223, 231 (3d Cir. 1979).

At the time Congress explicitly added this trust bank authorization to Section 27, the National Bank Act already authorized national banks chartered under Section 24 (Seventh) to exercise trust powers by special permit. *See id.* at 231-32; 12 U.S.C. § 92a.  Hence, if, in 1978, Congress believed the OCC "already possessed the authority" to charter non-depository institutions – as OCC now maintains – Section 27(a)'s targeted authorization of *non-depository* trust banks would have been superfluous.  Ordinarily, courts "will not construe a statute in any way that makes some of its provisions surplusage." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985). The OCC's erroneous interpretation of Section 24 violates this rule.

Second, in 1982, Congress amended Section 27 to specifically authorize the OCC to charter "bankers' banks." *See* Garn-St Germain Depository Institutions Act of 1982, Pub. L. 97-320, § 404, 96 Stat. 1469, 1511 (1982).  "Bankers' banks" are "limited charter institutions to be owned exclusively by depository institutions to provide services solely to depository institutions and their directors, officers, and employees." S. Rep. No. 536, 97th Cong., 2d Sess. 27 (1982).  This amendment is another example bluntly illustrating that when Congress wants to authorize the OCC to charter institutions that do not hold customer deposits, it knows how to do so.

It is no secret that the business of banking provisions in the NBA were modeled after the New York Banking Law of 1863. *See* "National Banks and The Dual Banking System" OCC, September 2003, 15-16 *available at* https://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/pub-national-banks-and-the-dual-banking-system.pdf.    Just as Congress has passed new legislation in the very few instances that it sought to authorize the chartering of non-depository institutions by the OCC, so too has New York State.  New York's authority to regulate non-depository institutions including licensed lenders, cash checkers, and money transmitters are all attributable to grants of authority that are in addition to the business of banking provisions in the New York Banking Law. See N.Y. Banking Law Articles 9, 9-A, 11-B,

13

12-A, 12-B, 12-C, 12-D, and 13-B.  There has never been a credible suggestion that the "business of banking" clause in New York law authorized the issuance of a charter or license to a non-bank.

      3.     The Fit of the NBA in the Overall Scheme of Federal Banking Law Demonstrates That the "Business of Banking" Must Include Deposit Taking

The NBA is just one of several federal statutes – and the OCC is just one of several federal agencies – that Congress has assembled to constitute the federal banking regulatory program.   In addition to the NBA, Congress has enacted the Federal Reserve Act administered by the Federal Reserve Board of Governors ("FRA" and "FRB"), 12 U.S.C. §§ 221 *et seq.*, the Federal Deposit Insurance Act administered by the Federal Deposit Insurance Corporation ("FDIA" and "FDIC"), 12 U.S.C. §§ 1811 *et seq.*, and the Bank Holding Company Act administered by the FRB ("BHCA"), 12 U.S.C. §§ 1841 *et seq*).  As demonstrated below, these statutes cannot be read in harmony unless the "business of banking" clauses in the NBA require that national banks receive deposits.   A different interpretation of the NBA would disturb continuity across these integrated statutes by empowering the OCC to create a separate class of entities that would evade the congressionally-intended application of other banking statutes.

Additionally, if the "business of banking" is given the meaning argued by the OCC, it also would violate the well settled presumption that, absent congressional command to the contrary, terms in related statutes or the same administrative regime should be interpreted together, as symmetrical parts of a coherent regulatory structure. *See, e.g., Sullivan v. Stroop*, 496 U.S. 478, 484-85 (1990); *see also ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988).   A court must ensure that the statutory provision under review is interpreted harmoniously with related statutes dealing with the same general subject and the same general principle, so as to give effect to a joint regulatory scheme. *Sullivan*, 496 U.S. at 484.  To that end, comparable words used in different statutes on the same subject should be interpreted to have consistent meanings. *Williams v. Taylor*, 529 U.S. 420 (2000); *see also Brown v. Gardner*,

14

513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context.").

