UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

MARIA T. VULLO, in her official
capacity as Superintendent
of the New York State Department
of Financial Services,

                      Plaintiff,

   - against -

OFFICE OF THE COMPTROLLER OF THE
CURRENCY, and JOSEPH M. OTTING,
in his official capacity as
U.S. Comptroller of the Currency,

                     Defendants.
------------------------------------X

: 18 Civ. 8377 (VM)

: **DECISION AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/2/19

**VICTOR MARRERO, United States District Judge.**

      Plaintiff Maria T. Vullo ("Vullo"), in her official capacity as Superintendent of the New York State Department of Financial Services ("DFS"), brings this action against defendants Office of the Comptroller of the Currency ("OCC") and Joseph M. Otting ("Otting"), in his official capacity as United States Comptroller of the Currency,[1] to challenge the decision made by OCC to begin accepting applications for -- and thereafter potentially granting -- special-purpose national bank ("SPNB") charters to "financial technology" ("fintech")[2] companies. (See "Complaint," Dkt. No. 1.)

---

[1] This Order will refer to the plaintiff as "DFS" and the defendants collectively as "OCC."

[2] The Court understands "fintech" companies to be non-bank companies that leverage recent technological innovations to provide financial services and/or products to customers in new ways. (See Dkt. No. 1-1 at 3 (OCC white paper describing "fintech companies" as entities "outside the

On February 26, 2019, OCC moved to dismiss the Complaint for lack of subject-matter jurisdiction or, alternatively, for failure to state a claim upon which relief can be granted. (See "Motion to Dismiss," Dkt. No. 20.) For the reasons set forth below, OCC's Motion to Dismiss is DENIED as to Counts I and II and GRANTED as to Count III.

## I.    BACKGROUND[3]

### A.    FACTUAL BACKGROUND

Vullo is the Superintendent of DFS, which is the New York State agency charged with enforcing the state's insurance, banking, and financial services laws. DFS has licensed 229 state and international banks, and the agency also regulates and supervises approximately 600 non-bank financial services firms. In total, DFS supervises approximately $7 trillion in assets across the insurance, banking, and financial services industries.

OCC is an office of the United States Department of the Treasury that is charged with regulating and supervising federally chartered national banks. Otting is the United

---

banking industry" that reflect "rapid technological change aimed at meeting evolving consumer and business expectations and needs," and providing examples such as "[m]obile payments services," "distributed ledger technology," "[m]arketplace lending," and "crowdfunding sites").)
[3] Except as otherwise noted, the factual background below derives from the Complaint and the facts there pleaded, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See infra Section III.A.1. Except where specifically quoted, no further citation will be made to the Complaint.

2

States Comptroller of the Currency, a role for which he was confirmed by the United States Senate on November 27, 2017. In his official capacity, Otting is thus the chief regulatory and administrative officer of OCC.

The National Bank Act ("NBA"),[4] codified at 12 U.S.C. Section 21 et seq., vests OCC with authority to charter national banks. To receive a national charter, a bank must satisfy certain prerequisites:

> If, upon a careful examination of the facts so reported, and of any other facts which may come to the knowledge of the Comptroller, whether by means of a special commission appointed by him for the purpose of inquiring into the condition of such association, or otherwise, it appears that such association is lawfully entitled to commence the business of banking, the Comptroller shall give to such association a certificate, under his hand and official seal, that such association has complied with all the provisions required to be complied with before commencing the business of banking, and that such association is authorized to commence such business.

12 U.S.C. § 27 ("Section 27"). A national bank -- i.e., one that is chartered by OCC -- is granted

> all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes.

---

[4] The statute currently known as the National Bank Act originated as the National Currency Act of 1863. See Act of Feb. 25, 1863, ch. 58, 12 Stat. 665. This Order will refer to all versions of the statute dating back to 1863 as the "National Bank Act" or "NBA."

12 U.S.C. § 24 (Seventh) ("Section 24 (Seventh)"). OCC also promulgates regulations regarding national banks.

In 2003, OCC amended its regulations to allow it to issue SPNB charters -- i.e., to charter "a special purpose bank that limits its activities to fiduciary activities or to any other activities within the business of banking." 12 C.F.R. § 5.20(e)(1)(i) ("Section 5.20(e)(1)" or "the Regulation"). Under Section 5.20(e)(1), a so-called special purpose bank "that conducts activities other than fiduciary activities must conduct at least one of the following core banking functions: Receiving deposits, paying checks, or lending money." Id. Because Section 5.20(e)(1) makes an entity eligible for an SPNB charter if it conducts "at least one" of those three functions, it contemplates that an SPNB charter could go to an entity that pays checks and/or lends money, but does not receive deposits. The current action concerns whether OCC can lawfully issue SPNB charters pursuant to Section 5.20(e)(1) to fintech companies that do not receive deposits ("non-depository fintech companies").

According to the Complaint, OCC first began considering whether to accept applications for SPNB charters from non-depository fintech companies in March 2016. At that time, OCC published a white paper in which it "identifie[d] the impact of fast-paced developments in financial services technology

4

as a much needed subject of regulatory inquiry." (Complaint
¶ 28; see also Dkt. No. 1-1.) As recounted in the Complaint,
OCC subsequently took numerous steps towards deciding whether
to issue SPNB charters to non-depository fintech companies,
including: publishing an additional white paper; receiving
comments opposing the agency's white paper; issuing a
response to the comments on the white paper; and issuing a
draft supplement to the Comptroller's Licensing Manual,
titled "Evaluating Charter Applications from Financial
Technology Companies." Furthermore, OCC reached out to
fintech companies to discuss the possibility of issuing SPNB
charters.

On July 31, 2018, OCC announced its allegedly final
decision to issue SPNB charters -- namely, OCC, acting under
the authority of Section 5.20(e)(1), announced that it would
begin to accept and review applications for SPNB charters
submitted by non-depository fintech companies (the "Fintech
Charter Decision"). According to DFS, the Fintech Charter
Decision undermines DFS's -- and therefore New York's --
ability to regulate and protect its financial markets and
consumers by "exempt[ing] . . . new fintech chartered entities
from existing federal standards of safety and soundness,
liquidity and capitalization." (Complaint ¶ 49.)

DFS asserts three counts seeking declaratory and injunctive relief. Count I asks the Court to find that the Fintech Charter Decision was unlawful because it exceeded OCC's authority under the NBA, to set that decision aside, and to enjoin OCC from taking any further actions to implement its provisions. (See id. ¶¶ 55-58.) Count II asks the Court to find Section 5.20(e)(1) "null and void" because OCC exceeded its statutory authority in promulgating the Regulation, to set it aside, and to enjoin OCC from taking any further actions to implement its provisions.[5] (See id. ¶¶ 59-62.) Finally, Count III asks the Court to find that the Fintech Charter Decision violates the Tenth Amendment of the United States Constitution (the "Tenth Amendment") because it creates a conflict with state law that Congress did not

---

[5] The Court perceives inconsistency between the title of Count II, which phrases the count as a facial challenge claiming that Section 5.20(e)(1) itself is "null and void," and the content of the count, which challenges Section 5.20(e)(1) only to the extent that it purports to authorize OCC to issue SPNB charters to institutions that do not receive deposits. (See Complaint ¶¶ 59-62.) Hence Count II appears not to challenge the full scope of Section 5.20(e)(1) -- for the text of the Regulation requires only that an institution engage in any one of the three enumerated activities, and therefore contemplates that an institution that only receives deposits (and does not pay checks or lend money), or an institution that receives deposits in addition to paying checks and/or lending money, could potentially receive an SPNB charter.

Thus the Court analyzes this count not as a facial challenge to Section 5.20(e)(1) in its entirety, but as a challenge only to so much of the Regulation as purports to authorize OCC to issue SPNB charters to non-depository institutions. See Babbitt v. Sweet Home Chapter, Cmtys. for a Great Or., 515 U.S. 687, 699 (1995) (facial challenge to a regulation asks for invalidation "in every circumstance"); United States v. Salerno, 481 U.S. 739, 745 (1987) (defining a facial challenge as one that argues that "no set of circumstances exists under which the [law] would be valid").

authorize, and to "declare it null and void." (See id. ¶¶ 63-68.)

