19-4271
*Lacewell v. Office of the Comptroller of the Currency*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2020

(Argued: March 9, 2021     Decided: June 3, 2021)

No. 19-4271

_____

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: Jun 03 2021

LINDA A. LACEWELL, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW
YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Plaintiff-Appellee,*

— v. —

OFFICE OF THE COMPTROLLER OF THE CURRENCY, MICHAEL J. HSU, IN HIS OFFICIAL
CAPACITY AS ACTING U.S. COMPTROLLER OF THE CURRENCY,

*Defendants-Appellants.*\*

_____

Before:          LEVAL, LYNCH, and BIANCO, *Circuit Judges.*

Plaintiff-Appellee the Superintendent of the New York State Department of
Financial Services ("DFS") brought this action against Defendants-Appellants the
Office of the Comptroller of the Currency and the U.S. Comptroller of the
Currency (together, the "OCC") to challenge the OCC's decision to begin

_____

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting U.S. Comptroller of
the Currency Michael J. Hsu is automatically substituted for former U.S. Comptroller of
the Currency Joseph M. Otting as Defendant-Appellant.

accepting applications for special-purpose national bank ("SPNB") charters from financial technology companies ("fintechs") engaged in the "business of banking," including those that do not accept deposits. DFS asserts that this decision, and the OCC regulation underlying it, exceed the OCC's statutory authority under the National Bank Act ("NBA" or the "Act"), 12 U.S.C. § 21 *et seq.*, because, in DFS's view, the "business of banking" as used in the NBA requires that national banks take deposits. The OCC moved to dismiss DFS's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted, arguing, *inter alia*, that: (1) DFS lacks Article III standing; (2) DFS's claims are constitutionally and prudentially unripe; and (3) the term "business of banking" in the NBA is ambiguous and the OCC's interpretation of that term to include institutions that do not accept deposits is reasonable, such that it is entitled to *Chevron* deference. The United States District Court for the Southern District of New York (Marrero, *J.*) denied the OCC's motion and held, in relevant part, that DFS has Article III standing, that its claims against the OCC are ripe both under the U.S. Constitution and as a matter of prudence, and that the OCC exceeded its authority under the NBA because the Act unambiguously requires national banks to engage in deposit-taking. After the parties agreed that no further factual development was required in light of these holdings, the district court entered judgment in favor of DFS, setting aside the OCC's decision to accept SPNB charter applications from non-depository fintechs nationwide. We conclude that DFS lacks Article III standing because it failed to allege that the OCC's decision caused it to suffer an actual or imminent injury in fact, and we find that DFS's claims are constitutionally unripe for substantially the same reason.

Accordingly, we **REVERSE** the amended judgment and **REMAND** to the district court with instructions to enter a judgment of dismissal without prejudice.

CHRISTOPHER CONNOLLY, Assistant United States Attorney, (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY, *for Defendants-Appellants*.

2

BARBARA D. UNDERWOOD, Solicitor
General (Steven C. Wu, Deputy
Solicitor General, Matthew W. Grieco,
Assistant Solicitor General, *on the brief*),
*for* Letitia James, Attorney General of
the State of New York, New York, NY,
*for Plaintiff-Appellee.*[†]

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiff-Appellee the Superintendent of the New York State Department of

Financial Services ("DFS") brought this action against Defendants-Appellants the

Office of the Comptroller of the Currency and the U.S. Comptroller of the

Currency (together, the "OCC") to challenge the OCC's decision to begin

accepting applications for special-purpose national bank ("SPNB") charters from

financial technology companies ("fintechs") engaged in the "business of banking,"

including those that do not accept deposits.[1] DFS asserts that this decision, and

the OCC regulation underlying it, exceed the OCC's statutory authority under the

---

[†] *See* Appendix A for a list of filings by *amici curiae*.

[1] For ease of reference, this opinion makes use of the following defined terms: 12 C.F.R. § 5.20(e)(1)(i) ("Section 5.20(e)(1)(i)"); the Administrative Procedure Act ("APA"); the Comptroller's Licensing Manual Supplement: Considering Charter Applications from Financial Technology Companies ("Licensing Manual Supplement"); the Conference of State Bank Supervisors ("CSBS"); financial technology companies ("fintechs"); the National Bank Act ("NBA" or the "Act"); the New York State Department of Financial Services ("DFS"); the Office of the Comptroller of the Currency and the U.S. Comptroller of the Currency (together, the "OCC"); and special-purpose national bank ("SPNB").

National Bank Act ("NBA" or the "Act"), 12 U.S.C. § 21 *et seq.*, because, in DFS's view, the "business of banking" as used in the NBA requires that national banks take deposits. The OCC moved to dismiss DFS's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted, arguing, *inter alia*, that: (1) DFS lacks Article III standing; (2) DFS's claims are constitutionally and prudentially unripe; and (3) the term "business of banking" in the NBA is ambiguous and the OCC's interpretation of that term to include institutions that do not accept deposits is reasonable, such that it is entitled to *Chevron*[2] deference. The United States District Court for the Southern District of New York (Marrero, *J.*) denied the OCC's motion and held, in relevant part, that DFS has Article III standing, that its claims against the OCC are ripe both under the U.S. Constitution and as a matter of prudence, and that the OCC exceeded its authority under the NBA because the Act unambiguously requires national banks to engage in deposit-taking. After the parties agreed that no further factual development was required in light of these holdings, the district court entered judgment in favor of DFS, setting aside the OCC's decision to accept SPNB charter applications from non-depository fintechs nationwide.

---

[2] *See generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

We conclude that DFS lacks Article III standing because it failed to allege that the OCC's decision caused it to suffer an actual or imminent injury in fact, and we find that DFS's claims are constitutionally unripe for substantially the same reason. Accordingly, we REVERSE the amended judgment and REMAND to the district court with instructions to enter a judgment of dismissal without prejudice.

## BACKGROUND

### I.    The Dual Banking System

Financial institutions in the United States operate within a "dual banking system." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) ("States have a legitimate role in regulating certain banking activity, and it is often said that we have a 'dual banking system' of federal and state regulation."); *accord Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 15 n.7 (2007). Within that system, both federal and state governments are empowered to charter banks and to regulate the banks holding their respective charters. Thus, banks with national banking charters are primarily supervised by federal regulators, and banks with state charters are largely, though not exclusively, subject to state regulation.