Here, the NBA is one of several statutes designed to provide a consistent structure across the banking industry and reflect the full extent of Congress's regulatory goals. *See, e.g.*, *Colo. Nat'l Bank v. Bedford*, 310 U.S. 41, 48 (1940) (recognizing that the NBA "correlated with the Federal Reserve Act, . . . has developed the present nationwide banking facilities"). The only interpretation of the "business of banking" that ensures harmony among the federal banking statutes is one that requires deposit taking.

  a. *To Be Lawfully Entitled to Commence the "Business of Banking," the NBA, FDIA, and FRA, Require that a National Bank Receive Deposits*

The interplay of the NBA with both the FRA and the FDIA makes clear that the "business of banking" must include the taking of deposits.

The NBA requires that the OCC issue a national bank charter **only if** the association is "lawfully entitled to commence the business of banking." 12 U.S.C. § 27(a); *see also* §§ 21, 26. In order to comply with the NBA's requirement of "lawfully" engaging in the business of banking, a national bank must become an "insured bank." The FRA requires national banks to, upon "commencing business," become both members of the Federal Reserve System and an insured bank under the FDIA. *See* 12 U.S.C. § 222. A national bank that fails to become both a Federal Reserve System member and an insured bank forfeits "all of the rights, privileges, and franchises of such association granted to it under the National Bank Act." 12 U.S.C. § 501a. A national bank, however, cannot become an insured bank without taking deposits. The FDIA explicitly requires that a national bank be "engaged in the business of receiving deposits" in order to be eligible to be an "insured bank." 12 U.S.C. § 1815(a)(1). Since its inception the FDIC has insured deposits, while non-depository institutions have always remained under the supervision of the states and subject to various state law protections.

In summary, federal law requires that all national banks be members of the Federal Reserve System and all members of the Federal Reserve System must be insured by the FDIC. A bank, however, must accept deposits in order to be an insured bank. A bank that does not take deposits cannot be an insured bank, which means it cannot be a member of the Federal Reserve System, which further means it cannot be lawfully engaged in the business of banking under the NBA, thus precluding the OCC from issuing a charter to such an entity.   The only interpretation of the "business of banking" that ensures harmony among the NBA, the FRA, and the FDIC is one that requires deposit taking.

> b.    *"Business of Banking" Should Be Interpreted Consistently with the BHCA Definition of a "Bank," Which Only Includes Deposit-Taking Institutions*

The Bank Holding Company Act is another component of the federal statutes that regulate national banks, and applies to banks that have established holding companies (i.e., a non-bank parent company of a national bank).   Congress envisioned that the BHCA and NBA would operate in harmony to fulfill a common purpose: restricting entry into the banking system and maintaining the separation of banking and commerce.   It is through the BHCA's and NBA's overlapping regulations concerning "banks" and the "business of banking" that these purposes are accomplished. *See Whitney National Bank v. Bank of New Orleans & Trust Co*., 379 U.S. 411, 417-26 (1965) (the NBA and BHCA should be interpreted in harmony and OCC cannot approve that which would violate the BHCA's terms or clearly intended policies).

Just as a government-issued charter is required to engage in the business of banking, 12 U.S.C. § 378(a)(2), the BHCA prohibits a company from acquiring a "bank" without prior approval by the FRB. 12 U.S.C. § 1842(a).  Additionally, just as the powers of national banks are limited to those within the business of banking, 12 U.S.C. § 24 (Seventh), the activities of a bank holding company are limited to those "closely related to banking," 12 U.S.C. § 1843(c)(8).

The BHCA defines a "bank" as an organization that either (1) is an insured bank as defined in Section 3(h) of the FDIA or (2) accepts demand deposits or deposits that may be withdrawn by check or similar means for payments to third parties or others; and engages in the business of making commercial loans. 12 U.S.C. §§ 1841(c)(1)(A) and (B).  Because Congress expressly defined a "bank" in the BHCA as a deposit-taking institution, any interpretation of the NBA's comparable term "business of banking" that allows the issuance of a charter to an entity that does not meet the definition of a bank under the BHCA, would create a giant loophole in the BHCA and would allow the comingling of commerce and banking without oversight by the FRB.  In other words, a bank that did not accept depositions could (according to the OCC's position) receive a bank charter but would not be deemed a bank for purposes of the BHCA and would therefore not be subject to the BHCA's restrictions on mixing commerce and banking.  Such an interpretation would undermine Congress's clear intent on ensuring that all bank holding companies are properly regulated. Due to the interplay between the two agencies and these two statutes, the definition of "bank" under the BHCA must be one that establishes the "inner limits," *i.e.* the essential elements, of what constitutes the "business of banking" under the NBA. *Indep. Bankers Ass'n of Am. v. Conover*, 1985 U.S. Dist. Lexis 22529, *33 (M.D. Fla. 1985).