B.   PROCEDURAL POSTURE

This litigation is not DFS's first action challenging the Fintech Charter Decision: it previously contested OCC's authority to issue SPNB charters to non-depository fintech companies by filing a lawsuit in this district on May 12, 2017. See Vullo v. Office of the Comptroller of the Currency, Dkt. No. 17 Civ 3574 (S.D.N.Y.). On December 12, 2017, that action was dismissed without prejudice by the Honorable Naomi Reice Buchwald, who granted OCC's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") for lack of subject-matter jurisdiction because, in her determination, the action was not yet ripe for adjudication. See Vullo v. Office of Comptroller of the Currency, No. 17 Civ. 3574, 2017 WL 6512245, at *10 (S.D.N.Y. Dec. 12, 2017) (hereafter, "Vullo I"). Specifically, Judge Buchwald determined that OCC -- at that time -- "ha[d] not yet determined whether it will issue SPNB charters to fintech companies, nor ha[d] it received or reviewed any applications for any such charter." Id. at *5. As a result, Judge Buchwald found both that DFS had not suffered an injury-in-fact and that DFS's claims were not ripe for adjudication. See id. at *8-10.

7

Following OCC's July 31, 2018 announcement, which the Complaint characterizes as "constitut[ing] the agency's final decision to proceed with the unlawful Fintech Charter [Decision]," DFS filed the Complaint in this action on September 14, 2018. (Complaint ¶ 39.)

OCC wrote to the Court, requesting on November 16, 2018 that the Court either endorse the parties' proposed briefing schedule for OCC's contemplated motion to dismiss or schedule a pre-motion conference regarding the contemplated motion. ("November 16 Letter," Dkt. No. 13.) OCC also set forth the bases for its contemplated motion to dismiss the Complaint. (See id. at 2.)

DFS responded to the November 16 Letter, joining in OCC's request for a pre-motion conference regarding "not only the Defendants' baseless motion to dismiss, but Plaintiff's anticipated motion for a preliminary injunction." ("November 26 Letter," Dkt. No. 15, at 1.) DFS also set forth the bases both for opposing OCC's contemplated motion to dismiss and for its contemplated motion for injunctive relief. (See id. at 2-3.)

The Court held a telephone conference on December 10, 2018, during which it directed the parties to update the Court regarding a motion schedule. (See Dkt. Minute Entry for 12/10/2018.) On December 14, 2018, OCC again wrote to the

8

Court with a proposed schedule for its motion to dismiss, and further notified the Court that the parties had failed to reach an agreement regarding DFS's contemplated motion for a preliminary injunction. (See Dkt. No. 18.)

Thereafter, on February 12, 2019, the Court held a telephone conference with the parties during which it directed them to submit a proposed motion schedule. (See Dkt. Minute Entry for 2/12/2019.) The Court subsequently So-Ordered the parties' agreed-upon briefing schedule for OCC's motion to dismiss the Complaint. (See Dkt. No. 19.)

OCC now moves to dismiss the Complaint pursuant to Rule 12(b)(1), for lack of subject-matter jurisdiction, and Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"), for failure to state a claim on which relief may be granted. (See Motion to Dismiss; "Defs.' Mem.," Dkt. No. 21; Dkt. No. 22.) It first argues that the Court lacks subject-matter jurisdiction over the action on several grounds: (1) DFS lacks standing because it has not suffered an injury-in-fact, as required by Article III of the United States Constitution; (2) this action is not yet ripe for adjudication because OCC has not taken any action to accept, review, or approve applications for SPNB charters for fintech companies; and (3) the challenge to the 2003 amendment to Section 5.20(e)(1) is time-barred. (See Defs.' Mem. at 7-11.)

9

OCC further argues that, if the Court reaches the merits of the dispute, the Complaint fails to state a claim on which relief may be granted because (1) the statutory term "business of banking" is ambiguous and, as a result, OCC's reasonable interpretation of the term is entitled to Chevron[6] deference; and (2) neither Section 5.20(e)(1) nor any SPNB charter potentially issued under the Regulation violates the Tenth Amendment. (See id. at 11-19.)

DFS opposes the Motion to Dismiss, arguing that the Court has subject-matter jurisdiction over this action and that the Complaint adequately states a claim. (See "Pl.'s Opp'n," Dkt. No. 25.) DFS first argues that the Court has subject-matter jurisdiction over the action on several grounds: (1) DFS, as an agency of New York State, has standing to challenge the Fintech Charter Decision by reason of DFS's allegation of an injury-in-fact; (2) this action is ripe for adjudication because OCC decided on July 31, 2018 to begin accepting applications for SPNB charters from fintech companies; and (3) the Complaint is timely because the causes of action accrued on July 31, 2018, and, moreover, the intermediate action and reopening doctrines apply to DFS's challenge to Section 5.20(e)(1). (See id. at 4-9.) DFS next argues that

---

[6] See Chevron USA Inc. v. NRDC, Inc., 467 U.S. 837 (1984); see also infra Section III.A.2.

the Complaint states a sufficient claim for relief because
(1) Congress intended the statutory term "business of
banking" to require deposit-receiving; (2) OCC's
interpretation of the term "business of banking" is
unreasonable and therefore not entitled to Chevron deference;
and (3) the Complaint alleges a valid Tenth Amendment claim.
(See id. at 9-25.)

In reply in further support of the Motion to Dismiss,
OCC argues that the Court lacks subject-matter jurisdiction
because DFS has not suffered an injury-in-fact. (See "Defs.'
Reply," Dkt. No. 26.) Moreover, OCC contends that the harms
alleged in the Complaint are speculative because OCC has not
yet received an application for, nor granted, an SPNB charter
to a non-depository fintech company. (See id. at 2-4.) OCC
also repeats its argument that a facial challenge to Section
5.20(e)(1) is untimely. (See id. at 5.) OCC further argues
that the Complaint fails to state a claim on which relief may
be granted because Section 5.20(e)(1) reflects a reasonable
interpretation of the term "business of banking" and
therefore is entitled to judicial deference. (See id. at 5-
9.) Finally, OCC asserts that the issuance of SPNB charters
under Section 5.20(e)(1) would comport with the Tenth
Amendment because OCC's envisioned SPNB charters would not

11

supersede traditional state bank chartering authority. (See id. at 9.)

## II.  **JUSTICIABILITY**

### A.  LEGAL STANDARDS

Article III, Section 2, of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies" -- a requirement which is satisfied only where a plaintiff has "standing" to commence an action in federal court. Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273-74 (2008). A plaintiff can demonstrate standing by establishing three elements: (1) an injury-in-fact; (2) causation; and (3) redressability. See id. Under the injury-in-fact requirement, "the first and foremost" element, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547-48 (2016) (internal quotation marks and alterations omitted). In evaluating a plaintiff's showing of standing, a court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. See Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns, S.à.r.l., 790 F.3d 411, 417 (2d Cir.

2015). Further, a court may consider evidence outside the
pleadings to determine whether jurisdiction exists. See id.

For an injury to be "actual or imminent," either the
"threatened injury must be certainly impending" or there must
be a "substantial risk that the harm will occur." Clapper v.
Amnesty Int'l USA, 568 U.S. 398, 409, 414 n.5 (2013) (internal
quotation marks omitted). The injury cannot be premised "on
a highly attenuated chain of possibilities." Id. at 410.
Although the term has never been used by the United States
Supreme Court, some courts -- including, importantly, the
United States Court of Appeals for the Second Circuit -- refer
to the "actual or imminent" consideration of the injury-in-
fact inquiry as "constitutional ripeness." See, e.g., Entergy
Nuclear Vt. Yankee, LLC v. Shumlin, 733 F.3d 393, 429 (2d
Cir. 2013).

Courts have separately developed the related doctrine of
"prudential ripeness" as "a more flexible doctrine of
judicial prudence." Simmonds v. INS, 326 F.3d 351, 357 (2d
Cir. 2003). Unlike the injury-in-fact requirement, prudential
ripeness is not a "limitation on the power of the judiciary."
Id. Rather, prudential ripeness encompasses whether a court
should, in its discretion, decline to exercise jurisdiction
because "the case will be better decided later." Id. When
examining claims for prudential ripeness, courts "evaluate

13

both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." New York Civil Liberties Union v. Grandeau, 528 F.3d 122, 131-32 (2d Cir. 2008) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). Of course, the considerations of this prudential ripeness inquiry may ultimately overlap with the considerations of the Article III standing inquiry. See id. at 130 n.8.