On the federal side, the OCC is the bureau of the U.S. Department of the Treasury "charged with assuring the safety and soundness of, and compliance

5

with laws and regulations, fair access to financial services, and fair treatment of customers by, the [federally-chartered] institutions and other persons subject to its jurisdiction." 12 U.S.C. § 1(a). In New York, DFS is the state agency responsible for "the enforcement of [New York's] insurance, banking and financial services laws." N.Y. Fin. Serv. Law § 102; *see also id.* § 102(c) (listing one of DFS's "goals" as "provid[ing] for the effective and efficient enforcement of [New York's] banking and insurance laws"). Among other duties, DFS is responsible for supervising more than 200 New York-licensed state and international banks (with assets of around $2.5 trillion), as well as approximately 600 non-bank financial services companies (with assets of around $1 trillion).

## II. Statutory and Regulatory Context

Under the NBA, the OCC has been granted the power to charter national banks. Specifically, the NBA's "[c]ertificate of authority to commence banking" section provides that:

> If, upon a careful examination of the facts so reported, and of any other facts which may come to the knowledge of the Comptroller . . . it appears that [an entity applying for a federal banking charter] is lawfully entitled to commence *the business of banking*, the Comptroller shall give to such association a certificate . . . that such association has complied with all the provisions required to be complied with before commencing *the business of*

6

> *banking*, and that such association is authorized to commence such business.

12 U.S.C. § 27(a) (emphases added). Although the term the "business of banking" is not defined in the NBA, the Act does specify that once a bank receives a federal charter—and thereby becomes a national bank—

> it shall have power . . . Seventh[,] [t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; *by receiving deposits*; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . .

*Id.* § 24(Seventh) (emphasis added).

In 2003, the OCC amended one of its regulations to give itself the ability to issue SPNB charters.[3] *See* Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real Estate Lending and Appraisals, 68 Fed. Reg. 70,122, 70,126 (Dec. 17, 2003). Specifically, the amended regulation provides:

> The OCC charters a national bank under the authority of the National Bank Act of 1864 . . . . The bank may be a special purpose bank that limits its activities to fiduciary activities or to any other activities within the business of

---

[3] An SPNB, in this context, is a "national bank that engages in a limited range of banking activities, including one of the core banking functions [*i.e.*, paying checks or lending money], but does not take deposits and is not insured by the Federal Deposit Insurance Corporation (FDIC)." Joint App'x at 120.

> banking. A special purpose bank that conducts activities
> other than fiduciary activities must conduct at least one
> of the following three core banking functions: Receiving
> deposits; paying checks; *or* lending money.

12 C.F.R. § 5.20(e)(1)(i) ("Section 5.20(e)(1)(i)") (emphasis added). By that

amendment, the OCC expressly pronounced that it had the authority to issue

national bank charters to institutions that do not receive deposits for the first time

since the NBA was enacted in 1864.[4]

DFS alleges that, in March 2016, the OCC first contemplated issuing SPNB

charters to non-depository fintechs[5] and released a white paper wherein it

"identifie[d] the impact of fast-paced developments in financial services

technology as a much needed subject of regulatory inquiry." Joint App'x at 19. It

then started the lengthy process of determining whether to issue SPNB charters to

non-depository fintechs. More specifically, the OCC began by releasing an

---

[4] Both DFS and the OCC note that the OCC has yet to grant a federal charter to a non-depository financial institution of any kind pursuant to its authority under Section 5.20(e)(1)(i).

[5] The OCC describes fintechs as "thousands of technology-driven nonbank companies offering a new approach to products and services . . . . Fintech companies vary widely in their business models and product offerings. Some are marketplace lenders providing loans to consumers and small businesses, others offer payment-related services, others engage in digital currencies and distributed ledger technology, and still others provide financial planning and wealth management products and services." OCC Br. at 7 n.1 (quoting Joint App'x at 47–48).

additional white paper in December 2016 titled "Exploring Special Purpose National Bank Charters for Fintech Companies," *id.* at 19–20, 46, which noted that "[a] question raised by technological advances in financial services and evolving customer preferences is whether it would be appropriate for the OCC to consider granting a special purpose national bank charter to a fintech company," *id.* at 48. The OCC also stated that its ability to grant SPNB charters to fintechs would be based upon Section 5.20(e)(1)(i), which, as mentioned *supra*, does not require deposit-taking. Further, it pointed out that "[s]tate law applies to a special purpose national bank in the same way and to the same extent as it applies to a full-service national bank," noting that "[e]xamples of state laws that *would* generally apply to national banks include state laws on anti-discrimination, fair lending, [and] debt collection," among others. *Id.* at 51.

Thereafter, the OCC received and, in March 2017, responded to comments from DFS and other interested parties concerning its plan to grant SPNB charters to fintechs—including those that did not receive deposits—set forth in its December 2016 white paper. In response to criticism that this plan exceeded the OCC's statutory authority under the NBA insofar as it enabled the OCC to grant SPNB charters to non-depository institutions, the OCC asserted that "[t]he [NBA]

9

does not require that a bank take deposits in order to be engaged in the 'business of banking.'  Rather, under the Act, performing only one of [either accepting deposits, paying checks, *or* lending money] is sufficient to be performing [the] core banking functions" required by Section 5.20(e)(1)(i).  *Id.* at 132–33.[6]

On July 31, 2018, the OCC announced its final decision to accept applications from—and grant SPNB charters to—fintechs, including those that do not receive deposits, pursuant to Section 5.20(e)(1)(i) (the "Fintech Charter Decision").  In the press release announcing its decision, the OCC stated that "it [would] begin accepting applications for national bank charters from nondepository financial technology (fintech) companies engaged in the business of banking."  *Id.* at 165.  That same day, the OCC also published a "Policy Statement on Financial Technology Companies' Eligibility to Apply for National Bank Charters," *id.* at 23, 167–70, and the "Comptroller's Licensing Manual Supplement:  Considering Charter Applications from Financial Technology Companies" ("Licensing Manual Supplement"), *id.* at 23–24, 172–91.  The policy statement made clear that the OCC's intent was to begin accepting SPNB charter applications from non-

---

[6] In March 2017, the OCC also released a draft supplement to the Comptroller's Licensing Manual titled "Evaluating Charter Applications [f]rom Financial Technology Companies," *id.* at 22–23, 135, regarding which DFS sent an opposition letter, again contending that the OCC's plan exceeded its statutory authority under the NBA.

depository fintechs.  *See id.* at 167 ("It is the policy of the Office of the Comptroller of the Currency (OCC) to consider applications for national bank charters from companies conducting the business of banking, provided they meet the requirements and standards for obtaining a charter.  This policy includes considering applications for special purpose national bank charters from financial technology (fintech) companies that are engaged in the business of banking *but do not take deposits*." (emphasis added)).  DFS further alleges that, following the Fintech Charter Decision, the OCC "immediately invited . . . Fintech startup companies to come to [its] office in New York to discuss . . . the new [SPNB] charter."  Joint App'x at 24.  In response to the Fintech Charter Decision, DFS brought this action in September 2018.