4.     Common Sense and the History of the Regulation of Non-Depository Institutions Dictates that Deposit Taking Is Central to the "Business of Banking"

The Supreme Court has repeatedly and emphatically instructed that "national banks possess only the powers conferred by Congress," *Bedford*, 310 U.S. at 48, and that "powers not conferred by Congress are denied," *Texas & Pacific Ry. Co. v. Pottorff*, 291 U.S. 245, 253 (1934); *see also City of Yonkers v. Downey*, 309 U.S. 590, 595 (1940). Against this back-drop, it makes little sense to think that Congress gave the OCC a blank slate upon which to identify the scope of all banking transactions regulated by federal charter.  The "business of banking" is at the center of the national economy, and although the OCC may have "discretion to authorize activities *beyond* those

17

specifically enumerated" in Section 24 (Seventh), *NationsBank*, 513 U.S. at 258 n.2 (emphasis added), Congress reasonably requires a set of mandatory minimum activities that define a national banking institution. When the OCC has desired to upset the regulatory regime that Congress has enacted—such as it did with the Fintech Charter Decision casting aside 150 years of the states' exclusive jurisdiction in chartering non-depository institutions—it must go to Congress first.

*Chevron* deference "is called for *only* when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Gen. Dynamic Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (emphasis added). Here, intent is clear, no deference is warranted, and the OCC's decision to charter non-depository institutions should be invalidated in its entirety.

**B.      The OCC's Interpretation of the "Business of Banking" Is Unreasonable**

Assuming, for the sake of argument, that this Court determines that the phrase "business of banking" is ambiguous, it should still reject the OCC's statutory construction as patently unreasonable. "Deference does not mean acquiescence," and courts defer to agency interpretations "only if the administrative interpretation is reasonable." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508 (1992). By any measure, Section 5.20(e)(1) is an unreasonable, and hence invalid, exercise of administrative authority.

1.      OCC's Interpretation of Section 5.20(e)(1) Is Unreasonable
        Because It Fundamentally Changes the OCC's Regulatory Role

An agency's interpretation of a statute is unreasonable if "it would bring about an enormous and transformative expansion of the [agency's] regulatory authority without clear congressional authorization." *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014); *see also MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 229 (1994) (agency's statutory interpretation "can be justified only if it makes a less than radical or fundamental change to the Act[]"). Section 5.20(e)(1) is not merely the OCC's innovative application of long-standing legislation. Instead,

"[w]hat we have here, in reality, is a fundamental revision of the statute." *MCI Telecomm. Corp.,* 512 U.S. at 231.

By authorizing itself through Section 5.20(e)(1) to grant non-depository charters, the OCC "would upend almost one and a half centuries of established federal banking law and displace a nation of 50 state financial regulators that annually supervise hundreds of billions of dollars in non-bank transactions." Cmplt. ¶ 25.   Courts have long rejected such power grabs.   "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, . . . [judges] typically greet its announcement with a measure of skepticism." *Utility Air Regulatory Group*, 134 S. Ct. at 2444.   Because Section 5.20(e)(1) "effectively…introduc[es]…a whole new regime of regulation," *MCI Telecomm.,* 512 U.S. at 234, the skepticism here should be piercing. The OCC's wholly unreasonable interpretation of Section 24 (Seventh) means even *Chevron* deference cannot save it.