Yet, to the extent that results of the prudential and constitutional ripeness inquiries yield different answers, such that a case may be constitutionally ripe but prudentially unripe, a court must proceed cautiously. A federal court's ability to decline jurisdiction on prudential grounds must be reconciled with the "virtually unflagging" obligation of a court "to hear and decide cases within its jurisdiction." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014) (internal quotation marks omitted). Thus, following the Supreme Court's decision in Lexmark, courts have questioned the "continuing vitality" of the prudential ripeness doctrine. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (commenting that dismissal on prudential ripeness grounds "is in some tension with" Lexmark but declining to determine the continued vitality of the prudential ripeness doctrine because its factors were

14

"easily satisfied" in that case (internal quotation marks omitted)); see also Young Advocates for Fair Educ. v. Cuomo, 359 F. Supp. 3d 215, 236 n.14 (E.D.N.Y. 2019) ("In Susan B. Anthony List v. Driehaus, a unanimous Supreme Court cast serious doubt as to whether a court may decline to hear a case on 'prudential' ripeness grounds."). Neither the Supreme Court nor the Second Circuit has squarely addressed the continued vitality of prudential ripeness in a published opinion since Lexmark and Susan B. Anthony List.

Ripeness concerns, especially of the prudential nature, are particularly prevalent when a plaintiff challenges agency action prior to an enforcement or adjudication. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 386 (1999) ("[T]his claim . . . is not ripe. When . . . there is no immediate effect on the plaintiff's primary conduct, federal courts normally do not entertain pre-enforcement challenges to agency rules and policy statements."). Courts have developed certain guidelines to prevent premature review of agency action except under certain conditions. As one example, regulated individuals or entities can typically demonstrate standing when "faced with a choice between risking likely criminal prosecution entailing serious consequences, or forgoing potentially lawful behavior." Thomas v. City of New York, 143 F.3d 31, 35 (2d Cir. 1998). Additionally, agency action may

be ripe for judicial review to the extent the issue is a purely legal one that cannot be aided by further factual development. See, e.g., National Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 691 (2d Cir. 2013) (determining that, "[a]lthough the factual record is not yet fully developed, the dispute primarily presents legal questions and there is a concrete dispute between the parties").

State plaintiffs seeking pre-enforcement review of federal agency action present courts with unique standing considerations. State plaintiffs are entitled to "special solicitude" in the standing analysis because they "are not normal litigants for the purposes of invoking federal jurisdiction." Massachusetts v. EPA, 549 U.S. 497, 518, 520 (2007). The depth of this "special solicitude" and its impact on other doctrines, such as the state's ability to bring suits on behalf of its citizens as parens patriae, is unclear. See Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 336–38 (2d Cir. 2009), aff'd in part and rev'd in part, 564 U.S. 410 (2011).

Regardless of the specific impact of this "special solicitude," whether a state has standing to sue the federal government "seem[s] to depend on the kind of claim that the state advances." Arizona State Legislature v. Arizona Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2664 n.10 (2015)

16

(quoting R. Fallon, J. Manning, D. Meltzer & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 263–266 (6th ed. 2009)).

On the one hand, states cannot sue the federal government for alleged violations of federal law merely on behalf of their citizens, even under the Tenth Amendment. See Massachusetts v. Mellon, 262 U.S. 447, 485-86 (1923) ("It cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof."); see also Virginia ex rel. Cuccinelli v. Sebelius, 656 F.3d 253, 270 (4th Cir. 2011) (finding that states have no standing to protect state law that "simply purports to immunize [state] citizens from federal law"); West Va. v. U.S. Dep't of Health & Human Servs., 145 F. Supp. 3d 94, 102 (D.D.C. 2015) (same), aff'd sub nom. West Va. ex rel. Morrisey v. U.S. Dep't of Health & Human Servs., 827 F.3d 81 (D.C. Cir. 2016).

On the other hand, states can sue the federal government to compel agency action in order to defend certain of their "sovereign" and "quasi-sovereign" interests. Massachusetts v. EPA, 549 U.S. at 520 n.17 (finding that a state has standing to "assert its rights under federal law"). Those sovereign and quasi-sovereign interests include, among others, "the exercise of sovereign power over individuals and entities

17

within the relevant jurisdiction -- this involves the power
to create and enforce a legal code." Alfred L. Snapp & Son,
Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601 (1982).
Some cases have also reasoned that, without implicating the
concerns in Mellon, states possess standing to "prevent[] an
administrative agency from violating a federal statute" in
order to "vindicate the [c]ongressional will." Abrams v.
Heckler, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984) (internal
quotation marks omitted) (finding New York State had standing
to sue the Department of Health and Human Services for acting
in excess of its statutory authority by promulgating
regulation that preempted New York insurance law).

States can also sue the federal government if federal
action "imposes" on a state an "obligation" that invades "the
powers of the State" and suffices to establish standing.
Mellon, 262 U.S. at 480; see also Texas v. United States, 787
F.3d 733, 748 (5th Cir. 2015) (finding that Texas had standing
to challenge agency action in part because of the costs
associated with providing additional driver's licenses),
affirmed by an equally divided court, 136 S. Ct. 2271 (2016)
(per curiam). Even when a federal law imposes no obligation
on a state, "[f]ederal regulatory action that preempts state
law creates a sufficient injury-in-fact" as well. Wyoming ex
rel. Crank v. United States, 539 F.3d 1236, 1242 (10th Cir.

18

2008) (citing <u>Alaska v. U.S. Dep't of Transp.</u>, 868 F.2d 441, 443 (D.C. Cir. 1989)) (finding Wyoming had standing to challenge Bureau of Alcohol, Tobacco, Firearms, and Explosives determination that Wyoming's expungement law would not restore federal firearm rights); <u>see also</u> <u>Oregon v. Ashcroft</u>, 192 F. Supp. 2d 1077, 1087 (D. Or. 2002) (finding Oregon had standing to seek declaratory and injunctive relief to invalidate non-final determination of the United States Attorney General implicating Oregon's Death with Dignity Act), <u>aff'd</u>, 368 F.3d 1118 (9th Cir. 2004).[7] The preemption concerns in these cases, involving state laws effectively regulating citizens' conduct, differ from the Virginia law at issue in <u>Cuccinelli</u>, which the United States Court of Appeals for the Fourth Circuit found "regulates nothing and provides for the administration of no state program." 656 F.3d at 270; <u>see also</u> <u>Vermont Assembly of Home Health Agencies, Inc. v. Shalala</u>, 18 F. Supp. 2d 355, 370 (D. Vt. 1998) (finding Tenth Amendment standing "[w]hen the federal government unduly interferes with the functioning of such local bodies").

The rigor of the standing inquiry thus turns not only on the type of plaintiff, but also on the type of claim. When

---

[7] The Supreme Court ultimately addressed the merits of the Attorney General's decision in <u>Gonzales v. Oregon</u>, 546 U.S. 243, 248 (2006), but did not address the standing issue. Accordingly, the <u>Gonzales</u> decision has "no precedential effect" regarding standing. <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 91 (1998).

Congress has "accorded a procedural right," states "can assert that right without meeting all the normal standards for redressability and immediacy." Massachusetts v. EPA, 549 U.S. at 517-18 (internal quotation marks and citations omitted). Numerous cases have identified challenges to agency action under the Administrative Procedure Act ("APA") to be analogous to the procedural claim in Massachusetts v. EPA. See, e.g., Texas, 787 F.3d at 751-52; Pennsylvania v. Trump, 351 F. Supp. 3d 791, 808 (E.D. Pa. 2019). Conversely, the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Clapper, 568 U.S. at 408.