## III.    Procedural History

### A.    The Instant Action

Following the July 2018 Fintech Charter Decision, DFS filed the complaint against the OCC at issue in this appeal in the Southern District of New York on September 14, 2018.[7]  As relevant here, DFS asserted that (1) the Fintech Charter

---

[7]  Before filing the instant action (and over a year before the OCC's Fintech Charter Decision became final), DFS filed a separate action against the OCC in the United States District Court for the Southern District of New York in May 2017, asserting, *inter alia*, that

11

Decision exceeded the OCC's authority under the NBA because it permits the OCC

to grant SPNB charters to institutions that do not accept deposits and

(2) Section 5.20(e)(1)(i) is null and void for that same reason.[8]  Although it was not

clear from the face of the complaint, the district court interpreted these claims as

---

the OCC lacked the authority under the NBA to issue SPNB charters to non-depository fintechs and that Section 5.20(e)(1)(i) "is null and void because it exceeds the OCC's authority under the NBA."  *Vullo v. Off. of the Comptroller of the Currency* (*Vullo I*), No. 17-cv-3574 (NRB), 2017 WL 6512245, at *4 (S.D.N.Y. Dec. 12, 2017).  After the OCC moved to dismiss the complaint for lack of subject matter jurisdiction, the district court found that, far from receiving and reviewing SPNB charter applications from non-depository fintechs (let alone granting such applications), the OCC "ha[d] not yet determined whether it [would] issue SPNB charters to fintech companies" at all.  *Id.* at *5.  Accordingly, the district court dismissed DFS's complaint without prejudice on the grounds that DFS had not suffered an injury in fact sufficient to confer Article III standing and that the claims against the OCC were not yet constitutionally or prudentially ripe.  *See id.* at *7–10.  With respect to standing, the court determined that DFS's asserted injuries, which included, among other things, that New York-chartered institutions seeking and receiving federal SPNB charters would thereby "escape New York's regulatory requirements, stripping their customers of the protections of New York State law," "[would] only become sufficiently imminent to confer standing once the OCC makes a final determination that it will issue SPNB charters to fintech companies."  *Id.* at *7.  In relation to constitutional ripeness, the court held that, because "constitutional ripeness is a subset of the injury-in-fact element of Article III standing, our constitutional ripeness analysis here is coterminous with our standing analysis."  *Id.* at *8.

[8]  With respect to DFS's second claim, the district court clarified that, although the claim was phrased as a facial challenge of Section 5.20(e)(1)(i) in the complaint, it read that claim as challenging "only . . . so much of the [r]egulation as purports to authorize [the] OCC to issue SPNB charters to non-depository institutions."  Joint App'x at 230 n.5.

arising under Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*[9]

The OCC subsequently moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively.  It first contended that DFS lacks Article III standing to pursue its claims and that the dispute is not yet constitutionally or prudentially ripe for adjudication.  As to the merits, the OCC argued that the statutory term the "business of banking" in the NBA is ambiguous and that, therefore, its interpretation of the term to encompass entities that do not accept deposits— including non-depository fintechs—pursuant to Section 5.20(e)(1)(i) warrants *Chevron* deference.

The district court denied the OCC's motion to dismiss as it related to the justiciability and *Chevron* issues now on appeal.  With respect to standing, the court noted that "DFS alleges two distinct harms that follow from OCC's actions," the first being that "New York citizens will suffer by losing critical financial

_____

[9]  In its complaint, DFS also alleged that the Fintech Charter Decision violated the Tenth Amendment.  However, the district court granted the OCC's motion to dismiss as to that claim, and DFS does not challenge that decision on appeal.

protections that New York banking law and regulatory oversight currently provides[,]" and more specifically "that the removal of state regulations impacts [DFS's] regulation of non-depository money transmitters, of payday lenders and their usurious trade, as well as of the state's safety and soundness standards for non-depository institutions." Joint App'x at 246–47 (internal quotation marks omitted). The second alleged harm identified by the district court was that DFS would "suffer direct economic harm because its operating expenses are funded by assessments levied by the agency upon New York State licensed institutions and the Fintech Charter Decision will deprive DFS of the revenues from future assessments." *Id.* at 247 (internal quotation marks omitted). The district court concluded that DFS has standing to bring its APA claims against the OCC, noting that "[t]hese alleged threats to New York and DFS implicate the type of sovereign and direct interests common in cases where states have standing to contest agency action." *Id.* (footnote omitted). Moreover, the district court held that DFS's claims are constitutionally ripe for review because DFS had sufficiently alleged that the OCC's execution of the Fintech Charter Decision was imminent and that there was a substantial risk that the OCC could grant an SPNB charter to a non-depository fintech at any time, thereby injuring DFS.

14

With respect to DFS's claims under the APA, the district court concluded that the term the "business of banking" in the NBA unambiguously requires federally chartered institutions to accept deposits. In reaching that conclusion, the district court found that the NBA's text, statutory framework, and legislative history, as well as the history of federal banking law and the fact that the OCC only gave itself charting power over non-depository institutions in 2003, all counseled in favor of finding that the receipt of deposits is clearly indispensable to the "business of banking." Accordingly, the district court determined that it did not need to reach the second step of the *Chevron* analysis and denied the OCC's motion to dismiss as to DFS's APA claims.

Following the district court's decision and order on the OCC's motion to dismiss, the parties agreed that the court had "resolve[d] the substantive legal issues in this matter[,] . . . render[ing] the entry of final judgment appropriate." *Id.* at 301. Notwithstanding the OCC's request for vacatur limited to non-depository fintechs "that have a nexus to New York State," *id.* at 293, the district court set aside Section 5.20(e)(1)(i) "with respect to *all* fintech applicants seeking a national bank charter that do not accept deposits," regardless of their location in the United

15

States, *id.* at 301 (emphasis added). After the district court entered its amended judgment, the OCC timely appealed.