  2. The OCC Unreasonably Equates "Business of Banking" with
    the Definition of a "Branch"

The OCC's interpretation also fails because it is not "based on a permissible construction of the statute." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 646 (2000).  The OCC has readily conceded that its definition of "business of banking" in Section 5.20(e)(1) that is necessary for the Fintech Charter Decision is based on 12 U.S.C. § 36(j)—a provision of the NBA that defines when an office of a national bank will be considered a "branch."   The OCC's use of the definition of "branch" in Section 36(j) to define the inner limits, or minimum requirements, of the "business of banking", is indefensible.  It nullifies any distinction between a "national banking association" and a mere "branch" of such an association and violates the legislative intent behind Sections 36 and 81 of the NBA.   It just makes no sense.   It is certainly far beyond an unprecedented interpretation of a longstanding statute that OCC lacks authority to implement through rulemaking,

and is entitled to no deference. *See Atwater v. D.C. Dep't of Consum. & Reg. Affairs*, 566 A.2d 462, 468 (D.C. 1989).

The NBA chartering provisions and the separate restrictions on the location of national bank branches do not share a common purpose.  The NBA chartering provisions (12 U.S.C. §§ 21-27) limit the type or character of institutions that OCC may lawfully charter by designating "business of banking" or other special purposes as the purposes for which national banks may be chartered. The branch location provisions (12 U.S.C. §§ 36 and 81), on the other hand, restrict geographic expansion within the national banking system by designating where certain activities of a national bank may be conducted.  Thus, the term "general business" in Section 81 and the definition of "branch" in Section 36 are restrictions on the geographic operations of an <u>existing</u> national bank, whereas the term "business of banking" in the NBA chartering provisions controls whether a national bank may exist at all.  Since the purpose and legal significance of the terms in the chartering provisions and location provisions do not bear even a tangential relation to one another, the OCC's reliance on the branch rules to interpret the definition of a bank is unreasonable.

Nothing in the text, structure, or legislative history of the NBA or the legislation establishing the branching rules suggests that Congress meant for the definition of "branch" in Section 36 to define the minimum activities required for a national bank charter. *See Leonardi v. Chase Nat'l Bank*, 81 F.2d 19, 22 (2d Cir. 1936) (Sections 36 and 81 refer to the establishment of branch banks, not national banks); *see also Pineland State Bank v. Proposed First Nat'l Bank*, 335 F. Supp. 1376, 1379 (D.N.J. 1971) (the definition of "branch" in 12 U.S.C. 36 "obviously . . . has no application to the creation or establishment of a new national bank").  In concluding otherwise, the OCC ignores clear statutory distinctions between chartering national banks and establishing branches and, relatedly, those between the main office of a national bank as opposed to its branch office(s).  The plain language of the NBA clearly distinguishes between the branches of a national

bank and the main office of a national bank, *see, e.g.*, 12 U.S.C. §§ 30, 36 and 81.  By its express

terms, Section 36 permits national banks only to "establish and operate branches," 12 U.S.C. §

36(c), and does not even come into consideration unless and until a national bank has already been

properly chartered. *See Independent Bankers Asso. v. Smith*, 534 F.2d 921, 951-52 (D.C. Cir. 1976)

(to qualify as a "branch" under section 36, a facility must be "established" by a national bank).

Moreover, using Section 36's definition of "branch" to define the "business of banking"

and redefine what qualifies as a national bank would turn the intent of the branching and locational

restrictions on their head.  Prior to the passage of Section 36 – the statutory provision that the OCC

relies on for its regulation – a national bank was prohibited from having a branch. S*ee Lowry

National Bank*, 29 Op. Att'y Gen. 81 (1911); *see First Nat'l Bank v. Missouri*, 263 U.S. 640, 659

(1924).  This meant that every national bank was permitted to operate out of only one physical

location, a restriction that was meant to prevent national banks (which did not exist prior to the

Civil War) from having an advantage over the long-established State banks, most of which were

prohibited by state law from branching.  As more and more states began to permit their own banks

to operate branches, the categorical restriction on national bank branches in the original NBA

began to disadvantage national banks.  Section 36 was enacted to permit national banks to branch,

but under limited circumstances.  Concerned about "unlimited branching," Congress crafted

Section 36 as a "limited exception to the otherwise applicable requirement of Section 81 that 'the

general business of each national banking association shall be transacted in the place specified in

its organization certificate . . . ." *Clarke v. Sec. indus. Ass'n*, 479 U.S. 388, 401 (1987).