B.   ANALYSIS

The alleged harms DFS complains about in this action are best understood against the backdrop of the nation's unique "dual banking system." Watters v. Wachovia Bank, N.A., 550 U.S. 1, 15 n.7 (2007). Both the federal and state governments have the power to issue charters to banking institutions. Banks that obtain state charters cannot necessarily escape federal regulations, but are supervised on a day-to-day basis by state examiners and agencies such as DFS. See generally "National Banks and the Dual Banking System," OCC (Sept.

2003), https://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/pub-national-banks-and-the-dual-banking-system.pdf. By contrast, banks that obtain national charters are largely supervised by OCC. See id. Critically, these national banks avoid application of many state laws and regulatory systems because of the blanket preemption that prevents state laws from unduly burdening federally-chartered banks. See Watters, 550 U.S. at 11 ("[F]ederal control shields national banking from unduly burdensome and duplicative state regulation."); see also Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519, 535-36 (2009) (holding that states cannot informally subpoena national banks through their "capacity as supervisor[s] of corporations"). Although banks may convert their charters to switch between the federal and state systems, see 12 U.S.C § 35; N.Y. Consolidated Banking Law 136, Congress has repeatedly endeavored to strike the balance of maintaining "competitive equality with its deference to state standards." Watters, 550 U.S. at 26 (internal quotation marks omitted). Importantly, the policy of competitive equality "is not open to modification by the Comptroller of the Currency." Id.

A key feature of the dual banking system is that, with certain exceptions, any entity that is not a deposit-receiving bank -- including non-depository fintech companies

-- is left largely to the prerogative of the states to regulate. See, e.g., Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 428 (2003) ("[T]he business of insurance shall be recognized as a subject of state regulation . . . ." (internal quotation marks omitted)); Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013), aff'd, 769 F.3d 105 (2d Cir. 2014) (recognizing New York State's primacy in regulating payday loans when no conflicting federal law existed).

DFS has repeatedly couched its concerns about the Fintech Charter Decision in terms of the dual banking system. (See, e.g., "January 2017 DFS Letter," Dkt. No. 1-3, at 1-2 ("States Already Regulate Nonbank Financial Services Companies."); Complaint ¶¶ 10-11.) DFS alleges that the Fintech Charter Decision upsets the balance of the dual banking system because it extends federal banking law's blanket preemption to numerous areas currently subject to New York laws and supervision. DFS alleges two distinct harms that follow from OCC's actions. First, New York citizens will suffer by losing "critical financial protections" that New York banking law and regulatory oversight currently provides. (See Complaint ¶¶ 45-49.) Specifically, DFS alleges that the removal of state regulations impacts the agency's regulation of "non-depository money transmitters," of payday lenders and

their "usurious trade," as well as of the state's safety and
soundness standards for non-depository institutions. (Id.)
Second, DFS will suffer direct economic harm because its
"operating expenses are funded by assessments levied by the
agency upon New York State licensed institutions" and the
Fintech Charter Decision will deprive DFS of the revenues
from future assessments. (Id. ¶¶ 50-51.)

These alleged threats to New York and DFS[8] implicate the
type of sovereign and direct interests common in cases where
states have standing to contest agency action. Unlike the
states in Mellon or Cuccinelli, DFS is not merely seeking to
protect New York citizens from obligations created by federal
law. Rather, like the preemption cases of Oregon and Wyoming,
New York provides a comprehensive regulatory system for non-
depository fintech companies -- a system allegedly threatened
by OCC's course of action at issue in this case (i.e., the
Fintech Charter Decision). Further, DFS's alleged anticipated
financial losses are analogous to the financial harms alleged
in Texas regarding the cost of issuing additional driver's

---

[8] Not only is DFS itself entitled to special solicitude as an arm of the
state, but the Court also notes that the New York Deputy Solicitor General
from the Office of the Attorney General of the State of New York is a
signatory to DFS's submissions. See Utah ex rel. Div. of Forestry, Fire
& State Lands v. United States, 528 F.3d 721, 715 (10th Cir. 2008)
(applying special solicitude to Utah's Division of Forestry, Fire, and
State Lands); see also Vermont Assembly, 18 F. Supp. 2d at 370 ("The
Second Circuit extends Tenth Amendment standing to include municipalities
or their arms." (citing Friends of the Earth v. Carey, 552 F.2d 25, 33-
34 (2d Cir. 1977))).

licenses. The statutory claims in this action also fall within the parens patriae framework of standing asserted in Abrams permitting states to vindicate the congressional will when it comes to federal agencies violating statutes.

The threats to New York's sovereignty are so clear that OCC does not even mention, let alone contest, the state's interests. Instead, OCC focuses exclusively on constitutional and prudential ripeness. (See Defs.' Mem. at 7-10; Defs.' Reply at 2-4.) Yet, even those arguments are necessarily hamstrung by OCC's failure to address the interaction between state standing and ripeness in this complicated area of law, especially in light of Massachusetts v. EPA. See Am. Elec. Power, 582 F.3d at 338.

Without demarcating precisely when a threat to a state's ability to create and enforce laws becomes ripe, the Court finds DFS's claims both constitutionally and prudentially ripe for adjudication. The state standing cases discussed above repeatedly make clear that early action by state plaintiffs to combat concerns arising from unlawful federal agency action can be warranted. Thus, a court permitted Oregon expeditiously to challenge -- Oregon sued only one day after the guidance was issued -- the United States Attorney General's non-final determination opining on whether assisting suicide was a "legitimate medical purpose," despite

24

the lack of any specific reference to Oregon's law or any
threatened enforcement actions. Oregon, 192 F. Supp. 2d at
1083-84, 1087. Similarly, even though Texas brought suit only
two weeks after the Department of Homeland Security issued a
memorandum regarding staying deportation proceedings for
certain immigrants, Texas established standing based on the
financial burden of issuing driver's licenses to additional
individuals, even though such issuance required the
"intervening act of a third party" and case law was unclear
whether Texas would be required to issue licenses to those
immigrants. Texas, 787 F.3d at 748, 753.

As a result of the Fintech Charter Decision, New York
State's regulations for over "600 non-bank financial services
firms" are all at risk of becoming null and void. (Complaint
¶ 10.) Of course, certain steps, namely the application for,
and then the granting of, an SPNB charter must occur before
a fintech firm can flout New York's laws. But those steps do
not stymie DFS's standing. For both steps, DFS benefits from
the supposition that the government enforces and acts on its
recent, non-moribund laws. See Hedges v. Obama, 724 F.3d 170,
197 (2d Cir. 2013). Specifically, DFS alleges that OCC has
invited fintech companies to its offices to discuss SPNB
charters, potentially indicating at least some demand for,
and interest in, such charters -- an allegation that the Court

takes as true for the purposes of this motion. (See Complaint
¶ 42.) This alleged interest, coupled with the common-sense
observation that OCC spent numerous years developing the
Fintech Charter Decision and coordinating its creation with
other federal banking regulators (as discussed supra Part I),
indicates that OCC has the clear expectation of issuing SPNB
charters. In fact, DFS points to comments Otting made in the
press indicating that OCC is in informal discussions with
numerous fintech companies for expected SPNB charters. (See
November 26 Letter at 3.)

In light of these expectations, DFS has demonstrated a
"substantial risk that the harm will occur." Clapper, 568
U.S. at 414 n.5 (internal quotation marks omitted). Moreover,
based on DFS's allegations about the threats of federal
preemption and the unique characteristics of the dual banking
system, DFS faces the current risk that entities may, at any
moment, leave its supervision to seek greener pastures. (See
January 2017 DFS Letter at 2-3, 3 n.2 (discussing the benefit
to a bank that switched from state to federal oversight and
thus avoided the state's special supervision imposed in light
of prior failures).) Such risks will color all agency action
until this dispute is resolved. And such risks will force DFS
to incur costs now to "mitigate or avoid" the harms that
currently unlawful lending practices might bring under OCC's

supervision, for example. Clapper, 568 U.S. at 414 n.5. DFS's standing is further bolstered by the fact that its statutory claim under the APA is predicated upon a procedural injury, lessening the "normal standards for . . . immediacy." Massachusetts v. EPA, 549 U.S. at 517-18.