## B.    Similar Actions in the District of Columbia

The Conference of State Bank Supervisors ("CSBS")—which filed an amicus brief in connection with this appeal—separately has filed similar lawsuits against the OCC in the United States District Court for the District of Columbia. In *Conference of State Bank Supervisors v. Office of the Comptroller of the Currency* (*CSBS I*), CSBS—like DFS—brought a pre-Fintech Charter Decision suit against the OCC, alleging that it lacked the authority to grant SPNB charters to non-depository fintechs. *See* 313 F. Supp. 3d 285, 291–93 (D.D.C. 2018). The district court dismissed the complaint for lack of standing, holding, like the court in *Vullo I*, that CSBS had not alleged a sufficient injury in fact given that each of the harms alleged were "contingent on whether the OCC charters a Fintech," *id.* at 295–96, and that CSBS's claims were constitutionally unripe for that same reason, *id.* at 299; *see also id.* at 296 ("Several contingent and speculative events must occur before the OCC charters a Fintech: (1) the OCC must decide to finalize a procedure for handling those applications; (2) a Fintech company must choose to apply for a charter; (3) the particular Fintech must substantively satisfy regulatory requirements; and

16

(4) the OCC must decide to grant the charter to the particular Fintech. When the complaint was filed, not even the first step—finalized procedures—had occurred.").

Again like DFS, CSBS filed another suit against the OCC after it issued its July 2018 Fintech Charter Decision. *See Conf. of State Bank Supervisors v. Off. of the Comptroller of the Currency* (*CSBS II*), No. 18-cv-2449 (DLF), 2019 WL 4194541, at *1 (D.D.C. Sept. 3, 2019). Unlike DFS, however, CSBS fared no better the second time around. Specifically, the district court found, for substantially the same reasons set forth in *CSBS I*, that CSBS lacked standing and that the dispute was not ripe for judicial review. *See id.* at *1–3.[10]

## DISCUSSION

On appeal, the OCC contends that the district court erred in denying in part its motion to dismiss DFS's complaint. Specifically, it argues that the district court erred in holding that: (1) DFS has Article III standing to pursue its APA claims and

---

[10] We note that, after briefing for this appeal was completed, CSBS *again* sued the OCC in the District of Columbia on December 22, 2020 in connection with the Fintech Charter Decision. CSBS has now added to its complaint the fact that Figure Technologies Inc.—a fintech that the OCC allegedly has determined does accept deposits but will not be required to obtain deposit insurance from the Federal Deposit Insurance Corporation— applied to the OCC for an SPNB charter. *See* Complaint at 2, 6, *Conf. of State Bank Supervisors v. Off. of the Comptroller of the Currency* (*CSBS III*), 20-cv-3797 (DLF) (D.D.C. Dec. 22, 2020), ECF No. 1. The OCC's motion to dismiss the complaint is pending.

that those claims are constitutionally and prudentially ripe for adjudication; (2) the OCC's decision to accept SPNB charter applications from non-depository fintechs is not entitled to *Chevron* deference because the "business of banking" under the NBA unambiguously requires the receipt of deposits; and (3) Section 5.20(e)(1)(i) should be vacated as applied to non-depository fintechs without any geographical limitation. As discussed below, we find that DFS lacks Article III standing and that its APA claims are constitutionally unripe because no non-depository fintech has filed a formal SPNB charter application, nor is it known whether such an application will be granted if filed.[11] Accordingly, we need not reach the OCC's other claims of error.

## I. Standard of Review

In this case, the OCC brought a "facial"—as opposed to a "fact-based"—standing challenge under Rule 12(b)(1) because its motion was "based solely on the allegations of the complaint . . . and exhibits attached to it." *Carter v. HealthPort*

---

[11] At various points in its appellate briefs, the OCC suggests that DFS's claims may not become justiciable even when a non-depository fintech formally applies for an SPNB charter, but rather that DFS may need to wait to bring its claims until after the OCC grants such an application. We do not decide the precise point at which DFS's claims may become justiciable in the future. Instead, we limit our analysis to the facts currently before us and conclude that at this juncture, where there is no formal application from a non-depository fintech for an SPNB charter, DFS does not satisfy the requirements for Article III standing, nor are its claims constitutionally ripe.

*Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  "[W]e review the district court's decision on such a facial challenge *de novo*."  *Id.*; *accord Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 533 (2d Cir. 2020).  In doing so, we "accept[] as true all material factual allegations of the complaint, and draw[] all reasonable inferences in favor of the plaintiff."  *Sonterra Cap. Master Fund Ltd.*, 954 F.3d at 533 (internal quotation marks omitted).  Additionally, "the plaintiff has no evidentiary burden" when confronted with a facial standing challenge.  *Carter*, 822 F.3d at 56.

As with its standing determination, a district court's conclusion as to ripeness "is also a legal determination subject to *de novo* review."  *Connecticut v. Duncan*, 612 F.3d 107, 112 (2d Cir. 2010); *accord Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).

## II.  **Article III Standing**

At the threshold, the OCC argues that DFS cannot establish Article III standing because it has not alleged that it suffered, or will suffer imminently, an injury in fact as a result of the OCC's Fintech Charter Decision.

Under Article III of the U.S. Constitution, "[t]he judicial Power of the United States" extends only to certain "Cases" and "Controversies."  U.S. Const. art. III, §§ 1–2; *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more

19

fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (internal quotation marks omitted)).  To satisfy the Constitution's "case-or-controversy requirement," a plaintiff in federal court "must establish that they have standing to sue."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines*, 521 U.S. at 818).  "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Id.*

The requirements of Article III standing are well established:  "[A] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  DFS, "as the party invoking federal jurisdiction, bears the burden of establishing these elements."  *Id.* ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  Because DFS fails to establish "the '[f]irst and foremost' of standing's three elements"—injury in fact, *id.* (alteration in original) (quoting *Steel*

20

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998))—we need not address traceability or redressability.

"[T]he injury-in-fact requirement[] . . . helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). For purposes of Article III standing, an "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized[] and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (footnote, citations, and internal quotation marks omitted); *accord Clapper*, 568 U.S. at 409; *Sonterra Cap. Master Fund Ltd.*, 954 F.3d at 534. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Driehaus*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 & n.5); *accord Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016); *see also Clapper*, 568 U.S. at 410 (finding an "objectively reasonable likelihood" of future harm to be an improper standard for showing a "threatened injury [is] certainly impending" (internal quotation marks omitted)). Importantly, however, "allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (alteration and internal quotation marks omitted) ("Although imminence is

21

concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes . . . ." (internal quotation marks omitted)).