As such, Section 36(j)'s enumeration of three distinct banking functions (any one of which

constitutes a branch) has *nothing* to do with the essential chartering requirements imposed by

Section 24 (Seventh).  Indeed, the relevant branching specifications of the NBA were not enacted

until 1927, *see First Nat'l Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 257 (1966),

some 64 years after the phrase "business of banking" was first incorporated into the statute, *cf.* *MCI Telecomm. Corp.,* 512 U.S. at 228 ("the most relevant time for determining a statutory term's meaning" is the date of its enactment).  There is no link between the two provisions either in purpose or time, and the OCC's attempt to make that connection in Section 5.20(e)(1) simply stretches the law too far.

The broad definition of branch was **<u>never</u>** intended to mirror the requirements for issuing a lawful charter.  Rather, to ensure that the specific exception permitting branching in Section 36 did not subsume the location restrictions in Section 81, Congress established a broad, disjunctive, definition of "branch" to limit branches of federal banks, not to provide expansive authority to the OCC. 67 Cong. Rec. 2860 (Rep. Celler explaining that the definition of branch is intended to stop the proliferation of "teller windows" at which only one banking function takes place).  To further preserve state law, Congress also limited the OCC's discretion to alter the definition of "branch" by specifically and remarkably denying the OCC any rulemaking authority to implement Section 36. *See* 12 U.S.C. § 93a.  A statute designed to *limit* the OCC's regulatory authority cannot logically be argued to authorize the OCC's expansion of its chartering authority.

3.    Attempts by the OCC to Unlawfully Charter Entities That Would Not Carry on the "Business of Banking" Have Routinely Been Struck Down by the Courts

This is not the first time the OCC has clearly exceeded the limits of its chartering authority. And each time, the courts rejected those efforts, concluding that the OCC is not empowered by the NBA to charter such institutions unless specifically authorized by Congress. OCC is permitted to charter a national bank only: (1) where the institution is organized to carry on "the business of banking," which necessarily includes taking deposits, or (2) where Congress has taken specific legislative action to allow for the chartering of an entity to carry on a special purpose.

As noted above, the OCC's authority to charter one category of special-purpose national banks—trust banks—derives from a specific amendment to the NBA enacted in 1978, presently

codified at 12 U.S.C. § 27(a).  Before this amendment, a federal court struck down the OCC's attempt to charter a purported national bank whose activities would be limited to the fiduciary services provided by a trust company, holding that the OCC lacked the authority to charter an institution that would not engage in any of the banking powers enumerated in Section 24 (Seventh) of the NBA. *National State Bank v. Smith*, No. 76- 1479, 1977 U.S. Dist. LEXIS 18184 (D.N.J. Sept. 16, 1977).  By amending the NBA to allow for the chartering of national trust banks, Congress enacted the legislation required for the licensure of the class of non-depository institutions at issue in *National State Bank*.

Following *National State Bank*, court action was once again needed to block OCC's efforts to issue special-purpose charters beyond its express congressionally granted authority. In *Conover*, the court granted an injunction prohibiting OCC from issuing charters to institutions that either did not accept demand deposits or make commercial loans. *Conover*, 1985 U.S. Dist. LEXIS 22529. The court held that the activities mentioned in the definition of "bank" in the BHCA, as amended in 1970, "represent[] a recognition by Congress that the acceptance of demand deposits and the making of commercial loans constitute the historic core activities of banks and the essence of the business of banking." *Id*. at *31.  The court likewise noted that it must "favor statutory construction which enables statutes to complement one another" and construe banking statutes "together to give effect to a joint regulatory purpose." *Id.* at *33.  Applying these principles, the court concluded "a financial institution that is legally unable to engage in both activities cannot engage in the 'business of banking' within the meaning of the NBA." *Id.*

The *Conover* court relied on the history of the amendments to the NBA authorizing the chartering of trust companies and bankers' banks:

> It is clear that when Congress has wanted to expand the authority of the Comptroller to charter national associations that are not to be engaged in the business of banking, it has done so through specific amendments. If Congress had intended that the

23

> Comptroller have broad chartering authority over various types of financial institutions, there would have been no need for the trust company and bankers' bank amendments, and those amendments would not have been narrowly drawn.