As for prudential ripeness, because of the concerns articulated by the Driehaus Court and the "special solicitude" provided to state plaintiffs, the Court would have to find overwhelming prudential considerations to decline jurisdiction on such grounds. The Court is not persuaded that such considerations exist here. Chiefly, the Court doubts that additional facts are necessary, or would even be helpful, to resolve the discrete legal question at issue in this case. See National Org. for Marriage, 714 F.3d at 691. For instance, the identity and specific services offered by a given non-depository fintech applicant for an SPNB charter are irrelevant to the Court's determination of whether the Fintech Charter Decision exceeds OCC's authority under the NBA.

If anything, the very narrowness of the question raised in this action supports answering it before a fintech company wastes its and OCC's time and money obtaining an SPNB charter. Although the narrowness of the legal issue has not changed since Vullo I, critically, OCC has taken certain small but

27

important steps towards the issuance of SPNB charters since Judge Buchwald's decision. For example, OCC's current Comptroller continued to pursue the SPNB charter program that his predecessor began in 2016. Then, OCC finalized its eighteen-page licensing manual for "Considering Charter Applications from Financial Technology Companies." (See Dkt. No. 1-13.) Finally, on July 31, 2018, OCC announced its "decision" to "accept[] applications for national bank charters from nondepository financial technology (fintech) companies" after "extensive outreach . . . over a two year-period." (See Dkt. No. 1-11.) Before publication of the final materials related to the Fintech Charter Decision, OCC could have made accommodations that would have accounted for the states' interests outlined in the comment letters, justifying OCC's earlier concern for ripeness. See Vullo I, 2017 WL 6512245, at *8-9. However, such concerns no longer exist with the final rules in place.

For all these reasons, the Court finds that DFS has sufficiently established standing to pursue its statutory and constitutional claims against OCC at this time, and that the claims are ripe for decision.

C.   TIMELINESS

Apart from its jurisdictional challenges, OCC argues that DFS's claims are untimely. (See Defs.' Mem. at 10-11.)

Specifically, OCC argues that, insofar as DFS's claims present a facial challenge to Section 5.20(e)(1), such claims had to be raised within six years of the rule's final promulgation -- a window that closed over nine years ago. (See id. (citing 28 U.S.C. § 2401(a); Harris v. FAA, 353 F.3d 1006, 1010 (D.C. Cir. 2004)).)

DFS rightly points out that OCC's position on timeliness is somewhat in tension with its argument about ripeness. (See Pl.'s Opp'n at 8.) Although parties are free to present arguments in the alternative, DFS's claims cannot be both unripe and untimely. Otherwise, agencies could partly insulate their actions (especially informal, non-final actions) from judicial review simply by promulgating rules that exceed their powers and then waiting six years before taking action under those rules. See Coalition for Responsible Regulation, Inc. v. EPA, 684 F.3d 102, 131 (D.C. Cir. 2012) (reviewing EPA rulemaking beyond the provided-for judicial review period because claims brought decades earlier would have been constitutionally unripe), rev'd in part on other grounds sub nom. Utility Air Regulatory Grp. v. EPA, 573 U.S. 302 (2014).

Unsurprisingly then, courts have developed doctrines to address situations where agencies justify new actions grounded on longstanding powers not previously exercised. In

29

addition to the reasoning set forth in <u>Coalition for</u> <u>Responsible Regulation, Inc.</u>, DFS also points the Court to the reopening doctrine, a longstanding principle applied by the United States Court of Appeals for the District of Columbia Circuit, which permits courts to review recent agency action based on prior agency interpretations. (<u>See</u> Pl.'s Opp'n at 8 (citing <u>CTIA-Wireless Ass'n v. FCC</u>, 466 F.3d 105 (D.C. Cir. 2006)).) The reopening doctrine requires an extensive examination of both the original and challenged rulemaking processes. <u>See</u> <u>CTIA-Wireless Ass'n</u>, 466 F.3d at 110; <u>see also</u> <u>Nat'l Ass'n of Mfrs. v. Dep't of Interior</u>, 134 F.3d 1095, 1104 (D.C. Cir. 1998) ("An agency may be deemed to have 'constructively reopened' a previously unchallenged decision if its original rulemaking did not give adequate notice or incentive to contest the agency's decision.").

An examination of the record here indicates that the reopening doctrine likely defeats OCC's statute of limitations defense. Since the adoption of Section 5.20(e)(1), OCC concededly has never chartered a national bank that does not take deposits, nor has it pointed to guidance prior to the Fintech Charter Decision regarding what that process might be. Finally, when OCC began the process of seeking feedback on SPNB charters, numerous banks raised concerns about OCC's reliance on Section 5.20(e)(1), concerns

to which OCC directly responded in its "Summary of Comments and Explanatory Statement" about issuing SPNB charters to fintech companies. (See Dkt. No. 1-8 at 14-15.) The Court also considers application of the reopening doctrine especially appropriate in light of the persuasive reasoning in Coalition for Responsible Regulation, which explained the need to toll the judicial review period for certain agency actions when the challenging party could not have brought a ripe claim any earlier. See 684 F.3d at 131.

However, the Court need not delve too deeply into these issues because OCC has not carried its burden as to timeliness. Typically, defendants bear the burden of proof for affirmative defenses such as timeliness, and conversely plaintiffs need not plead to address time bars. See Gonzalez v. Hasty, 651 F.3d 318, 322 (2d Cir. 2011). OCC did not respond to DFS's arguments about the reopening doctrine on reply or address any other aspects of the administrative record for the Court's consideration.

Of course, if a statute of limitations is jurisdictional, the Court has an independent obligation to confirm the timeliness of the claim. Gonzalez v. Thaler, 565 U.S. 134, 141 (2012). But federal statutes of limitations are not jurisdictional absent clear direction from Congress. See United States v. Kwai Fun Wong, 135 S. Ct. 1625, 1631-32

(2015). As a matter of fact, the Supreme Court has found that the neighboring subsection in the statute OCC invokes here is not jurisdictional. See id. (finding that the time bar in 28 U.S.C. Section 2401(b) is not jurisdictional). Furthermore, other courts have found that Section 2401(a) is not jurisdictional. See, e.g., Phillips v. Lynch, No. 15 Civ. 1514, 2016 WL 3248307, at *6 (E.D.N.Y. June 9, 2016), aff'd sub nom. Phillips v. Boente, 674 F. App'x 106 (2d Cir. 2017). The Court agrees with the persuasive reasoning in Phillips (which relies in part on Kwai Fun Wong), and finds that Section 2401(a) does not operate as a jurisdictional bar in this case.

Thus, the Court is satisfied that Section 2401(a) does not preclude DFS's prosecution of this action, and OCC has not shown that DFS's claims are untimely. OCC may re-raise its timeliness defense later in the proceedings when the record is more fully developed.

### III. **MERITS**

A.    LEGAL STANDARDS

DFS's Complaint and OCC's Motion to Dismiss invoke three sources of substantive and procedural authority that the Court is called upon to review in this proceeding: Rule 12(b)(6), the APA, and the Tenth Amendment.

1.   Rule 12(b)(6)

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A defense that turns on "a clear question of statutory interpretation . . . is properly adjudicated in the context" of a motion to dismiss. F.R. v. Bd. of Educ., 67 F. Supp. 2d 142, 145 (E.D.N.Y. 1999); accord Bank v. Indep. Energy Grp. LLC, 2014 WL 4954618, at *1 (E.D.N.Y. Oct. 2, 2014). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See id. However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

33

2.   Administrative Procedure Act

DFS is not explicit about what type of claim it purports to state in Count I (alleging that the Fintech Charter Decision "exceeds OCC's statutory authority" (Complaint ¶ 58)) and Count II (alleging that OCC "exceeded its statutory authority in approving" Section 5.20(e)(1) at the time of its promulgation (id. ¶ 62)). However, DFS invokes subject-matter jurisdiction for bringing this action under the APA generally (see id. ¶ 14 (premising the Court's "subject matter jurisdiction over this action," inter alia, "pursuant to . . . 5 U.S.C. § 701 et seq. (Administrative Procedure Act)")), and Section 702 of "[t]he APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702); accord Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 370 (2018). Hence the Court construes Counts I and II as raising an APA claim under 5 U.S.C. Section 702.[9]

---

[9] The Court notes that the APA provides other avenues for judicial review that are perhaps applicable here. See, e.g., 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); 5 U.S.C. § 706(2)(C) (providing for courts to "hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). Although the APA's various judicial review provisions are non-fungible "separate standards," Bowman Transp., Inc. v. Arkansas-Best

The Court "evaluate[s] challenges to an agency's interpretation of a statute that it administers within the two-step Chevron deference framework." Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA, 846 F.3d 492, 507 (2d Cir. 2017) (citing Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837 (1984)). "At Chevron Step One," the Court "ask[s] 'whether Congress has directly spoken to the precise question at issue.'" Id. (quoting Chevron, 467 U.S. at 842-43). If the statutory language is "silent or ambiguous," the Court "proceed[s] to Chevron Step Two, where 'the question . . . is whether the agency's answer is based on a permissible construction of the statute' at issue." Id. (quoting Chevron, 467 U.S. at 843). If the agency's interpretation of the ambiguous statutory language is reasonable, that interpretation receives judicial deference. Id.