DFS alleges that it will suffer two classes of injuries as a result of the OCC's actions. First, it asserts that the Fintech Charter Decision will lead to the preemption of state law and thereby reduce DFS's regulatory power, to the detriment of New York consumers. Second, it argues that it faces the prospect of losing revenue from assessments it currently levies against non-depository fintechs, which may opt to convert to a federal SPNB charter.[12] Each of these alleged injuries is discussed below in turn.

### A. Preemption and Regulatory Disruption

In asserting that it has standing, DFS does not argue that it has already suffered any sort of injury as a result of the OCC's actions. Instead, it contends that there is a substantial risk that the Fintech Charter Decision will enable non-depository fintechs with SPNB charters that would otherwise be subject to its regulatory jurisdiction to escape enforcement by claiming federal preemption. DFS's logic is as follows: Under the dual banking system, states have heretofore

---

[12] Under federal law, state-chartered institutions may convert into national banks, provided that they meet certain requirements. *See* 12 U.S.C. § 35.

regulated non-depository institutions. Thus, if any New York-chartered, non-depository fintech converts to—or any new non-depository fintech seeking to do business in New York applies for—an SPNB charter pursuant to the Fintech Charter Decision, it will, in DFS's view, claim federal preemption in response to any DFS-initiated regulatory action.

DFS further alleges that this alleged preemption, will, *inter alia*, "weaken[] regulatory controls on usury, payday loans, and other predatory lending practices" and thereby harm New York, as well as the consumers and businesses that reside there. Joint App'x at 11. In particular, DFS contends that non-depository fintechs with federal SPNB charters will "escape" New York's "bonding requirements, liquidity and capitalization standards, and [certain] payment obligations" meant "to protect consumers against loss in the event that such an institution fails." *Id.* at 25. Relatedly, DFS asserts that "the Fintech Charter Decision effectively negates New York's strict interest-rate caps and anti-usury laws" because, under federal law, national banks are subject to the interest-rate laws of the jurisdiction in which they are "located." *Id.* at 26 (quoting 12 U.S.C. § 85). Thus, according to DFS, "under the Fintech Charter [D]ecision, marketplace lenders that use the Internet can now gouge New York borrowers by receiving an

23

OCC special purpose charter and locating in any number of other states that authorize interest rates considered usurious in New York." *Id.*

The district court determined that the alleged threat of federal preemption and subsequent regulatory harm was sufficient to confer Article III standing because New York's "comprehensive regulatory system for non-depository fintech companies" is "allegedly threatened by" the OCC's Fintech Charter Decision. *Id.* at 247 ("These alleged threats to New York and DFS implicate the type of sovereign and direct interests common in cases where states have standing to contest agency action." (footnote omitted)). We disagree.[13]

---

[13] Although not relied upon by DFS on appeal, the district court also determined that DFS's APA claims "fall within the *parens patriae* framework of standing." Joint App'x at 248. *Parens patriae* standing allows a state (in its capacity as a sovereign) to bring suit on behalf of its citizens when it "allege[s] injury to a sufficiently substantial segment of its population," "articulate[s] an interest apart from the interests of particular private parties," and "express[es] a quasi-sovereign interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). The ability of a state to sue the federal government under this doctrine of standing is subject to continuing judicial debate. *See Connecticut v. U.S. Dep't of Com.*, 204 F.3d 413, 414 n.2 (2d Cir. 2000) (declining to address the issue); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015) (noting that the cases relating to "standing of states to sue the federal government[,]" including those addressing *parens patriae* standing, "are hard to reconcile" (internal quotation marks omitted)). However, we need not delve into this complex threshold question because, even assuming *parens patriae* standing could apply here, New York residents (like the state itself) lack a concrete or imminent harm stemming from the OCC's Fintech Charter Decision and that same lack of harm at this juncture prevents DFS from relying on this doctrine to establish *parens patriae* standing under *Snapp*. *See, e.g.*, *Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885

As an initial matter, insofar as DFS is relying on the "substantial risk" test for Article III standing articulated in *Driehaus* and *Clapper*, we find DFS's asserted risk of regulatory injury to be too speculative to meet the requirements of Article III. At this time, no non-depository fintech has applied for—let alone been granted—an SPNB charter, and, as DFS concedes, no state law or regulation has been preempted as a result of the Fintech Charter Decision. Thus, there is currently no non-depository fintech that can claim federal preemption engaging in any practice that may give rise to the regulatory harms that DFS alleges, such as charging interest rates that exceed New York's statutory cap. Moreover, the Fintech Charter Decision merely indicates that the OCC intends to begin accepting SPNB charter applications from non-depository fintechs; it is not a guarantee that those applications will be granted. As was the case before the Fintech Charter Decision was made final, "[a]ny allegation of preemption at this point relies on speculation about the OCC's future actions." *Vullo I*, 2017 WL 6512245, at *8; *see also CSBS I*, 313 F. Supp. 3d at 298 ("[No] state law has been preempted by the

---

(9th Cir. 2001) (holding that "[the sovereign] still must allege injury in fact to the citizens they purport to represent as *parens patriae*"); *accord Utah Div. of Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1145 (D. Utah 2019) ("[A]s a matter of logic, it is clear enough that the mere assertion of a state interest, untethered from injury to the State's citizens, cannot support *parens patriae* standing—even if that interest might qualify as a quasi-sovereign interest if accompanied by such injury.").

OCC's preliminary activities respecting Fintech charters.").  In short, before any

non-depository fintech that engages in the types of business practices about which

DFS is concerned applies for or receives an SPNB charter, there will be no requisite

"imminent" injury to DFS.[14]  *Lujan*, 504 U.S. 560; *accord Clapper*, 568 U.S. at 406,

409–14 (finding plaintiffs—a group that included "attorneys and human rights,

labor, legal, and media organizations"—failed to establish Article III standing to

challenge a statute permitting the foreign surveillance of individuals other than

"United States persons" where plaintiffs contended that their own

communications could be intercepted by the U.S. government under the statute

based upon "a highly attenuated chain of possibilities").  For the same reasons,

there is not, at this time, a sufficiently "substantial risk" that such injury will occur.

*Driehaus*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

---

[14] In its brief on appeal, DFS argued that it "will be forced to incur regulatory costs *before* any issuance of a charter" because it will need "to complete enforcement actions before a fintech company can seek immunity from OCC, and to monitor fintechs nationwide for potential incursion into the New York marketplace."  DFS Br. at 28.  As a threshold matter, DFS failed to raise this issue below.  *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018) ("The well-established general rule is that an appellate court will not consider an issue raised for the first time on appeal." (alteration and internal quotation marks omitted)).  But even if it were properly raised, we note that counsel for DFS conceded at oral argument that DFS still has yet to incur these costs, despite alleging that the OCC had already begun processing draft applications when the district court judgment was entered, thus demonstrating that these costs—like the other costs DFS alleges it will incur—are too speculative at this stage to support standing.