*Id.* at *35.   Following the OCC's defeat in *Conover*, Congress specifically declined to adopt legislation extending to OCC the special-purpose chartering authority it had attempted to assert with respect to "nonbank banks."

OCC, in part, relies on its authority to charter credit card banks, but explicit authority is not necessary there because **credit card banks engage in deposit-taking activities and are FDIC insured and thus are engaged in the business of banking**. *See, e.g.*, 12 U.S.C. §§ 1841(c)(2)(F) (contemplating that credit card banks accept "savings or time deposit[s]" and maintain one office "that accepts deposits").   OCC further cites *Indep. Cmty. Bankers Assoc. v. Bd. of Governors of the Fed. Reserve Sys.*, 820 F.2d 428 (D.C. Cir. 1987) ("*ICBA v. FRB*"), for the proposition that it is authorized to issue limited purpose charters. OCC Br. at 17-18.   But the holding in *ICBA v. FRB* is simply that a national bank that qualifies as a "bank" under the BHCA may limit its activities to less than the full scope of activities permissible for national banks.   The court did not hold, as OCC asserts, that a national bank may limit its activities such that it no longer qualifies as a "bank" carrying on the "business of banking."   The court was not faced with deciding whether deposit taking was required to be engaged in the "business of banking": the credit card bank at issue indisputably took deposits. *See ICBA v. FRB*, 820 F.2d at 439; *see also* ECF Doc. No. 21 at 21.

## C. DFS Has Alleged a Valid Tenth Amendment Claim

In the final section of its memorandum, the OCC argues that neither Section 5.20(e)(1) nor the Fintech Charter Decision "run[s] afoul of the Tenth Amendment" because "the Supremacy Clause operates in concert with the National Bank Act to displace state laws or state causes of action that conflict with federal law or that prevent or significantly interfere with national bank

powers." OCC Br. at 23.  That argument misses the point. No one disputes that *valid* federal regulations can preempt state laws without violating the Tenth Amendment.  But there's the rub.

The Supreme Court has stressed that a "federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002) (internal quotation marks, brackets, and ellipsis omitted).  Moreover, "because the States are independent sovereigns in our federal system, [courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996).  To the contrary, in cases "in which Congress has legislated ... in a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotation marks and citations omitted).

DFS has alleged that the OCC acted beyond its statutory authority under the NBA by promulgating Section 5.20(e)(1) and issuing the Fintech Charter Decision. *See* Cmplt. ¶¶ 25, 61. DFS has also alleged that the "Fintech Charter Decision conflicts with state law insofar as it claims to insulate OCC-chartered non-depository institutions from state regulation" and, moreover, that Congress "did not intend to preempt state regulation of such entities." *Id* at ¶¶ 60-61.  These allegations state an actionable claim under the Tenth Amendment because, without legislative authorization, the OCC is powerless to preempt state law. *See New York*, 535 U.S. at 18.

## CONCLUSION

For the reasons stated above, the Court should deny the OCC's motion to dismiss the complaint in its entirety.

Date:   March 19, 2019                          Respectfully submitted,

                                                /s/ Nathaniel J. Dorfman

                                                NATHANIEL J. DORFMAN, *pro hac vice*
                                                General Counsel & Deputy Superintendent
                                                MATTHEW L. LEVINE (ML-6247)
                                                Executive Deputy Superintendent for Enforcement
                                                JAMES F. CAPUTO (JC-0801)
                                                Senior Assistant Deputy Superintendent for
                                                Enforcement
                                                EAMON G. ROCK (ER-9510)
                                                Senior Attorney, Office of General Counsel

                                                New York State Department of Financial Services
                                                One State Street Plaza
                                                Executive Division, 19th Floor
                                                New York, NY 10004-1511
                                                212-709-5538
                                                Nathaniel.Dorfman@dfs.ny.gov
                                                Matthew.Levine@dfs.ny.gov
                                                James.Caputo@dfs.ny.gov
                                                Eamon.Rock@dfs.ny.gov

                                                *Attorneys for Plaintiff*

STEVEN C. WU
Deputy Solicitor General
MATTHEW W. GRIECO
Assistant Solicitor General

Office of the Attorney General of
the State of New York
28 Liberty Street
New York, NY 10005
(212) 416-8014

*of Counsel*