   3.   Tenth Amendment

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance,

---

Freight Sys., Inc., 419 U.S. 281, 284 (1974), neither party argues that whether DFS states a claim turns on which APA provision it invokes.

reserve power to the States." New York v. United States, 505
U.S. 144, 157 (1992). This structural provision is judicially
enforceable by both states and individuals: as long as a
litigant "is a party to an otherwise justiciable case or
controversy," she may "object that her injury results from
disregard of the federal structure of our Government." Bond
v. United States, 564 U.S. 211, 226 (2011).

B.    ANALYSIS

1.    Administrative Procedure Act

OCC argues that DFS's statutory challenge fails as a
matter of law because textual ambiguity exists in the NBA's
command that OCC determine whether an applicant for a national
bank charter "is lawfully entitled to commence the business
of banking." 12 U.S.C. § 27(a). OCC believes that, given that
it is the agency empowered to administer the NBA, and it
reasonably interpreted the ambiguous language to mean a non-
depository institution can be in the "business of banking,"
its interpretation is insulated from DFS's challenge by
Chevron deference. (See Defs.' Mem. at 11.)

Courts begin the multi-step Chevron deference analysis
by answering the "Chevron 'step zero'" question: "whether
courts should turn to the Chevron framework at all." Matadin
v. Mukasey, 546 F.3d 85, 93 (2d Cir. 2008) (Walker, J.,
concurring) (quoting Thomas W. Merrill & Kristin E. Hickman,

36

Chevron's Domain, 89 Geo. L.J. 833, 836 (2001)); see Chevron, 467 U.S. at 843 (considering whether Congress "delegat[ed] authority to the agency to elucidate a specific provision of the statute by regulation"); accord King v. Burwell, 135 S. Ct. 2480, 2488-89 (2015). The Court does not doubt that the Chevron framework applies to an OCC regulation promulgated pursuant to a statute that OCC is responsible for interpreting, see NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256 (1995), and that specifically directs OCC to determine whether applicants for national bank charters are "lawfully entitled to commence the business of banking." 12 U.S.C. § 27(a).

Satisfied that the Chevron framework applies, the Court turns to "steps" one and two of Chevron analysis: "whether the statute is ambiguous and, if so, whether the agency's interpretation is reasonable." King, 135 S. Ct. at 2488-89. The Chevron framework "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000); see also Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 740–41 (1996) ("Congress, when it left ambiguity in a statute[,] . . . . understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather

37

than the courts) to possess whatever degree of discretion the ambiguity allows.").

However, if the statutory language is "plain and unambiguous," it must be enforced "according to its terms." Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 251, (2010); see also Chevron, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); Li v. Renaud, 654 F.3d 376, 382 (2d Cir. 2011) ("[If] a statute is found to be plain in its meaning, then Congress has expressed its intention, . . . and deference is not appropriate.").

The Court finds that the term "business of banking," as used in the NBA, unambiguously requires receiving deposits as an aspect of the business. At the outset, the Court notes that OCC largely anchors its argument that the "business of banking" is ambiguous in the fact that the NBA does not define receiving deposits as a required component of the "business of banking" in so many words. (See Defs.' Mem. at 11-12.) This argument begs the question. The relevant inquiry here is not whether the NBA explicitly expresses such a definition but whether it unambiguously does so.

"As with any question of statutory interpretation, [the Court] begin[s] with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 108 (2d Cir. 2012). The "business of banking" formulation dates back to the original 1863 version of the NBA. The predecessor to Section 27 provides that

> if, upon a careful examination . . . it shall appear that such association is lawfully entitled to commence the business of banking, the comptroller shall give to such association a certificate under his hand and official seal, showing that such association has complied with all the provisions of this act required to be complied with before being entitled to commence the business of banking under it.

Act of Feb. 25, 1863, ch. 58 § 10, 12 Stat. 665, 668 (codified at 12 U.S.C. § 27(a)). Similarly, the predecessor to Section 24 (Seventh) provides that

> every association formed pursuant to the provision of this act . . . shall have power to carry on the business of banking by obtaining and issuing circulating notes in accordance with the provision of this act; by discounting bills, notes, and other evidences of debt; by receiving deposits; by buying and selling gold and silver bullion, foreign coins, and bills of exchange; by loaning money on real and personal security, in the manner specified in their articles of association, for the purposes authorized by this act, and by exercising such incidental powers as shall be necessary to carry on such business.

Id. at ch. 58 § 11, 12 Stat. 665, 668 (codified at 12 U.S.C. § 24 (Seventh)).

39

As a starting point in interpreting this 19th century language, the Court turns to dictionaries published just prior to the NBA's adoption, "the most relevant time for determining a statutory term's meaning." MCI Telecommc'ns Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 228 (1994); cf. Perrin v. United States, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. Therefore, we look to the ordinary meaning of the term . . . at the time Congress enacted the statute . . . ." (citation omitted)).

At the time of the NBA's drafting, Webster's Dictionary defined "banking" as "[t]he business or employment of a banker; the business of establishing a common fund for lending money, discounting notes, issuing bills, receiving deposits, collecting the money on notes deposited, negotiating bills of exchanges, &c." Noah Webster, American Dictionary of the English Language 97 (1861). Similarly, Worcester's Dictionary defined a "bank" as

> [a]n establishment for the custody and issue of money;
> a   joint-stock   association,   either   private   or
> incorporated, whose business it is to employ in loans,
> or other profitable modes of investment, the common fund
> or capital, increased by the issue of notes to a certain
> amount payable on demand, and by such sums as may be
> temporarily deposited in their hands, by others, for
> safe-keeping: -- the place where the transaction of a
> banking association are carried on.

Joseph Worcester, Dictionary of the English Language 112 (1860).[10] Though these definitions do not define deposit-receiving as an indispensable part of banking, the fact that the entries on these lists are separated by "and" rather than "or" implies that receiving deposits is not an optional alternative to the other listed activities. In light of the prospect that this inference might prove too much, however -- for the Court hesitates to conclude that each of the listed functions was understood as indispensable -- the Court finds some ambiguity on this point.

But the work of determining whether the NBA's text is unambiguous does not end with definitions. After all, the interpreter of statutory text should "not make a fortress out of the dictionary." Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), aff'd, 326 U.S. 404 (1945). For "[c]ourts have a 'duty to construe statutes, not isolated provisions,'" Graham Cty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson, 559 U.S. 280, 290 (2010) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 568 (1995)), and "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that

---

[10] "Banking" was defined as "the management of banks or money; the business of a banker." Id. at 113.

41

language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). Hence a phrase that "may seem ambiguous in isolation" because it has multiple meanings is in fact "often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) (citation omitted); see also Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (finding that a statute's "text, structure, purpose, and history" are properly considered at Chevron step one).

The Court begins its survey of the broader context by noting how often the original NBA discusses the deposit-receiving function of national banks. In addition to enumerating "receiving deposits" as one of the ways in which a national bank "shall have power to carry on the business of banking," see Act of Feb. 25, 1863, ch. 58 § 11, 12 Stat. 665, 668, the original NBA is replete with provisions predicated upon a national bank's deposit-receiving power. See id. at ch. 58 § 5, 12 Stat. 665, 666 (requiring that applicants for a national bank charter "make a certificate which shall specify . . . [t]he place where its operations of discount and deposit[] are to be carried on"); id. ch. 58

42

§ 41, 12 Stat. 665, 677 (imposing capital requirements of at least 25 percent "of the aggregate amount of its outstanding notes of circulation and its deposits").