Moreover, even if the OCC grants an SPNB charter to *some* non-depository fintech, it is not entirely clear that the regulatory disruption that DFS fears will actually occur. Indeed, DFS's purported standing on the basis of preemption and regulatory injury is undermined by its own complaint, which repeatedly couches this alleged injury in conditional or future-oriented terms. For example, DFS alleges that: "federal preemption claims *will surely proliferate* among fintech charter-holders in response to New York misconduct charges," Joint App'x at 25 (emphasis added); "New York-licensed money transmitters . . . *could qualify* for an [SPNB] charter and thereby escape New York's regulatory requirements," *id.* (emphasis added); and the Fintech Charter Decision "*could realistically lead* in New York to the proliferation of prohibited payday lending by out-of-state OCC chartered entities," *id.* at 26 (emphasis added). DFS also undercuts its own claimed standing, admitting that "the full scope of regulatory disruption is difficult to ascertain" because the class of fintechs to which the OCC will ultimately grant SPNB charters is uncertain. *Id.* at 25.

Although no non-depository fintech has filed a formal application for an SPNB charter, DFS urges us to assume that the OCC will grant one imminently. In its brief on appeal, for instance, DFS points to evidence that the OCC has

actively solicited SPNB charter applications from non-depository fintechs and that a former Comptroller of the Currency suggested that there were multiple entities "going through the [SPNB charter] application process" prior to the district court's decision in this case denying in part the OCC's motion to dismiss. DFS Br. at 19–20 (internal quotation marks omitted). In DFS's view, these developments suggest that its alleged regulatory injuries are sufficiently imminent. We disagree, however, because the mere act of welcoming SPNB charter applications from non-depository fintechs does little to show that the OCC is on the verge of granting those applications imminently or at all (or even that one will necessarily be filed). Consequently, DFS's concern about preemption and its regulatory fallout is too speculative.[15]

---

[15] Although the district court noted that "DFS benefits from the supposition that the government enforces and acts on its recent, non-moribund laws," Joint App'x at 249 (citing *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013)), that supposition does not alter the standing analysis here. In *Hedges*, this Court assessed, *inter alia*, whether certain non-citizens had Article III standing to challenge a provision of the National Defense Authorization Act purporting to authorize the U.S. President to detain any person associated with certain terrorist activities. 724 F.3d at 182, 193–94. In that context, we stated that plaintiffs seemed to face a more "forgiving" standing inquiry before the Supreme Court when bringing a pre-enforcement challenge of a statute proscribing certain conduct, in part, because of the Court's apparent "willing[ness] to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Id.* at 197 (internal quotation marks omitted). This presumption is of no moment here, however, because the Fintech Charter Decision proscribes *nothing* and it does not even apply directly to DFS. *See Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is

Furthermore, at oral argument, DFS asserted that, in light of certain statements by former Comptrollers of the Currency to the effect that applications for SPNB charters were in process, the OCC must have been in preliminary discussions with—and received draft SPNB charter applications from—non-depository fintechs, such that any ultimate grant of such a charter would occur very soon after a formal application is filed. To be sure, the OCC's Licensing Manual Supplement includes a "prefiling phase," during which a fintech that considers applying for an SPNB charter can engage with OCC staff regarding the application process, discuss any potential issues concerning the business plan at issue, and, if necessary, submit a draft application. Joint App'x at 176–77. But contrary to DFS's view, the possibility that some unidentified non-depository fintechs were in initial discussions with the OCC about applying for an SPNB charter prior to the district court's decision in this case, or that those fintechs had submitted draft applications for such a charter, does not render the granting of an SPNB charter to a non-depository fintech, much less DFS's asserted preemption-related injuries, actual or imminent; rather, it only makes those events somewhat

---

not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." (internal quotation marks omitted)).

more "*possible*." *Clapper*, 568 U.S. at 409 (noting that "allegations of *possible* future

injury are not sufficient" to establish Article III standing (alteration and internal

quotation marks omitted)).[16] Indeed, the Licensing Manual Supplement itself

provides that "[f]iling a draft application does not guarantee that the OCC will

approve a formal application," Joint App'x at 177 n.11, and DFS ignores the fact

that applicants are, by regulation, required to publish notice of formal SPNB

charter applications and that the OCC must then provide a thirty-day public

comment period, *see id.* at 178 & nn.12–13.

The district court and DFS stress that DFS, as a state-agency plaintiff, is

owed "special solicitude" when assessing Article III standing. *Massachusetts v.

EPA*, 549 U.S. 497, 520 (2007). In finding that DFS lacks standing, however, we do

not cast doubt on this principle because it does not absolve a state or state-agency

---

[16] We are also unmoved by developments that have occurred since the briefs in this appeal were filed. In its Federal Rule of Appellate Procedure 28(j) letter dated September 4, 2020, DFS informed the court that *Politico* had reported that the then-Acting Comptroller of the Currency had indicated in an interview that the OCC "[would] be ready as soon as [September 1, 2020] to start processing applications for charters from payments companies." DFS Rule 28(j) Letter at 1 (Sept. 4, 2020), ECF. No. 103. DFS contends that the reported statement demonstrates that it is in no way "speculative" that the OCC "will exercise [its challenged] chartering authority." *Id.* at 2. Even if we were to agree that this statement constituted evidence that the OCC is now more eager to accept SPNB charter applications, it does not establish that non-depository fintechs are any more likely to now submit such applications or have such applications granted imminently.

plaintiff from the constitutional requirement that it establish a sufficiently "concrete, particularized, and . . . imminent" injury in fact. *Clapper*, 568 U.S. at 409 (internal quotation marks omitted); *see Del. Dep't of Nat. Res. & Env't Control v. Fed. Energy Regul. Comm'n*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) ("This special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury, as [*Massachusetts v. EPA*] amply indicates."). Additionally, we note that the considerations in *Massachusetts v. EPA* were quite different from those presented in this case. In particular, there, Massachusetts had experienced an *actual* injury in fact—namely, "rising seas ha[d] already begun to swallow Massachusetts' coastal land," *Massachusetts v. EPA*, 549 U.S. at 522, whereas here, DFS has not suffered any actual injury, and the future injuries it fears will only occur if, at least, an application for an SPNB charter is filed by a non-depository fintech and the OCC decides to grant that application.