Moreover, in drafting the NBA, "Congress relied heavily on New York's experiences derived from the operation of its Free Banking Act and the Act's language." Edward L. Symons, Jr., The 'Business of Banking' in Historical Perspective, 51 Geo. Wash. L. Rev. 676, 698 (1983) (hereafter, "Symons"). That experience reflected "a consistent theme of historical development of the business of banking as defined by the indefinite forms of deposit taking, credit granting, and credit exchange," which "activities may vary in form," but "do not vary in substance." Id. at 697. In New York, "[t]he phrase 'the business of banking' ha[d] been given a principled shape and definition by the historical approval and disapproval of various bank activities," and "[a]lthough various limitations on the business of banking may have been imposed from time to time, the power to engage in deposit-receiving, credit-granting, and credit-exchange activities has never been denied to banks." Id. at 715; cf. Oulton v. Savs. Inst., 84 U.S. (17 Wall.) 109, 118-19 (1872) ("[T]he term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution." (construing the Internal Revenue Act)).

43

Indeed, the Court is not aware of OCC ever having chartered a non-depository entity as a national bank on the strength of the NBA's "business of banking" clause. Rather, on the two occasions that OCC began issuing national bank charters to a type of non-depository institution, Congress first amended the NBA explicitly to authorize OCC to do so. First, in 1978, Congress amended Section 27 to allow OCC to charter non-depository "trust banks" as national banks. See Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, Title XV § 1504, 92 Stat. 3641, 3713 (codified at 12 U.S.C. § 27(a)) (providing that a national bank "is not illegally constituted solely because its operations are or have been required by the Comptroller of the Currency to be limited to those of a trust company and the activities related thereto"). Second, in 1982, Congress amended Section 27 to allow OCC to charter non-depository "bankers' banks" as national banks. See Garn-St. Germain Depository Institutions Act of 1982, Pub. L. No. 97-320, Title IV § 404(a), 96 Stat. 1469, 1511 (codified at 12 U.S.C. § 27(b)(1)) ("The [OCC] . . . may also issue a certificate of authority to commence the business of banking . . . to a national banking association which is owned exclusively . . . by other depository institutions and is organized to

44

engage exclusively in providing services for other depository institutions . . . ."").

The Court infers from these two enactments that the amending Congresses understood the NBA's original use of the "business of banking" phrase to require deposit-receiving, such that a non-depository institution (or class of such institutions) is not considered eligible to be granted a federal charter to commence the "business of banking" absent a statutory amendment to the contrary. If those Congresses had a different understanding of the prerequisites for a national bank charter, it is unclear why they would have acted to confer upon OCC an authority they believed OCC already possessed. To be sure, the actions and views of later Congresses are not necessarily dispositive of an earlier-enacted statutory phrase's meaning, and the Court is mindful not to overweigh anti-surplusage arguments -- for benign statutory redundancies "are not unusual events." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992). Nonetheless, the NBA's 1978 and 1982 amendments are illuminating on the point at issue.

The Court is also guided by the canon of construction under which the plausibility of an agency interpretation of statutory text that would confer new power upon that agency bears inverse relation to the size of that putative power and

the belatedness of the putative discovery. See Utility Air, 573 U.S. at 324 ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts] typically greet its announcement with a measure of skepticism." (internal quotation marks and citation omitted)). Here, OCC claimed the power to charter non-depository institutions as national banks in 2003, some 140 years after the adoption of the statutory language that is that power's putative source. The Court finds that a delay of that length provides substantial grounds to cast doubt on OCC's interpretation. This conclusion is only strengthened by what DFS alleges is the impact of this interpretation (see Complaint ¶¶ 3, 11-12, 35, 43-49) on at least "a significant portion" of the national economy, Utility Air, 573 U.S. at 324, as well as on nationwide banking regulation and the proper balance of federal and state functions and powers in our dual system of government and dual-banking structure.

As one instance of the consequential effects of issuing SPNB charters to non-depository fintech companies, the Court notes that such action would entail federal preemption of the state banking regulatory scheme nationwide as it relates to such fintech entities. Such dramatic disruption of federal-state relationships in the banking industry occasioned by a

federal regulatory agency lends weight to the argument that it represents exercise of authority that exceeds what Congress may have contemplated in passing the NBA. See Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouse holes.").

Indeed, if DFS's characterization of the impact is accurate -- which the Court assumes, given the posture of this Order, see supra Section III.A.1 -- OCC's reading is not so much an "interpretation" as "a fundamental revision" of the NBA -- essentially exercise of a legislative function by administrative agency fiat. MCI Telecommc'ns, 512 U.S. at 231. Whether non-depository institutions can qualify as national banks appears to be "a question of deep 'economic and political significance' that is central to this statutory scheme," such that the Court infers that, because of its fundamental regulatory, legislative, and constitutional implications, "had Congress wished to assign that question to an agency, it surely would have done so expressly." King, 135 S. Ct. at 2489 (quoting Utility Air, 573 U.S. at 324).

The Court next turns to two DFS arguments that turn on the manner in which the NBA fits into the wider statutory scheme of national banking regulation. While perhaps of

47

limited weight, the Court takes note of them as additional data points that further undermine OCC's interpretation. First, the Federal Reserve Act requires national banks to obtain membership in the Federal Reserve System and insurance under the Federal Deposit Insurance Act (FDIA). See 12 U.S.C. § 222. But a national bank must be "engaged in the business of receiving deposits" to obtain insurance under the FDIA. 12 U.S.C. § 1815(a)(1). Chartering national banks that do not receive deposits -- which are ineligible for insurance under the FDIA and therefore unable to join the Federal Reserve System -- would introduce an anomaly into this scheme.

Second, the Bank Holding Company Act (BHCA) requires companies to obtain prior approval by the Federal Reserve Board before acquiring a "bank." 12 U.S.C. § 1842(a). The BHCA defines a "bank" as a deposit-receiving institution.[11] 12 U.S.C. §§ 1841(c)(1)(A), (B). Chartering non-depository national banks would create an exception to the BHCA's regulatory scheme without formally amending the statute: there would be banks in the marketplace that could be acquired without Federal Reserve Board approval. Even OCC implicitly

---

[11] The Court finds that Congress's decision to make such a definition in the BHCA -- although perhaps not sufficient by itself to determine the meaning of the text in the earlier-enacted NBA -- lends further support to the proposition that Congress has long considered receiving deposits an indispensable part of what it means for a national bank to be in the "business of banking."

concedes the strained and anomalous role a non-depository bank would play in this statutory scheme, as its licensing manual attempts to ensure that certain FDIA provisions -- which are inapplicable to SPNBs -- nonetheless would apply through specific SPNB chartering requirements in order "to achieve the goals of a particular statute or regulation." (See Dkt. No. 1-13 at 12 n.35.) The Court finds that these points cast doubt on the notion that OCC could charter non-depository national banks without a further act of Congress.

Turning to OCC's main counterarguments, the Court is not persuaded by the point based on Independent Community Bankers Association of South Dakota, Inc. v. Board of Governors of the Federal Reserve System, 820 F.2d 428 (D.C. Cir. 1987). OCC reads this case to support the proposition that an institution can be in the "business of banking" even if it does "not exercise the full complement of banking powers." (Defs.' Mem. at 15.) But even if, as the D.C. Circuit declares in that case, a national bank's "activities" may be lawfully "[r]estricted . . . to less than the full scope of statutory authority" unless that restriction "undermines the safety and soundness of the bank or interferes with the bank's ability to fulfill its statutory obligations," -- and the Court is

not certain this test correctly restates the law[12] -- the proposition that deposit-receiving, specifically, is optional, does not follow. Independent Cmty. Bankers, 820 F.2d at 440. Indeed, the question whether receiving deposits is one of those "statutory obligations" is the very question now before this Court. Id. And in any event, it appears the banks at issue there did take deposits. See id. at 439.