Furthermore, we find the cases upon which DFS relies for the proposition that "[a]gency action that expands the preemptive scope of an existing federal statute causes a cognizable injury to [s]tates," DFS Br. at 31, to be factually inapposite to the circumstances here because the preemptive effect of the new federal law, regulation, or policy at issue in those cases was direct and immediate.

For instance, *Wyoming ex rel. Crank v. United States* involved a federal law prohibiting individuals convicted of misdemeanor domestic violence crimes from owning firearms. 539 F.3d 1236, 1239 (10th Cir. 2008). In response to this law, Wyoming passed its own statute establishing a process for the expungement of certain domestic violence crimes for the purpose of restoring firearm ownership rights. *Id.* at 1239–40. The state brought suit in federal court after federal authorities informed state officials that the new state law did not align with federal law and that anyone possessing a gun pursuant to the expungement law could still face federal prosecution. *See id.* at 1240–41. With respect to Article III standing, the Tenth Circuit concluded that Wyoming had sufficiently alleged injury in fact because federal authorities expressly found that Wyoming law was preempted, and thereby infringed upon the state's sovereign interest in enforcing its own laws. *Id.* at 1242.

The situation before us is altogether different from *Wyoming ex rel. Crank*. As noted above, no New York law or regulation has been preempted because the OCC has not received an SPNB charter application from, or granted an SPNB charter to, any non-depository fintech and, in addition, it is unclear at this juncture

whether New York law will *ever* be preempted in the ways DFS fears.[17] Simply put, the Fintech Charter Decision has not implicated the sorts of direct preemption concerns that animated DFS's cited cases, and it will not do so until the OCC receives an SPNB charter application from or grants such a charter to a non-depository fintech that would otherwise be subject to DFS's jurisdiction.

## B. Loss of Assessment Revenue

We are also unpersuaded that DFS faces a substantial risk of suffering its second alleged future injury—that it will lose revenue acquired through annual assessments. In its complaint, DFS alleges that it is funded through assessments levied upon institutions it regulates pursuant to N.Y. Fin. Serv. Law § 206(a). DFS further asserts that, in light of this assessment regime, the Fintech Charter Decision will cause it injury in "a directly quantifiable way" because "[e]very non-depository financial firm that receives an [SPNB] charter in place of a New York

---

[17] The remaining preemption-based standing cases that DFS cites are unavailing for this same reason. *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 442–43 (D.C. Cir. 1989) (concluding that states had suffered sufficient injury in fact to confer Article III standing because federal officials expressly took the position that federal regulations preempted state consumer protection laws concerning "airline price advertising," which encroached upon the states' sovereign interest in enforcing their own laws); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 229–30, 232–33 (6th Cir. 1985) (finding same where a federal "statement of policy" expressly provided that federal regulations preempted state laws requiring prenotification of the transportation of certain radioactive materials within state lines).

license to operate in the state deprives DFS of crucial resources that are necessary to fund the agency's regulatory function."  Joint App'x at 27–28.

As with its asserted preemption-related injuries, DFS has not alleged that it lost any assessments as a result of the Fintech Charter Decision, nor has it shown that such a financial loss is sufficiently imminent.  At least until a non-depository fintech that DFS currently regulates—or would otherwise regulate—decides to apply for an SPNB charter, this alleged assessment loss will remain purely "conjectural or hypothetical," rather than "imminent" as the Constitution requires. *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).

In addition, the cases DFS relies upon to support its loss-of-revenue argument are distinguishable either because the new law or agency decision at issue had already led to pecuniary injury at the time of the lawsuit, or because such injury was inevitable.[18]  For example, in *Wyoming v. Oklahoma*, Wyoming brought suit against Oklahoma under the Commerce Clause of the U.S. Constitution, challenging an Oklahoma law requiring utility companies to purchase a certain amount of coal from in-state sources rather than sources in

---

[18]  For purposes of this discussion, we assume, without deciding, that the cited decisions of other courts of appeals, which are not binding on this Court in any event, were correctly decided.

34

Wyoming. *See* 502 U.S. 437, 440–41, 443 (1992). The Supreme Court concluded that Wyoming had been sufficiently injured for purposes of Article III standing because the Oklahoma law had already led to decreased coal sales, which, in turn, had decreased Wyoming's tax revenues. *Id.* at 447–48; *see also Air Alliance Hous. v. EPA*, 906 F.3d 1049, 1056–57, 1059–60 (D.C. Cir. 2018) (per curiam) (finding that states had standing to challenge regulations delaying a final Environment Protection Agency rule concerning chemical disasters in light of *prior*, as well as anticipated, expenditures the states had made to prevent such disasters while the final rule was delayed).

Additionally, in *Texas v. United States*, multiple states brought a challenge under the APA against a decision by the Department of Homeland Security to defer enforcement of the immigration laws against the parents of U.S. citizens and Lawful Permanent Residents. 787 F.3d 733, 743–44 (5th Cir. 2015), *affirmed by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). The Fifth Circuit agreed with the district court that Texas had sufficiently demonstrated that it had Article III standing because the program, which would have gone into effect but for the preliminary injunction entered by the district court, *see id.* at 745–46, would require the state to incur the cost of issuing driver's licenses to program beneficiaries, *id.*

35

at 748; *see also id.* at 749 ("Texas's forced choice between incurring costs and changing its laws is an injury because those laws exist for the administration of a state program, not to challenge federal law, and Texas did not enact them merely to create standing."); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 50, 59–60 (2d Cir. 2020) (finding that states had established standing to challenge an agency rule "setting out a new . . . interpretation of a . . . provision of [U.S.] immigration law that renders inadmissible to the United States any non-citizen who is likely to become a 'public charge'" where the states alleged "they [were] injured because the [r]ule [would] cause many of their residents to forgo use of public benefits programs, thereby decreasing federal transfer payments to the states, reducing Medicaid revenue, increasing overall healthcare costs, and causing general economic harm" and the agency itself had anticipated a decrease in public benefits enrollment).

Plainly, the instant case presents an entirely different situation. It is clear that, contrary to its cited cases, *see Wyoming v. Oklahoma*, 502 U.S. at 447–48 (finding that the state-plaintiff had already suffered a financial loss); *Air Alliance Hous.*, 906 F.3d at 1059–60 (same), DFS has yet to lose out on any revenue acquired through its assessments as a result of the Fintech Charter Decision because the OCC has

36

not received, let alone approved, an application for an SPNB charter from a non-depository fintech within DFS's jurisdiction. Moreover, unlike *Texas v. United States*, where the challenged immigration program would have certainly gone into effect absent the states-plaintiffs' APA challenge and thereby forced Texas to incur the costs of issuing driver's licenses, 787 F.3d at 745–46, the OCC may never grant an SPNB charter to a non-depository fintech currently subject to DFS assessments and, in fact, has yet to even receive a formal application.