Nor is the Court persuaded by OCC's argument based on NationsBank. (See Defs.' Mem. at 13-15.) It is concededly the case that in NationsBank, the Supreme Court found the phrase "business of banking" in Section 24 (Seventh) ambiguous as to whether it encompasses -- in addition to the five enumerated activities (which include deposit-receiving) -- the sale of annuities. See 513 U.S. at 256-57 (finding that OCC's resolution of that ambiguity was reasonable and therefore deserved judicial deference). But determining the outermost bounds of the phrase "business of banking" is a different task from determining its threshold requirements. See, e.g., Symons, supra at 719 (contrasting "the outer limits of a bank's authority" with "the inner limits of the business of

---

[12] In addition to being an out-of-circuit decision that does not bind this Court, Independent Community Bankers did not support this putative recitation of the applicable standard with a citation to authority. See 820 F.2d at 440. The Second Circuit has not ruled on the underlying question. Further, no other court appears to have cited the decision in support of this point.

banking," or "the minimum activity an entity has to be engaged in to be deemed a bank").

The Court agrees that the determination of the outer limit of the phrase "business of banking" embodies a longstanding ambiguity, as evidenced by the century and a half of case law (to which NationsBank belongs) struggling to define it. See, e.g., Franklin Nat'l Bank of Franklin Square v. New York, 347 U.S. 373, 376-77 (1954) (banking includes advertising); First Nat'l Bank in St. Louis v. Missouri, 263 U.S. 640, 657-59 (1924) (national banks could not open a branch office); Logan Cty. Nat'l Bank v. Townsend, 139 U.S. 67, 74-75 (1891) (declining to reach the question whether banking includes buying municipal bonds); First Nat'l Bank v. Nat'l Exch. Bank, 92 U.S. 122, 127-28 (1875) (under certain circumstances, banking includes purchasing stock). Indeed, the "et cetera" that followed enumerated activities, such as receiving deposits, in Webster's 1861 definition of "banking" attests to the ambiguity of the outer limits of the "business of banking," and supports the notion that the "business of banking" has long been understood to encompass both a determinate core of activities, such as deposit-receiving, in addition to an indeterminate number of other potential activities. See Webster, supra at 97.

51

It does not follow from the uncertainty surrounding the outer bounds of the term, however, that the threshold indispensability (or not) of deposit-receiving to the "business of banking" is necessarily ambiguous. And because the "interpretive clues speak almost unanimously," Cline, 540 U.S. at 586, the Court finds it unambiguous that receiving deposits is an indispensable part of the "business of banking" as used by Congress in the original phrase from the NBA that now appears in Section 27 and Section 24 (Seventh). Cf. Whitman, 531 U.S. at 471 (finding statutory text unambiguous when "interpreted in its statutory and historical context and with appreciation for its importance to the [statute of which it is part] as a whole").

Because the Court finds the NBA text unambiguous as it relates to the component of receiving deposits as a prerequisite for OCC's issuance of a national bank charter under the NBA, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. The Court therefore does not reach the "Chevron step two" question of whether OCC's interpretation is reasonable and therefore deserves deference.[13] See MCI Telecommc'ns, 512 U.S.

---

[13] The Court notes, however, that its conclusion that OCC's interpretation is unambiguously wrong entails the conclusion that, even if the text were

at 229 ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear . . . .").

The Court concludes that the NBA's "business of banking" clause, read in the light of its plain language, history, and legislative context, unambiguously requires that, absent a statutory provision to the contrary, only depository institutions are eligible to receive national bank charters from OCC. The Court therefore finds that DFS states an APA claim, and denies OCC's Motion to Dismiss with respect to Counts I and II.

    2.   Tenth Amendment

"[T]he federal structure serves to grant and delimit the prerogatives and responsibilities of the States and the National Government vis-a-vis one another." Bond, 564 U.S. at 221. The Tenth Amendment helps police this "vertical" separation of powers between federal and state governments. LaRoque v. Holder, 650 F.3d 777, 792 (D.C. Cir. 2011) (contrasting such separation with the "horizontal" separation of powers between the three branches of government); see also Gregory v. Ashcroft, 501 U.S. 452, 458 (1991). Hence "[i]f a power is delegated to Congress in the Constitution, the Tenth

---

ambiguous, OCC's interpretation would be unreasonable at Chevron step two.

Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." New York, 505 U.S. at 156.

"[A]s the Supreme Court has explained, the powers 'delegated to the United States by the Constitution include those specifically enumerated powers listed in Article I' -- such as those conferred by the Commerce Clause -- 'along with the implementation authority granted by the Necessary and Proper Clause' . . . ." United States v. Aquart, 912 F.3d 1, 60 (2d Cir. 2018) (quoting United States v. Comstock, 560 U.S. 126, 144 (2010)). The power to regulate national banks is one such power delegated to the federal government; the NBA represents an exercise of this "prerogative of Congress" to "[r]egulat[e] . . . national bank operations . . . under the Commerce and Necessary and Proper Clauses." Watters, 550 U.S. at 22; see also Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 58 (2003) (per curiam); Cupo v. Cmty. Nat'l Bank & Trust Co. of N.Y., 438 F.2d 108, 110 (1971).

Importantly, DFS does not allege that, in and of itself, the issuance of SPNB charters to non-depository fintech institutions pursuant to Section 5.20(e)(1) would exceed that broad federal authority. To be sure, Congress has previously

chosen to permit OCC to charter non-depository national banks in the specific cases of trust banks and bankers' banks, see 12 U.S.C. §§ 27(a), (b)(1), and DFS does not contest the constitutionality of those legislative choices. Rather, DFS claims that OCC has violated the Tenth Amendment because federal law preempts state law only when "Congress has clearly expressed its intent," and here "Congress did not authorize OCC to charter fintech companies that provide non-depository financial services;" therefore, DFS contends, Congress "did not intend to preempt state regulation of such entities." (Complaint ¶¶ 65-67.) Hence DFS's own pleading indicates that the operative question is not whether the federal government has the power to take the action challenged in this case, but whether Congress has, in fact, exercised that power. (See also Pl.'s Opp'n at 25 (premising Tenth Amendment claim on the contention that Section 5.20(e)(1) lacks "legislative authorization").)

For this reason, the Court finds that DFS fails to state a Tenth Amendment claim. To violate the Tenth Amendment, an action must "exceed[] the National Government's enumerated powers," Bond, 564 U.S. at 225; it must categorically lie beyond federal authority. Hence an action that violates the Tenth Amendment is one that Congress cannot choose to take. A claim that turns on whether Congress articulated its choice

with sufficient clarity simply does not implicate the Tenth Amendment.

The Court therefore concludes that although DFS has standing to raise a Tenth Amendment claim, see supra Section II.B, it fails to state such a claim. Cf. Bond, 564 U.S. at 219 (distinguishing between the justiciability of a Tenth Amendment claim and "the question whether a plaintiff states a claim for relief"). Thus the Court grants OCC's Motion to Dismiss with respect to Count III.[14]

## IV.   ORDER

For the reasons described above, it is hereby

**ORDERED** that the motion (Dkt. No. 20) of defendants Office of the Comptroller of the Currency and Joseph M. Otting, in his official capacity as United States Comptroller of the Currency, to dismiss the complaint (Dkt. No. 1) of plaintiff Maria T. Vullo, in her official capacity as Superintendent of the New York State Department of Financial Services, is **DENIED** as to Counts I and II and **GRANTED** as to Count III. It is further

---

[14] Although the Court finds that DFS fails to state a Tenth Amendment claim, it is not unmoved by the potentially vast effect that OCC's proposed course of action could have on the dual banking system and the balance of state and federal power. The Court finds that these concerns are more properly cognizable as a basis to find DFS has standing and as a consideration that undermines the proposition that the NBA is fairly read to indicate that Congress has, in fact, taken the momentous step of broadly authorizing OCC to charter non-depository national banks. See supra Section II.B; Section III.B.1.

56

**ORDERED** that the parties confer and submit a case management plan, including a schedule for dispositive motion practice or trial to commence after not more than sixty days of discovery.

**SO ORDERED.**

Dated:   New York, New York
         2 May 2019


                                    Victor Marrero
                                       U.S.D.J.