In short, DFS asks this Court to determine—in the absence of an actual or imminent harm, or a sufficiently "substantial risk" of harm—whether the NBA unambiguously requires that fintechs accept deposits in order to be eligible for an SPNB charter. The standing requirement under Article III of the U.S. Constitution forecloses consideration of such a request at this time. Accordingly, because DFS failed to adequately allege that it has Article III standing to bring its APA claims against the OCC, those claims must be dismissed without prejudice.

## III.  Constitutional & Prudential Ripeness

The OCC also separately asserts that DFS's APA claims are neither constitutionally nor prudentially ripe for judicial review because the OCC has merely announced that it would begin accepting applications for SPNB charters

from non-depository fintechs, and has not received, or granted, such an application. We hold, in the alternative, that constitutional ripeness considerations require dismissal of this case for lack of subject matter jurisdiction. Because we hold that constitutional considerations mandate dismissal, we need not reach the OCC's argument that DFS's claims are prudentially unripe.

In the administrative context, the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). "'Ripeness' is a term that has been used to describe two overlapping threshold criteria for the exercise of a federal court's jurisdiction." *Simmonds v. INS*, 326 F.3d 351, 356–57 (2d Cir. 2003). In particular, this doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808 (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). Thus,

we refer to the former aspect of the doctrine as "constitutional ripeness" and the latter aspect as "prudential ripeness." *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 109–10 (2d Cir. 2013); *Simmonds*, 326 F.3d at 357 ("These two forms of ripeness are not coextensive in purpose.").

"Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary" in that it "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Simmonds*, 326 F.3d at 357; *accord In re MTBE Prods. Liab. Litig.*, 725 F.3d at 110 ("The doctrine of constitutional ripeness prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." (internal quotation marks omitted)); *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 232 (2d Cir. 2020). Crucially, the doctrine of constitutional ripeness "overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 110 (quoting *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 226 (2d Cir. 2008)); *accord Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("Often, the best way to think of

constitutional ripeness is as a specific application of the actual injury aspect of Article III standing."); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (explaining that "standing and ripeness boil down to the same question" in cases where "the party seeking declaratory relief is himself preventing the complained-of injury from occurring"); *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006) ("Because [defendant's] ripeness arguments concern only [the] shared requirement" that "the [alleged] injury be imminent rather than conjectural or hypothetical, . . . it follows that our analysis of [defendant's] standing challenge applies equally and interchangeably to its ripeness challenge."), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211 (2011).[19]

Accordingly, for substantially the same reasons set forth above with respect to Article III standing, we hold that DFS's APA claims are not constitutionally ripe.

---

[19] To be sure, the doctrines of standing and ripeness serve separate and distinct purposes. *See Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.*, 492 F.3d 89, 111 (2d Cir. 2007) (Leval, J., concurring) ("Standing, in its fundamental aspect, focuses on the party seeking to get his complaint before a federal court and whether that party suffers a sufficiently direct and concrete injury to be heard in complaint. By contrast, the fundamental concern of ripeness is whether *at the time* of the litigation the issues in the case are fit for judicial decision." (citation and internal quotation marks omitted)). We simply reemphasize that, where, as here, the justiciability inquiry focuses on whether an alleged injury is "imminent rather than conjectural or hypothetical," the two doctrines "overlap[]." *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 110.

In particular, we reiterate that, even if non-depository fintechs have engaged in preliminary discussions with the OCC regarding (or submitted draft applications for) SPNB charters, DFS is still asking us to "entangl[e] [ourselves] in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 110 (internal quotation marks omitted).

## IV.  Merits

Having determined that DFS lacks Article III standing, and that its claims are not constitutionally ripe, we lack jurisdiction to decide the remaining issues on appeal.  Specifically, we do not address the district court's holding, on the merits, that the "business of banking" under the NBA unambiguously requires the receipt of deposits, nor whether that holding warrants setting aside Section 5.20(e)(1)(i) nationwide with respect to non-depository fintechs applying for SPNB charters. In reversing the amended judgment, we express no view on the district court's determinations regarding these issues.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the amended judgment and **REMAND** to the district court with instructions to enter a judgment of dismissal without prejudice.

19-4271
*Lacewell v. Office of the Comptroller of the Currency*

# Appendix A

## Filings by *Amici Curiae*[1]

BRIEF OF PROFESSOR DAVID ZARING AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS (Jeffrey S. Bucholtz, J.C. Boggs, Amy R. Upshaw (King & Spalding LLP, Washington, DC), David Zaring (University of Pennsylvania, Philadelphia, PA)).

BRIEF OF THIRTY-THREE BANKING LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF APPELLEE (Daniel R. Walfish (Walfish & Fissell PLLC, New York, NY)).

BRIEF OF *AMICUS CURIAE* CONFERENCE OF STATE BANK SUPERVISORS IN SUPPORT OF APPELLEE AND AFFIRMANCE (Michael Townsley (Conference of State Bank Supervisors, Washington, DC), Jennifer Ancona Semko, Graham R. Cronogue (Baker McKenzie, Washington, DC)).

BRIEF OF NATIONAL ASSOCIATION OF CONSUMER CREDIT ADMINISTRATORS AND AMERICAN CONFERENCE OF UNIFORM CONSUMER CREDIT CODE STATES AS *AMICI CURIAE* IN SUPPORT OF APPELLEE (Zachary D.A. Hingst (Iowa Division of Banking, Des Moines, IA)).

*AMICUS CURIAE* BRIEF OF THE CENTER FOR RESPONSIBLE LENDING, NATIONAL CONSUMER LAW CENTER AND NATIONAL COMMUNITY REINVESTMENT COALITION IN SUPPORT OF APPELLEE (Stuart Rossman (National Consumer Law Center, Boston, MA), Bradley H. Blower (National Community Reinvestment Coalition, Washington, DC), Lauren Saunders (National Consumer Law Center, Washington, DC), William R. Corbett, Yvette Garcia Missri (Center for Responsible Lending, Durham, NC)).

BRIEF FOR INDEPENDENT COMMUNITY BANKERS OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE (Keith Bradley, Darin Smith (Squire Patton Boggs (US) LLP, Denver, CO)).

---

A True Copy
Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

[1] None of the *Amici Curiae* listed herein participated in oral argument.